Case No. 25-3163

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MARC WOLSTENHOLME,

*Plaintiff-Appellant,*

v.

RIOT GAMES, INC.,

*Defendant-Appellee.*

---

## APPELLANT'S REPLY BRIEF TO RIOT GAMES' DKT 14

## DATED 28TH JULY 2025

---

Appeal from the United States District Court For The Central District

Marc Wolstenholme

5 Shetland Close

Coventry, England CV5 7LS

Tel: 044-782-796-4404

Email: marc@mwwolf-fiction.co.uk

August 6th, 2025

Clerk of the Court

United States Court of Appeals for the Ninth Circuit

95 Seventh Street

San Francisco, CA 94103

**TABLE OF CONTENTS**

| Section | Title | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTIONAL STATEMENT | 2 |
| III. | STANDARD OF REVIEW | 2 |
| IV. | SUMMARY OF ARGUMENT | 3 |
| V. | ARGUMENT | 5 |
| A. | Riot's Arguments Rely on Procedural Mischaracterizations | 5 |
| B. | Timeline is Verified by Riot's Own Publications and Public Record | 8 |
| C. | Riot's Prior Statements Contradict Their Own Evidence | 10 |
| D. | Riot's Whistleblower Contradictions and Alleged Data Destruction Raise Legal Concerns | 13 |
| E. | Riot Forge Portal Submission System Proves Access | 15 |
| F. | Plaintiff's Work Was Circulated Through Agencies That Link to Writers and Cast | 17 |
| G. | Coordinated Industry Access and Nexus of Control Demonstrated | 19 |
| H. | Obstruction of Discovery and Procedural Bullying Are Structural Violations | 22 |
| I. | Legal and Precedential Concerns Justify Reversal | 25 |
| VI. | CONCLUSION | 27 |
| VII. | CERTIFICATE OF COMPLIANCE | 28 |
| VIII. | CERTIFICATE OF SERVICE | 29 |
| IX. | EXHIBIT INDEX | 30 |
| X. | SUPPORTING EXCERPTS | 32 |
| XI. | DECLARATION | 34 |

# TABLE OF AUTHORITIES

## Cases

- *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010)
- *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)
- *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)
- *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)
- *Erickson v. Pardus*, 551 U.S. 89 (2007)
- *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)
- *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)
- *Wilborn v. Escalderon*, 789 F.2d 1328 (9th Cir. 1986)
- *Agyeman v. Corr. Corp. of Am.*, 390 F.3d 1101 (9th Cir. 2004)
- *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)

## Statutes and Rules

- **28 U.S.C. § 1915(e)(1)** – Appointment of Counsel
- **Federal Rules of Appellate Procedure Rule 10(e)** – Modification or supplementation of the record on appeal
- **Federal Rule of Civil Procedure 12(b)(6)** – Motion to Dismiss
- **Federal Rule of Civil Procedure 37(e)** – Sanctions for failure to preserve electronically stored information

## Other Authorities

- *Lumen Database* (for DMCA transparency and archive suppression documentation)
- *Internet Archive / Wayback Machine* (evidence of web content and deletions)
- *Plaintiff's Declaration dated April 25, 2025 (Dkt. 14.3)*

## I.  INTRODUCTION

Plaintiff-Appellant Marc Wolstenholme respectfully submits this Reply Brief to address and rebut the arguments raised by Riot Games, Inc. ("Riot") in their Answering Brief filed on July 28, 2025 (Dkt. 14). Riot's selective use of excerpts omits the broader evidentiary context, particularly surrounding Plaintiff's allegations of procedural abuse and evidence suppression. By focusing narrowly on tone and surface structure of gaslighting rather than the substance of the claims, Riot seeks to reframe this litigation as something it is not. This approach misleads the Court and avoids engaging with the underlying pattern of access, coordination, and post-submission development now corroborated by Riot's own public materials. Every event in season 1 of Arcane can be stripped down and shown to be a direct "Swipe N Gripe" and "Mix N Match" of Bloodborg, less for the final rocket scene. Season 2 hasn't yet been officially analysed, but it is abundantly clear that it follows the same pattern of infringement.

Riot's own Art Book publication (Exhibit A), submitted after prior court action, now validates Plaintiff's original timeline and undermines Riot's narrative of independent development and claims that all writing and production concluded and were locked in, in 2019 (Exhibit B).

Riot also misled the court by submitting selectively archived Wayback Machine evidence during confidential settlement processes to imply the Riot Forge portal never accepted submissions (Exhibit C). This directly contradicts public archives, firsthand declarations, and documentation. The Plaintiff-Appellant submits video evidence showing that the Riot Forge portal did accept full manuscript submissions from 2019 onwards (Exhibit D).

Furthermore, Riot's attempt to dismiss Appellant's broader concerns as "conspiratorial" is both legally and ethically indefensible. It reflects a strategic effort to discredit the Appellant by mischaracterizing legitimate and evidence-based allegations as irrational, rather than responding to them on the merits, which of course is both an ad hominem and a straw man logical fallacy. This approach seeks to obscure the material facts, point at the Plaintiff's disability and evade accountability for coordinated acts of intellectual property misappropriation and wider crimes, which when paired with the nature of the Plaintiff's disability, is wholly discriminatory.

The wider abuse of the M.W. Wolf catalogue is clearly captured in the charts in Exhibit E which documents a consistent pattern: submissions were made to Curtis Brown Group (CBG) both before and after its merger alignment with United Talent Agency (UTA), followed by a subsequent derivative release.

These release patterns are not isolated but systemic, each involving interconnected avenues of production and income, heavily featuring talent, cast, creators, and executives linked to CBG and UTA during their merger period (Exhibit E).

This coordinated relationship is especially evident in the case of Arcane where at least two of the executive producers were represented by or had close relationships with UTA. As shown in the attached materials, Appellant's submission of Bloodborg to CBG preceded the mid-2020 redevelopment and distribution arrangement between Riot Games and Netflix.

Moreover, several whistleblowers concerns also corroborate these timelines (to be filed under seal). This, along with hundreds of animators CV's and numerous public statements, and evidence including Riot's own documentary, show that Riot has lied about timelines to the court and has actively attempted to deceive the court, the public and the Plaintiff about development timelines and the true ownership of the source material used to build Arcane, get the show greenlit and to secure a distribution deal with Netflix, all in mid-2020 after the show failed many times and directly after receiving Bloodborg (Exhibit F & Excerpts).

While the systemic pattern argument is strong, courts are wary of broad conspiracy narratives. Yet it's used here to validate the "Access" pipeline and to show that such a clear and endemic misuse of one persons IP (M.W. Wolf) by the same literary conglomerate (CBG/UTA) during the period of their merger (2019-2022) and continued thereafter, and consistently mis-sold as original, cannot be coincidence, it's a clear and evidenced pattern of IP abuse.

This case (Arcane) is tied tightly to plausible enterprise conduct. However the Plaintiff again emphasizes that the timeline, agency overlap, thousands of striking similarities and direct submissions as the factual backbone.

Plaintiff, as a pro se disabled litigant, seeks fair process, not special treatment. Riot's brief illustrates a strategic pattern of procedural bullying and evidentiary manipulation, warranting reconsideration, criminal investigations and the reopening of discovery.

## II. RIOT'S RELIANCE ON "FORFEITURE" IS PROCEDURAL GAMESMANSHIP

Riot claims Plaintiff forfeited his right to challenge dismissal because the Opening Brief did not cite specific legal standards. This fails under Erickson v. Pardus, 551 U.S. 89 (2007), which requires liberal construction of pro se filings. Riot's forfeiture claim is a procedural trap to avoid substantive scrutiny, not a valid defence.

The Opening Brief clearly set forth:
- Copyright infringement
- Improper early dismissal
- Submission records to CBG and UTA
- Retaliatory conduct and psychological harm
- Fraud on the court
- Spoliation of evidence
- Broader systemic concerns
- New evidence (Art Book / Tips / Fraud on the court / Ext)

Reducing these to a formatting error weaponizes procedural imbalance. This is evasion, not rebuttal. Riot does not dispute the submission timeline or evidence trail; they urge the court to disregard them on technicalities. This is not about fairness or justice, but strategic evasion.

1. The Opening Brief Raised Legal Standards and Preserved Issues

It explicitly cited legal standards and precedent:
• Erickson v. Pardus, 551 U.S. 89 (2007) – liberal pro se pleading
• Hebbe v. Pliler, 627 F.3d 338 (9th Cir. 2010) – Rule 12(b)(6)
• Leon v. IDX Systems, 464 F.3d 951 (9th Cir. 2006) – spoliation
• Skidmore v. Led Zeppelin, 952 F.3d 1051 (9th Cir. 2020) – substantial similarity

2. The Opening Brief Cited Rule 12(b)(6) and Fed. R. Civ. P. 26

6

The Plaintiff–Appellant raised:
- Premature dismissal without discovery
- Improper denial of ADA and pro se accommodations
- Spoliation and misleading Wayback evidence
- Timeline fabrications and whistleblower reports
- Copyright infringement and substantial similarity
- Access through Curtis Brown, UTA, Riot Forge
- Retaliatory suppression of submissions
- Additional withheld evidence

The Plaintiff also identified issues for de novo review:

- Discovery denial – abuse of discretion
- Dismissal under Rule 12(b)(6) – de novo
- Bias and ADA issues – due process and abuse of discretion

This Framing Meets the Legal Threshold

- Pro se briefs are construed liberally (Erickson)
- Legal theories were clearly articulated
- Riot is misusing forfeiture to avoid accountability

This is procedural gamesmanship. Courts must not punish pro se litigants for form when substance is evident.

7

### III. PLAINTIFF'S TIMELINE IS CONFIRMED BY RIOT'S OWN ART BOOK AND MANY OTHER AVENUES OF EVIDENCE.

Defendant Riot Games dismisses Plaintiff's submission timeline as speculative. However, Riot's own publication, The Art and Making of Arcane, confirms that substantial narrative revision, redevelopment and a shift in direction of the Arcane series took place in mid-2020, after Plaintiff submitted Bloodborg and associated material to CBG and Riot Forge.

This publication, along with Riot's documentary, their own back scheduled planner, tens of public statements, and CVs of hundreds of Fortiche animators, directly contradict Riot's prior assertions that all narrative work was completed by 2019. In 2021, The Plaintiff was informed by Riot's legal team that the writing and production of Arcane concluded in late 2019. This assertion is now demonstrably false. Riot's own Art Book, whistleblower disclosures, and public-facing materials confirm that major narrative rewrites, casting, and production changes occurred well into mid-to-late 2020, and ongoing throughout season 2 of Arcane, after Plaintiff's documented submissions of Bloodborg and related works.

These deliberate misrepresentations caused years of instability, legal confusion, and emotional distress. They impeded Plaintiff's ability to properly investigate or assert his claims, and they formed the basis for multiple adverse procedural outcomes. Such conduct, when paired with threats of crippling legal fees and disproportionate procedural defences, violates foundational principles of fair dealing and constitutes bad faith litigation conduct. These actions, and indeed the continued pattern of procedural bullying and chilled access to the court, amount to retaliation for protected activity (filing a legal claim), and procedural suppression intended to dissuade pro se litigants from asserting their rights.

In federal litigation, parties are bound by duties of candour and good faith under both Federal Rule of Civil Procedure 11(b) and the Court's inherent equitable powers (see Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991)). False or misleading factual assertions, particularly when used to avoid discovery or forestall litigation, may constitute fraud on the court (Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944)) and justify sanctions, reconsideration, or equitable relief. Moreover, As the court will see, the deceitfulness and blatant disrespect for the court and the law did not stop there.

Riot's reliance on a knowingly false timeline, combined with its pattern of procedural suppression, undermines the integrity of the litigation process and the truth-seeking function of the judiciary. Plaintiff respectfully requests the Court recognize this pattern, reject Riot's mischaracterizations, and preserve Plaintiff's right to a full and fair adjudication on the merits.

Plaintiff has submitted corroborating evidence showing that Arcane underwent a major rework in mid-2020, following the Plaintiff's submission of Bloodborg and predating the public announcement of the CBG–UTA agency partnership, which facilitated Riot's solicited manuscripts, a monopoly of casting and writers, Arcane's greenlight and Netflix distribution deal. This timeline is consistent with public casting announcements and internal production reports.

Arcane would not have been made, if they didn't have the Bloodborg manuscript. Abundance of evidence, including promotional material, public statements, and Whistleblower confirmation, show that Arcane scripts before the mid-2020 rewrite was centred in Bilgewater with *"2 of the unused 3d modèles are from Twisted Fate and Graves."* Only after receipt of the manuscript did the scripts and direction change to centring the story around the Zaun-Piltover conflict (identical to Bloodborg) and Jinx's trauma, alleged to have been taken directly from the Plaintiff's real life trauma writing.

See Section (Whistleblower Evidence) for further details on Riot's internal rewrite confirmation and data suppression efforts. Following these events, Riot Games allegedly used DMCA tools to purge digital archive content relevant to the original Riot Forge submission portal.

The court was informed via sealed evidence, never reviewed, that insider whistleblower evidence (13 May 2025) shows that in January and February 2025, during litigation, Riot destroyed critical evidence using a Paris and Montreal based company called Chronodisk to wipe evidence "to "Secure" (read: to scrap) everything" and ship the "overclocked" computers that the Fortiche French team used during 2019/2020 to build Arcane to their Fortiche Spain division (Las Palmas), which was opened in October 2020, along with the Fortiche Montpellier studio, long after Riot had access to the Bloodborg manuscript. Whistleblower evidence suggests that the Las Palmas location is strategic to easily evade European data regulations and laws. Assets and data are now reportedly being relocated to NetEase (China based) cloud servers.

"Showrunner" Alex Yee confirmed in Riot's own publication (Bridging the Rift) that during the period in question (2020) they were soliciting manuscripts and writers and that Amanda Overton (writer and co-executive producer) came with manuscripts, which we have now confirmed was from UTA, more specifically agent Abby Glusker of UTA.

Jane Chung Hoffacker, 2022 Winner Primetime Emmy for Executive Producer of Arcane, confirms that during this period, they were soliciting and reading manuscripts. Jane Chung has now distanced herself from Arcane. On her resume, Arcane isn't named, it's skirted around. And during this interview: https://www.youtube.com/watch?v=GtvWmaqSPuM&ab_channel=JustinGary

Jane Chung Hoffacker, further distances herself, alluding to herself as just a runner, after litigations were brought against Riot Games for the violations of the Plaintiff's trauma writing in Bloodborg.

These actions, reflect a systematic effort to obscure the true timeline and suppress traceable submission metadata.

Taken together, these facts support the inference that Riot had access to Plaintiff's work, materially revised Arcane thereafter, and subsequently took active measures to erase or conceal evidence of access. Riot's own publications now contradict the version of events presented to the Court and support Plaintiff's right to discovery.

## IV.    FRAUD ON THE COURT AND SPOLIATION

Riot allegedly fabricated timelines, falsely claimed scripts were locked by mid-2019, and ambushed the Plaintiff during a confidential settlement hearing with disputed Wayback Machine screenshots which are fabricated to look as though they show that submissions were impossible which is demonstrably untrue but accepted on face value, without rebuttal, by the Settlement Conference Magistrate Judge. It can be demonstrated that purging of wayback and internet archive evidence is now taking place.

The Plaintiff-Appellant submits video evidence that the Riot Forge Submission portal was not limited to 150 words or characters which Riot claimed on ambush via Magistrate Judge Brianna Fuller Mircheff. The video demonstrates that there was no word count, and that the whole of Bloodborg: The Harvest (340 pages) can be submitted via this portal.

The court was informed that insider whistleblower evidence (13 May 2025) shows Riot destroyed critical evidence using a Paris and Montreal based company called Chronodisk.

### 1, About Chronodisk

Chronodisk is a verified digital recovery and data forensics company with facilities in:

• Central Paris, including a laboratory and clean room

• Montreal, Canada, at 841 Cherrier Street, Montreal (QC) H2L 1H6

They are a known provider of professional data recovery and wiping services, which adds credibility to the sender's claims of data manipulation and digital suppression.

### 2, Supporting Context

The email also refers to allegedly falsified internal communications between key Arcane creative figures (including Christian Linke, Alex Yee, and Jane Hoffacker) containing final scripts for Arcane Season 1 and early materials for

Season 2. These emails are dated August 2018, January 2019, and possibly mid-2019, and are allegedly being prepared for use as fabricated "proof" in U.S. court filings.

**3, Website Traffic Before the Email**

Immediately prior to receiving the message (12/05/ 2025), The Plaintiff-Appellant observed a notable surge in activity on his personal website, originating from:

France (Paris region)- Fortiche and Chronodisk locations

France Montpellier- Fortiche

Hong Kong and Singapore - Tencent Location

Mainland China (Shenzhen) - Tencent location

Montreal, Canada (a city shared by Chronodisk's headquarters and Tencent-owned studios), with a hit 1.4 Km away from Tencent-owned studios and 3 Km from Chronodisk.

North London England, (Hendon, Barnet)- seems to always visit following events in these cases and is the location of a key conspirator of CBG Jonny Geller. Many of these visits have been traced to East Finchley, many with the recurring IP address of 31.94.34.229.

These visits appear to correlate with strategic monitoring and align with regions associated with Fortiche, Tencent, and Riot Games, as well as Chronodisk locations.

**4, The alleged related crimes here:**

Fabrication of legal evidence

Destruction of digital records

Use of falsified timelines and lies to influence the outcome of litigation

Failed to honour multiple litigation hold notices.

**5, Implications.**

Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944)

Fraud on the court includes intentional acts that prevent the judicial system from functioning fairly.

Chambers v. NASCO, Inc., 501 U.S. 32 (1991)

Courts have inherent power to sanction abuse, including suppression of evidence.

Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003)

Spoliation of electronic records can justify discovery sanctions and evidentiary inferences.

These alleged acts, including fabrication of legal evidence, spoliation of digital records, and misrepresentation of submission protocols, strike at the heart of judicial integrity. Several of these issues were not fully known to the Plaintiff or the Court at the time of dismissal and only came to light after further whistleblower testimony and forensic review of Riot's representations.

To ignore such potential misconduct without inquiry contradicts the purpose of justice. As courts have held, when a party destroys evidence in bad faith, that act is evidence of guilt (Nationwide Life Ins. Co. v. Richards, 541 F.3d 903, 911 (9th Cir. 2008)). The Court retains the inherent authority to investigate and sanction fraud upon the court (Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944)), particularly when discovery suppression and evidentiary tampering may have affected the outcome.

One cannot dismiss the plausibility of a criminal act, whether in the context of murder or litigation fraud, simply because the full details remain obscured. In a criminal investigation, if law enforcement receives credible leads, they are required to pursue them. They may not discard a potential suspect or key witness solely because too much time has passed or proof is incomplete. Although not yet officially in the criminal domain, the same guiding principle must apply here.

13

Where whistleblower accounts, preserved screenshots, and manipulated public records suggest fraud or misconduct in the handling of submissions and litigation and cooperate each other to paint a clear pattern of criminal activity in a court case, the Court must preserve the right to investigate. These are not speculative grievances. They are allegations of deliberate deception that require evidentiary inquiry, not procedural dismissal.

---

## V.    PLAUSIBLE ALLEGATIONS OF ACCESS AND COORDINATION

Plaintiff's allegations not only satisfy but clearly exceed the pleading standard established under Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), which require that a complaint contain "enough facts to state a claim to relief that is plausible on its face." The Court does not demand discovery-level proof at this stage, but rather well-pled facts that support a reasonable inference of access, copying, or coordination. Those elements are present here.

1, Documented Submission and Active Submission Portal

Plaintiff submitted a full-length narrative manuscript through the Riot Forge developer portal in April 2020. Video evidence, screenshots, contemporaneous metadata, and a 2023 support ticket from Riot Games confirm that the portal allowed long-form narrative uploads during this window.

2, Submission Date Aligns with Riot's Restructuring of Arcane

According to Riot's Art Book and Bridging the Rift, Arcane underwent a narrative "re-scope" in mid-2020. This included shifting the show's core narrative to focus on the Piltover-Zaun conflict, an axis that mirrors key elements of the Plaintiff's submitted manuscript. These changes occurred after

14

the Plaintiff's submission, directly contradicting prior claims by Riot's legal team that the production was locked in late 2019.

3, Agency Overlap and Shared Industry Channels

The Arcane writers (including Amanda Overton) and at least six cast members (e.g., Hailee Steinfeld, Ella Purnell, Kevin Alejandro, Katie Leung) were, at the time, represented by either United Talent Agency (UTA) or Curtis Brown Group (CBG). CBG directly received Plaintiff's submission during this same period. These overlapping industry affiliations support an inference of enterprise-like coordination.

4, Legal Precedent on Intermediary Access

As held in Arista Records, LLC v. Doe 3, 604 F.3d 110, 118–19 (2d Cir. 2010), a plaintiff may establish access at the pleading stage by showing submission to a shared intermediary. This threshold is satisfied here: CBG acted as both a submission recipient and a representation agent to multiple individuals later involved in the development of Arcane. Under this standard, Plaintiff's access claims are not speculative but plausibly inferred and well supported.

5, Refusal to Engage in Discovery on Access

Riot has repeatedly avoided questions of access, refused to produce relevant server logs, portal records, or communications from CBG and UTA. The Plaintiff has been procedurally stonewalled from substantiating these claims further. Yet even absent discovery, the combination of (a) direct submission, (b) aligned development timelines, (c) overlapping agency connections, and (d) post-submission restructuring of the infringing work supports a strong presumption of access under the law.

Plaintiff respectfully asserts that these facts, when viewed collectively, meet and surpass the plausibility threshold required to proceed beyond dismissal. To argue otherwise is to apply an evidentiary burden incompatible with Rule 8 or prevailing case law.

## VI. PLAINTIFF HAS PLAUSIBLY ALLEGED A NEXUS OF ACCESS AND ENTERPRISE ACTIVITY DESPITE BEING DENIED DISCOVERY

The Supreme Court has made clear that plaintiffs are not required to prove the full scope of a conspiracy or misconduct at the pleading stage, only to allege facts that, if true, would plausibly support their claims. (Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); Ashcroft v. Iqbal, 556 U.S. 662 (2009); Swierkiewicz v. Sorema, 534 U.S. 506 (2002)). Plaintiff's allegations satisfy this standard and support a compelling inference of access, coordination, and enterprise misconduct involving Riot Games, Curtis Brown Group (CBG), United Talent Agency (UTA), and Netflix.

1, Plausibility of Nexus Without Discovery

While Plaintiff lacks subpoena power, server access, and discovery rights, the Federal Rules do not require documentary proof at this stage. As the Second Circuit confirmed in Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 2010), access may be inferred where a work was submitted to an intermediary shared by both parties. Here, CBG received Plaintiff's manuscript in early 2020. Multiple writers and cast members associated with Arcane are represented by either UTA or CBG, and Riot's own Art Book confirms Arcane was narratively revised shortly thereafter.

2, Defence Tactics Rely on Procedure, Not Merits

Defendants have consistently refused to address the material substance of the claims, including the submission record, the timeline of narrative redevelopment, and industry links. Instead, they have relied on procedural suppression: vague denials, shifting dismissal theories, and a refusal to engage in discovery regarding authorship, access, or agency coordination.

This conduct creates a prejudicial asymmetry. The court's prior dismissal assumed a level of evidentiary access the Plaintiff never had. Meanwhile, the defence has continued to suppress access to internal development logs, communications with agencies, and other documents central to authorship and timeline claims.

3, Pattern of Coordination and Quid Pro Quo

Plaintiff has shown that the main credited writer/ Executive Editor of Arcane, Amanda Overton, is represented by UTA. At least six cast members also share representation through UTA or CBG including the top five roles and the seventh top role in terms of screentime. These six have over half the screen time of the show between them. The Curtis Brown Group received Plaintiff's submissions in the same period that Netflix greenlit Arcane. Within months, the show was publicly restructured, and its content mirrored core story and world-building elements from Plaintiff's manuscript.

This pattern of IP submission followed by production coordination and representation-based benefit creates a clear inference of quid pro quo: intellectual property in exchange for production credit and agency participation. That inference, on top of this copyright claim, supports a plausible RICO enterprise pattern, including predicate acts of wire fraud, mail fraud, and misappropriation.

4, Whistleblower Evidence and Spoliation of Public Records

Whistleblower evidence further supports the Plaintiff's timeline, indicating that Arcane was materially reworked in mid-2020. These accounts were later corroborated by Riot's own publications. Despite this, Defendants misled the court by asserting that all writing and production was completed in 2019, a claim now demonstrably false. Moreover, Riot has actively purged digital archives and may have engaged in targeted server destruction through Fortiche and Chronodisk, as confirmed by witness accounts. Others also attended SREcon-EMEA 2022 where Riot presented slide 18 of the Mid-2020 rework.

5, Procedural Bullying Undermines Equal Access to Justice

It is inherently anti-competitive, and constitutionally suspect, to suggest that a pro se litigant must produce internal submission routing records between a talent agency and a private game studio before surviving dismissal. To accept that standard would be to immunize large-scale coordinated misappropriation by embedding it within closed industry pipelines shielded from judicial scrutiny.

Plaintiff cannot reasonably be expected to match the legal machinery of a multinational corporate defence team. The procedural expectations placed upon them have become a tool of structural suppression, not fair adjudication.

This is not a good-faith defence of the merits, but a deliberate exploitation of process to avoid the substance of the claims. It should not be permitted to stand unchallenged.

6, Plaintiff Has Preserved the Right to Discovery and Relief

All told, the Plaintiff has provided a detailed, plausible, and factually supported narrative of access, redevelopment, and attribution redirection. He has also

presented evidence that Defendants have withheld or destroyed materials central to those claims. Under established pleading standards and due process principles, this is more than sufficient to entitle Plaintiff to discovery and appellate relief.

The Plaintiff is going to make mistakes, he isn't trained in any area of law, is from the UK, has dyslexia, has complex PTSD and is facing daily death, bomb, and stab threats, hacking, harassment and abuse from Riot's unhealthy community. Under these conditions, it is impossible for the plaintiff to be able to spot all of Riot Games's deceitful traps, technicalities, manipulations and fraudulent practices without fair and honest discovery and Jury trial.

## VII.  SYSTEMIC PATTERN OF ACCESS, DERIVATION, AND MONETIZATION VIA CBG, UTA, AND NETFLIX

Plaintiff's allegations are not isolated. The submission of Bloodborg to Curtis Brown Group (CBG) in 2020 fits a larger, documentable pattern in which:

- Plaintiff submitted long-form works to CBG;
- CBG rejected the works or did not respond, but derivative properties appeared thereafter;
- The derivative works featured CBG/UTA clients as writers, cast, or producers;
- Six of the eight investigated examples were subsequently released on Netflix.

This pattern supports Plaintiff's access theory: submissions to CBG provided a conduit to UTA-affiliated projects, a path confirmed by overlapping talent, mirrored themes, and synchronized production timelines. The appearance of Arcane on Netflix, featuring UTA-linked showrunners and CBG-linked voice talent, falls squarely within this pattern.

The consistent appearance of derivative narratives restructured stories, and agency-linked talent following submission to a single literary agency is not

coincidental, it reflects a pipeline of access, attribution suppression, and unjust enrichment.

This is precisely the kind of pattern that courts have recognized as satisfying the plausibility standard for conspiracy and enterprise coordination. See Twombly, Iqbal, Swierkiewicz, and Arista Records, LLC v. Doe 3.

---

## VIII.   SUPPRESSION OF DISCOVERY AND EVIDENCE

Riot refused to engage in Rule 26 disclosures, declined meet-and-confer transparency, and relied on sealed submissions to introduce misleading Wayback evidence. Riot's use of a selectively framed archive during settlement proceedings constitutes bad faith and potential fraud on the court, as defined by *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944).

Plaintiff submitted Bloodborg through Riot Forge using the exact submission portal Riot now claims did not accept submissions. Riot's own Wayback evidence includes a developer submission form, proving their assertions false. The spoliation of archival records, now skipping from 2019 to 2025, supports Plaintiff's position that Riot tampered with digital records which is consistent with publicly known facts that Riot Games has a history of swiping IP and sabotaging their victims, and hiring hackers, such as Greg "Ghostcrawler" Street to steal IP and hide the evidence, sometimes using DMCA takedowns or threats towards vulnerable individual creatives.

### 1, The Plaintiff Alleges Courtroom Misconduct

The Plaintiff has demonstrated the grounds to state that Riot:

Misrepresented the function of their portal

Presented misleading evidence during a judicial settlement process

Withheld rebuttal context (e.g., video evidence and 2023 receipt offered in rebuttal).

**2, Pattern of Stonewalling and Bad Faith**

Plaintiff's many Meet and Confer attempts, and chart of evidence shows:

Repeated refusal to engage in Rule 26 disclosures.

Editing and manipulation of Rule 26 (J) joint report after the Plaintiff has already called them out on these behaviours.

Refusal to produce internal server records, portals, and attachments.

Denial of active submission routes, despite archive evidence and the portal only being made for submissions.

Riot citing "settlement confidentiality" to evade follow-up, which is recorded at the end of the Settlement conference during the section where the Magistrate Judge attempted to book in unsafe discovery.

Gaslighting during Meet and Confer attempts including gleeful denial and refusal to condemn the ongoing daily abuse and harassment of the Plaintiff via Riot's control and fostered cult-like unhealthy community.

Endless and provable lies, motions, technicalities, threats, requests for crippling bonds, and diversions orchestrated to suppress, overwhelm, pressure and intimidate the plaintiff and to evade lawful outcomes on their merits.

This is consistent with procedural manipulation and prejudicial use of sealed proceedings to suppress rebuttal and obscure discovery paths.


**3, Legal Implications Asserted**

Misleading the Court During a Settlement Conference can constitute:

Fraud on the court (Hazel-Atlas Glass)

Sanctionable conduct under Rule 11 or 37(c)

Grounds for reconsideration or discovery reopening

## IX.   ENTERPRISE COORDINATION AND RICO PATTERN

Plaintiff's concurrently submitted RICO materials detail a coordinated pattern of IP laundering and access suppression, supported by agency overlap, economic benefit, and strategic talent placement.

Arcane's writers and performers were selected from a talent pool directly linked to the agencies that received Plaintiff's work. There is a plausible quid pro quo: submissions were redirected through agency channels and monetized via creative repackaging.

## X.   EMOTIONAL AND PSYCHOLOGICAL HARM

Riot minimizes the emotional harm caused by its conduct. Plaintiff alleges not isolated harm, but a sustained campaign of stonewalling, gaslighting, daily hate mail campaign, financial hardship caused and reputational sabotage that directly exploited his vulnerabilities as a disabled creator.

The psychological distress is exacerbated by the imbalance of power and denial of discovery. The totality of this conduct satisfies the outrage threshold, particularly in light of Plaintiff's ADA-protected disabilities.

## XI.   GUIDING PRINCIPLES OF U.S. LAW SUPPORT APPELLANT'S RIGHT TO BE HEARD

The Appellant respectfully submits that the present appeal must be evaluated not only under procedural technicalities, but in light of the foundational legal doctrines that define the American justice system. These principles, enshrined in the U.S. Constitution, federal case law, and long-standing judicial values, require that the Court afford a full and fair opportunity for a pro se litigant to develop claims of copyright infringement, misappropriation, and coordinated enterprise activity under RICO.

1, Constitutional Supremacy and Due Process

The Fifth and Fourteenth Amendments to the U.S. Constitution guarantee that no person shall be deprived of life, liberty, or property without due process of law. Dismissing the Appellant's complaint without discovery, while accepting unchallenged evidence presented during settlement, violates this principle. Appellant was denied the opportunity to test critical facts through fair legal process, including access, attribution, and development timelines.

2, Equal Protection and Disability Equity

Under the Equal Protection Clause, litigants must be treated equitably, regardless of resources, status, or disability. The Appellant has disclosed that they are a disabled individual with communication and processing challenges. Denying the Appellant discovery, while accepting evidence manipulated by opposing counsel, effectively rewards procedural power over factual truth. This contradicts the Americans with Disabilities Act (ADA) and the spirit of equitable judicial review.

3, The Rule of Law and Pro Se Fairness

The Rule of Law ensures that no party, corporate or individual, is above the law. The Appellant's claim, if true, implicates coordinated misconduct by multiple media entities and their agents. Riot Games' procedural defences have evaded the merits and relied on evidentiary suppression. As held in Erickson v. Pardus, 551 U.S. 89 (2007), pro se pleadings must be "liberally construed" and not held to the standard of legal professionals. Rigid application of forfeiture doctrine to suppress factual allegations undermines this mandate.

4, Democratic Accountability and Public Interest

The Appellant alleges that original creative works were misappropriated and laundered through insider-controlled agencies and platforms without compensation, credit, or recourse, and these behaviours are not isolated but can be shown to be a part of a wider pattern of systemic IP theft and redirection of US markets to eastern control. These allegations, backed by whistleblower accounts, submission records, and timeline confirmations, raise serious public interest concerns about intellectual property theft, anticompetitive behaviour and stability and sabotage of US economic markets. The courts have a duty to permit such claims to be fully and fairly litigated in the interest of democratic transparency and accountability.

5, Access to Justice and Judicial Integrity

The courts exist to provide an accessible and truth-seeking forum for all. The Appellant's submissions are not frivolous, they are substantiated by dated evidence, industry links, public documents, and corroborating materials. The procedural posture of this case has allowed Riot Games to avoid discovery, misrepresent facts, and manipulate settlement records. This offends the foundational premise that "justice must not only be done but must also be seen to be done."

6, Precedent Supports Discovery and Plausibility

Appellant's allegations meet the standard set in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009): factual content must state a plausible claim for relief—not a proven one. Further, as held in Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 2010), access may be inferred from submission to an intermediary, such as a talent agency with direct production links. The Appellant's RICO-based chronology aligns precisely with this doctrine.

## XII. GUIDING PRINCIPLES OF U.S. LAW SUPPORT APPELLANT'S RIGHT TO BE HEARD

The Appellant respectfully submits that this appeal must be considered not only on procedural grounds but in light of foundational U.S. legal principles. These doctrines, rooted in the Constitution, case law, and judicial ethics, require the Court to ensure a fair opportunity for a pro se litigant to develop claims of copyright infringement, misappropriation, and coordinated enterprise activity under RICO.

1. Constitutional Supremacy and Due Process

The Fifth and Fourteenth Amendments guarantee no person shall be deprived of life, liberty, or property without due process. Dismissing Appellant's complaint without discovery, while accepting one-sided evidence from settlement, violates this principle. Appellant was denied the chance to test facts including access and development timelines.

## 2. Equal Protection and Disability Equity

The Equal Protection Clause ensures equity regardless of resources or disability. The Appellant has disclosed disabilities affecting communication and cognition. Denial of discovery, paired with the acceptance of manipulated evidence, rewards procedural power over truth and violates the spirit of the Americans with Disabilities Act (ADA).

## 3. Rule of Law and Pro Se Fairness

The Rule of Law protects all parties equally. The Appellant's allegations, if true, involve systemic misconduct by multiple media entities. Riot's procedural tactics evade scrutiny. As held in Erickson v. Pardus, 551 U.S. 89 (2007), pro se filings must be liberally construed, and rigid forfeiture rules undermine that mandate.

## 4. Democratic Accountability and Public Interest

The Appellant alleges theft of original works through insider-controlled agencies and platforms, without credit or compensation, a pattern that endangers U.S. creative industries. These claims, supported by evidence and whistleblower accounts, raise pressing public interest concerns requiring full judicial examination.

## 5. Access to Justice and Judicial Integrity

Courts must remain accessible forums for truth. The Appellant's claims are substantiated by dated records, industry connections, and public data. Riot Games has used this procedural posture to evade discovery and distort facts. This undermines the principle that "justice must not only be done but must be seen to be done."

6. Precedent Supports Discovery and Plausibility

Appellant meets the Twombly, 550 U.S. 544 (2007) and Iqbal, 556 U.S. 662 (2009) plausibility standard. In Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 2010), courts held that access may be inferred from submissions to intermediaries. The Appellant's timeline aligns with this precedent.

---

## XIII.    REQUEST FOR RELIEF AND FAIR PROCESS

Plaintiff seeks equitable judicial relief to overcome Riot's procedural suppression and to restore the integrity of this litigation. Specifically, Plaintiff respectfully requests:

1. Reversal of the district court's dismissal

2. Reinstatement of discovery rights

3. Sanctions for evidentiary misconduct

4. Appointment of counsel under 28 U.S.C. § 1915(e)(1)

5. A finding that pro se litigants are entitled to a meaningful opportunity to develop the record

6. Riot Games and its conspirators to face criminal scrutiny

Specific judicial findings or clarifications regarding:

7. The authenticity and accuracy of Riot's claimed development timelines

8. The functionality of the Riot Forge submission portal at the time of submission

9. The legitimacy of Riot's evidentiary representations during confidential settlement proceedings

10. The pattern of misrepresentation and spoliation across the litigation

11. The plausible chain of access through Curtis Brown Group and United Talent Agency

Plaintiff submits that these findings are necessary to ensure the judicial process has not been circumvented by bad faith conduct and that truth, not procedural evasion, governs the outcome of this case.

## XIV.    SUPPLEMENTAL EVIDENCE

Plaintiff respectfully submits supplemental exhibits referenced in this Reply Brief, which were either:

(a) unavailable during earlier filings due to Riot's refusal to engage in discovery and withholding of key documentation,

(b) publicly released or discovered only after the district court's dismissal, or

(c) excluded from the original record but relevant to correcting misleading representations made by Riot Games.

Plaintiff respectfully requests the Court's permission to admit these materials into the appellate record under Fed. R. App. P. 10(e) as they are essential to clarifying the facts, responding to new claims raised by Appellee in Dkt. 14, such as forfeits, frivolous, timeline, baseless, ext., and preserving Plaintiff's right to a full and fair review of the record.

27

### XV.    Need for Equitable Treatment in the Face of Imbalance

Plaintiff-Appellant is a disabled pro se litigant living in the UK, with limited financial means, suffering hardship directly because of these cases and a period of significant life changes and challenges, and respectfully notes that Riot Games has used its superior resources to overwhelm the record with highly curated filings and procedural posturing. Plaintiff is preparing to come to trial in the US, thus cannot afford legal counsel, professional printing, or administrative support.

To require the same format, citation density, or filing precision from a self-represented individual as from a multinational corporate defendant with unlimited legal support would be inequitable. Plaintiff does not seek special treatment, only equal footing. The court is respectfully asked to consider these structural disadvantages in reviewing the filings and responding to procedural expectations.

Plaintiff also fears making mistakes and facing pressure, anxiety, legal technicalities and the same legal gamesmanship distractions away from the merits of the case, based on the dressing of his words, by Riot Games.

Plaintiff-Appellant respectfully requests relief from the requirement to file multiple paper copies due to financial hardship and pro se status. Appellant is unable to afford reproduction and binding costs on top of preparing for jury trial and respectfully requests the court accept the electronic version as sufficient.

*See 28 U.S.C. § 1915(e)(1); Erickson v. Pardus, 551 U.S. 89 (2007) (pro se pleadings must be liberally construed).*

## XVI. CONCLUSION

Plaintiff, proceeding pro se and disabled, has been subjected to procedural barriers that would be difficult for even represented parties to overcome. Riot Games has exploited these dynamics not to rebut material claims, but to suppress them, relying on legal volume, shifting defences, flip-flop moaning, and misleading evidence to avoid discovery and factual review. Riot's Answering Brief does not substantively refute the core allegations of access, coordination, and concealment. Instead, it leans on forfeiture tactics and evidentiary suppression. Plaintiff urges this Court to restore his opportunity to be heard, grant discovery, and prevent further abuse of process.

## XVII.    CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

This brief contains 6,386 words, excluding the parts of the brief exempted by Rule 32(f), as counted by the word-processing system used to prepare the document.

This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 6th, 2025, in Coventry, United Kingdom.

Signed, *M.WOLSTENHOLME.*

Marc Wolstenholme

Pro Se Appellant

# XVIII. CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2025, I served a true and correct copy of the foregoing document, including all exhibits and attachments, on the following counsel of record by electronic mail.

Aaron Moss

Mitchell Silberberg & Knupp LLP

aaron.moss@msk.com

Dated: August 6, 2025

Respectfully submitted, *M.WOLSTENHOLME.*

Marc Wolstenholme

Pro Se Appellant

# EXHIBIT INDEX

## Exhibit     - Description

Exhibit A - The Art and Making of Arcane – Riot Games Art Book-combined

Exhibit B – 2021 Letter from Riot's Counsel Claiming Arcane's Scripts Were Locked by mid-2019.

Exhibit C – Riot's Misrepresentation of Riot Forge Portal Functionality and Access

Exhibit D- Cover Sheet

Exhibit_D_Riot_Forge_Submission_Video.mp4

Exhibit_D2_Riot_Forge_Submission_Video.mp4

Exhibit E – Patterns of Submission and Derivative Releases via Curtis Brown Group and United Talent Agency

Exhibit F- Timeline Evidence of Post-2020 Development of Arcane

**Supporting Excerpts**

1. Whistleblowers & Public Statements

"The Plaintiff alleges that he is concerned over this pattern of lies and theft and deceit, and use and manipulation of vulnerable people, given the wider concerns at Riot Games and their expansion."

— Complaint as One, Dkt. 58 at 920–921, Page ID #2882–2883

2. Animator CVs (Timeline Reconstruction)

"With 250 to 300 animators, it is calculated at… Arcane could have completed animation by mid to late 2021… many characters were reused with a little touch up and I alleged that some designs were taken from external IP… but of course, my manuscript mostly."

— Dkt. 58 at 727, Page ID #2689

3. Inconsistencies from Riot's Own Documentary and Cast Statements

"Cast comments show ongoing development during recording in 2020–21... Writers Christian Linke, Alex Yee, and Amanda Overton only actively contributed to the main Arcane show between 2020–21, despite claims of a much longer creative process."

— Dkt. 58 at 605–606, Page ID #2567–2568

4. Backdating & Misrepresentation Allegations

"Melinda Dilger was the real unsung showrunner of Arcane. I believe she began working on Arcane in May 2020 and ran with it... Riot Games didn't have an efficient pipeline. Fortiche had their hands full figuring it out."

— Dkt. 58 at 648, Page ID #2610

5. Greenlight Post-Submission

"The majority of staff were brought in from mid-2020 onward… COVID-19 lockdown restrictions align more accurately with when much of the writing, animation, and voice recording took place, suggesting Arcane was not in development for six years as claimed, but instead came together rapidly after mid-2020."

— Dkt. 58 at 834–835, Page ID #2796–2797

6. Cast and Representation Overlap (UTA/CBG)

"Five of these characters represented by UTA and Curtis Brown Group received significantly more screen time than most, with Steinfeld, Purnell and Leung being the top three… That's the top five roles in Arcane, cast by the same conglomerate… Moreover, Jason Spisak, as Silco, represented by UTA, is joint 7th for most screen time."

— Dkt. 58 at 58–59, Page ID #2020–2021

7. Collaboration and Acquisition Motives

"A massive deal such as Arcane, with Riot Games… populated with multiple talent from both agencies… is an effective strategy to make both agencies and their assets valued high at the time of sale, to convince major stakeholders to agree to the buyout deals."

— Dkt. 58 at 60, Page ID #2022

8. Submission Confirmation and Portal Capacity

"The court was informed that insider whistleblower evidence (13 May 2025) shows Riot destroyed critical evidence… and shipped the 'overclocked' computers… to their Fortiche Spain division… long after Riot had access to the Bloodborg manuscript."

— Dkt. 58 at 921, Page ID #2883

## 9. Amanda Overton's Manuscript Linkage

"Showrunner Alex Yee confirmed in Riot's own publication (Bridging the Rift) that during the period in question (2020) they were soliciting manuscripts and writers… which we have now confirmed was from UTA, more specifically agent Abby Glusker of UTA."

— Dkt. 58 at 921–922, Page ID #2883–2884

## 10. Industry Pattern – Bloodborg as Central Work

"Arcane would not have been made, if they didn't have the Bloodborg manuscript… scripts before the mid-2020 rewrite… were centred in Bilgewater… Only after receipt of the manuscript did the scripts and direction change to centring the story around the Zaun-Piltover conflict (identical to Bloodborg)."

— Dkt. 58 at 921, Page ID #2883

## 11. Coordination and Netflix Deal Timeline

"Arcane underwent a major rework in mid-2020, following the Plaintiff's submission of Bloodborg… predating the public announcement of the CBG– UTA agency partnership, which facilitated Riot's solicited manuscripts, a monopoly of casting and writers, Arcane's greenlight and Netflix distribution deal."

— Dkt. 58 at 921, Page ID #2883

## 12, Whistleblower Email and Allegations of Fabrication:

"The anonymous message alleges that a company called Chronodisk was engaged by associates of the Defendants to 'scrub' computer systems at Fortiche's Paris-based headquarters during February 2025… fabricated internal emails dated August 2018, January 2019, and potentially mid-2019… will be presented by Defendants as authentic proof of independent development of Arcane… The date of the emails is real. The content is not."

— Dkt. 138 at 4–5, Page ID #4885–4886 (Filed Under Seal)

**Declaration**

I, Marc Wolstenholme, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 6th, 2025, in Coventry, United Kingdom.

Signed,    *M.WOLSTENHOLME.*

Marc Wolstenholme

Pro Se Appellant