# Exhibit B – 2021 Riot Games Solicitor Letter Claiming Scripts Were Locked by mid-2019

---

**Plaintiff's Supporting Statement:**

The 2021 Riot Games Solicitor Letter Claiming Scripts Were Locked by mid-2019 is attached as a PDF, at the end of this PDF along with screenshots and the letter retyped Verbatim. This exhibit includes multiple forms of supporting material to ensure clarity and authenticity. Specifically, the following are included in Exhibit B:

1. Exhibit B Overview
2. The Email letter as it was sent in Dec 2021.
3. Screenshot of the email.
4. Timeline Conflicts and Misstatements in Riot's Response (Fabrications)
5. Coercive Threats, Harm, and Denial of Access to Justice
6. Follow-Up Communication That Reinforced Intimidation and Obstructed Justice
7. Conclusion: A Pattern of Misrepresentation and Coercive Threats
8. Legal Section: Grounds for Judicial Concern and Action
9. PDF print format of The 2021 Riot Games Solicitor Letter.

These materials are presented together to ensure fidelity of the timeline and content, and to affirm the Plaintiff's representation of Riot Games' demonstrable fabrications to evade lawful outcomes.

0

## 1. Exhibit B Overview

Document Title:

Letter from Greenberg Glusker LLP (on behalf of Riot Games) to Marc Wolstenholme, 2021.

Purpose in Case:

This letter is central to Riot's legal defence and is now contradicted by Riot's own later disclosures. The letter asserts that "The scripts for the final episodes were completed by mid-2019."

This claim was repeated throughout the case to suggest that Plaintiff's 2020 submission of Bloodborg could not have influenced Arcane. However, Riot's own Art Book, documentary footage, and public interviews now confirm significant production activity in 2020–2021.

Moreover, the Plaintiff will identify and document at least thirteen materially false or misleading statements within the 2021 letter from Riot's counsel. These misrepresentations appear intended to obscure the true development timeline of Arcane, deny the Plaintiff's rightful attribution, and strategically evade legal accountability. Each of these claims will be directly addressed and rebutted through supplemental evidence and sworn declarations.

Relevance:

This exhibit undermines Riot's credibility by showing:

False timeline assertions made under colour of legal representation.

Misrepresentation of the development chronology to suppress discovery and deflect claims of access or derivation.

Evidence that contradicts Riot's sworn position and validates Plaintiff's access and timeline claims.

Exhibit B – 2021 Letter from Riot's Counsel Claiming Arcane's Scripts Were Locked by Mid-2019

1

## 2. The Email letter as it was sent in Dec 2021.

**Moss, Aaron**
From:amoss@greenbergglusker.com
To:Marc Wolstenholme
Cc:Geller, Joshua
Wed, 1 Dec 2021 at 03:06
Mr Wolstenholme,

To be clear: Riot did not purchase or otherwise acquire any manuscripts from Austin Macaulay Publishers, Maximilian Ximenez, Sandra Dijkstra And Associates, Image comics or any other third party. Aside from the fact that your assertions are the type of sheer speculation and conjecture that cannot support a claim of access under the U.S. Copyright Act as a matter of law, the timeline indicated in your email demonstrates beyond any doubt that Riot simply could not have used your Manuscript to create "Arcane."

The "Arcane" story was conceived by Riot beginning in 2016. Production-ready scripts of the first three episodes were completed in 2018. The scripts for the final episodes were completed by mid-2019. In other words, at the time you contend your manuscript was likely obtained (i.e., after Friday, September 18, 2020), all of the written material underlying the "Arcane" program had been long completed. And, as I previously noted, all of the main characters, themes, settings and motifs in Arcane are a decade old.

Frankly, your assertions reflect a fundamental lack of understanding as to how long television production (especially animation) actually takes. It would be physically impossible for Riot to have acquired source material during 2020, created scripts based on that material, and then have that material animated and ready for exhibition by 2021. That's simply not how it works. Even you concede that the *earliest* Riot could have accessed your material was at the end of 2019, which is already *after* the date that all of the scripts for "Arcane" had been completed and locked for production.

If required to do so in a court of law, Riot can easily corroborate these timelines, given the hundreds if not thousands of people who were involved in the production of its series. And to be clear, if you were to proceed with this matter in court, Riot would vigorously defend itself and, upon prevailing, would seek its attorneys' fees and other available sanctions against you. There will be no mediation, out of court settlement, or bestowed credit at any time. Rather than continue to send emails, I strongly suggest that you speak with competent

2

U.S. copyright counsel who can properly explain the law to you as well as the risks you take by moving forward. All of Riot's rights and remedies are, of course, reserved.

Sincerely,
Aaron J. Moss


**Aaron J. Moss**
Attorney at Law
Biography
310.785.6814 Direct
amoss@greenbergglusker.com

**Greenberg Glusker LLP**
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
**GreenbergGlusker.com**


### 3. Screenshot of the email.



3

### 4. Timeline Conflicts and Misstatements in Riot's Response (Fabrications)

**Fabrication 1- Manuscript Deception**

*"To be clear: Riot did not purchase or otherwise acquire any manuscripts from Austin Macaulay Publishers, Maximilian Ximenez, Sandra Dijkstra And Associates, Image comics or any other third party."*

*Fabrication 1 – Riot Denied All Manuscript Acquisition*

*Claim (from Riot Legal Letter, Dec. 1, 2021):*

**Why this is misleading or false:**

Both Christian Linke and Alex Yee acknowledged reviewing external narrative submissions in Bridging the Rift, Riot's own behind-the-scenes series.

Moreover, Jane Chung Hoffacker, Executive Producer on Arcane, stated publicly that Riot "reviewed many submitted manuscripts" after restarting development, statements which directly contradict Riot's legal assertions.

(See Plaintiff's Complaint, Exhibit X; Bridging the Rift, Ep. 1–3.)

**Reference:**

- Complaint as One, pp. 1185–1187complaint as one
- Bridging the Rift, Riot Games (2022), Episode 2
- Jane Hoffacker Podcast, Carolina Groppa interview (2023)

4

**Fabrication 2- Law Deception**

*"Aside from the fact that your assertions are the type of sheer speculation and conjecture that cannot support a claim of access under the U.S. Copyright Act as a matter of law."*

Analysis:

This statement is misleading and legally incorrect. It falsely characterizes the Plaintiff's specific, evidentiary claims as "speculation," ignoring both the threshold pleading standard and relevant copyright precedent.

In fact, Plaintiff had cited:

- Submission records to the Curtis Brown Group (CBG), who represent writers and cast involved in Arcane, as well as to others.
- Confirmed timeline inconsistencies, including Riot's own admissions in The Art and Making of Arcane.
- Industry testimony and overlapping representation between Plaintiff's submission targets and Arcane development team members.

These are not speculative. They constitute circumstantial evidence of access, which courts routinely accept under the Copyright Act.

Legal Precedent:

Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 2010):

Circumstantial evidence (e.g., submissions to shared intermediaries) can support an inference of access without direct proof. Plaintiff meets that standard.

Swierkiewicz v. Sorema, 534 U.S. 506 (2002):

A complaint must only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Plaintiff's filings exceed this bar.

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007):

5

The standard is plausibility — not certainty. Riot's misstatement implies a higher burden than what the law actually requires.

Rentmeester v. Nike, Inc., 883 F.3d 1111 (9th Cir. 2018):

Clarifies that factual overlap and access can support a copyright claim even in absence of direct admission.

Conclusion:

Riot's claim that Plaintiff's assertions are "speculative" is both legally and factually unsupported. It is a fabrication designed to dismiss substantial evidence of access, without engaging with that evidence on the merits.

## Fabrication 3 – Contradicted by Riot's Own Publications

*"the timeline indicated in your email demonstrates beyond any doubt that Riot simply could not have used your Manuscript to create "Arcane.""*

Analysis:

This is demonstrably false. Riot's assertion ignores Riot's own subsequent disclosures, third-party statements, and Plaintiff's documented submission timeline, all of which refute the notion that development was closed before the Plaintiff's manuscript was available.

Why this is a Fabrication:

Contradicted by Riot's Own Publications

Riot's official Art and Making of Arcane (Exhibit A) admits that producer Melinda Dilger was brought on in 2020 to "help Arcane cross the finish line," long after Riot claims writing was completed in 2019.

Whistleblower Disclosures

Testimonies from insiders (referenced in Plaintiff's Declaration and Brief) confirm that major reworking of the show occurred in mid-2020, including narrative, structure, and production timelines, all after Plaintiff's April 2020 submission of Bloodborg.

LinkedIn Records & Interviews

Melinda Dilger and others confirm that the Arcane pipeline, casting, and even structural production design were still in flux throughout 2020–2021.

Plaintiff's Timeline Was Accurate

The Plaintiff submitted materials to the Curtis Brown Group in April 2020, and Arcane's key story elements, such as the Piltover/Zaun conflict, were only prioritized during mid-2020 narrative revision (confirmed in Riot's Bridging the Rift series).

False Certainty

Riot's claim of "beyond any doubt" is disingenuous. Courts rarely accept such blanket assertions in the face of conflicting evidence. The record now shows almost certainty, not no doubt.

Supporting Legal Standard:

Twombly & Iqbal: At the motion-to-dismiss or pleading stage, the question is not certainty, but whether the Plaintiff has plausibly alleged a claim that can be proven through discovery.

Plausibility ≠ Proof: The Court is not to weigh evidence but to determine whether the claim could, if true, support relief. Riot's insistence on certainty at this stage is legally improper.

7

Conclusion:

Riot's claim that the timeline "beyond any doubt" rules out use of Plaintiff's manuscript is itself a false statement of fact and law. The timeline is actively in dispute, and Riot's own public admissions now corroborate the Plaintiff's submission and access narrative.

**Fabrication 4 - Public Statements by Key Creators Refute This Claim.**

"The Arcane story was conceived by Riot beginning in 2016."

Analysis:

This claim is misleading and contradicted by Riot's own conduct, public records, and admissions. While Riot may have explored animated content related to League of Legends as early as 2016, the specific story and narrative structure of Arcane, including its characters, tone, and thematic content, was not conceived or finalized in 2016.

Why This Is a Fabrication:

"Arcane" as a Concept Was Still Undefined in 2016–2018

Internal and external materials show Riot was exploring unspecified animation projects, not a locked narrative. The idea of doing "something animated" based on LoL champions (especially Jinx and Vi) arose after the success of the Get Jinxed music video by Fortiche in 2013.

Public Statements by Key Creators Refute This Claim

In Riot's Bridging the Rift documentary, Christian Linke, Jane Chung Hoffacker, and Melinda Dilger all describe major structural and story revisions between 2019–2021.

Melinda Dilger confirmed (on the Life with Caca podcast) that the production lacked a clear pipeline, and her work from 2020 onward involved building the entire LA infrastructure, casting, and narrative structuring, none of which would have been necessary had the show been fully conceived in 2016.

Solicitations Continue Well Into 2020

Riot was still seeking narrative content, talent, and manuscript submissions in late 2019 and early 2020, including through:

The Riot Forge portal accepting story submissions (Exhibit X)

Public blog posts inviting pitches from external creators

Direct representation links between Riot/Arcane writers and Curtis Brown Group (CBG), with CBG actively soliciting and submitting content, including the Plaintiff's Bloodborg manuscript.

Contradiction with Riot's Art Book and Timelines

Riot's Art and Making of Arcane states that Melinda Dilger was hired in 2020 to help the show "cross the finish line," implying the story was far from complete.

Significant creative decisions (e.g., focusing on Piltover/Zaun conflict) were made during the mid-2020 narrative revision phase, well after 2016.

Legal and Procedural Context:

Riot's assertion attempts to preclude any possible inference of access or copying by falsely anchoring Arcane's creation to a distant past.

Courts have recognized that a vague early idea does not constitute completed authorship or defence against subsequent access and influence (see Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49).

Conclusion:

9

Riot's claim that Arcane's story was "conceived" in 2016 is a strategic misrepresentation intended to evade the Plaintiff's access timeline. The record shows that Arcane's narrative evolved over years and was actively restructured during and after the Plaintiff's 2020 submission. This fabrication is central to Riot's attempt to suppress evidence of misappropriation.

**Fabrication 5- "Be Less Shitty!" shows a narrative re-scope.**

*"Production-ready scripts of the first three episodes were completed in 2018."*

Analysis:

This claim is directly contradicted by Riot's own published statements, behind-the-scenes materials, and sworn declarations from production leadership. It misrepresents the actual state of the project before Arcane's full redevelopment beginning in mid-2020.

Why This Is a Fabrication:

Bridging the Rift Documentary Disproves It

Riot's own Bridging the Rift docuseries (2022) shows that the early versions of Arcane were narratively unstructured and incomplete before the hiring of Melinda Dilger and the full redevelopment phase in 2020. In Episode 1, producers and showrunners describe how they had to "start over from the beginning" and "rebuild the pipeline" after years of stagnation and in their words, "Be Less Shitty!"

The Art and Making of Arcane Book Supports the Plaintiff

Riot's own art book, The Art and Making of Arcane (Exhibit A), makes it clear that 2020 was the true narrative turning point, stating that new producers were brought in "to help Arcane cross the finish line." This passage, and others, confirm that much of the final narrative structure was developed after 2020, not before.

No Evidence of Production-Ready Scripts in 2018 Exists

Nowhere in Bridging the Rift, the Art Book, or other public records does Riot produce or reference actual "production-ready scripts" from 2018.

If such scripts existed and matched the final show, they would have been produced in discovery, but Riot has withheld internal development documents and stonewalled all discovery.

Whistleblower and Internal Statements Corroborate the Reboot

Multiple insiders and whistleblower accounts, including those cited in Plaintiff's filings (e.g., Exhibit I), show that the first coherent, greenlit version of Arcane only emerged after 2020, following Plaintiff's submission of Bloodborg and the Curtis Brown Group–UTA merger.

The narrative was still in flux well into 2021, and the show's thematic centre (Piltover-Zaun conflict) was reportedly only locked after a mid-2020 internal reboot.

Legal and Factual Relevance:

The fabricated 2018 script date is a cornerstone of Riot's attempt to sever the timeline of Plaintiff's 2020 submission from Arcane's production.

Courts routinely hold that changing timelines and internal contradictions (especially where timelines are material to defences) justify discovery and weigh against dismissal. (See Bell Atl. Corp. v. Twombly, 550 U.S. 544).

Conclusion:

Riot's claim that the first three scripts were "production-ready" in 2018 is not only unsupported but also flatly contradicted by its own materials and personnel statements. In fact, all credible sources confirm that Arcane's final version, the version that resembles Plaintiff's work, emerged after Riot gained access to Bloodborg through industry intermediaries in 2020.

**Fabrication 6- Can not be true.**

*"The scripts for the final episodes were completed by mid-2019."*

Analysis:

This assertion is not supported by any credible production records and is directly contradicted by Riot's own publications and public statements.

Why This Is False:

- Riot's own documentary series Bridging the Rift reveals that major narrative restructuring occurred after 2019.
- In interviews, creators describe significant changes in story focus, tone, and production organization taking place well into 2020.
- There is no indication that final scripts were locked before 2020.
- The Art and Making of Arcane book indicates that production workflows, casting, narrative focus, and even the animation pipeline were still in development after 2019.
- This includes the hiring of key production staff like Melinda Dilger in 2020, whose role involved organizing and structuring the show from the ground up.
- Plaintiff has submitted multiple whistleblower accounts, podcast interviews, and internal timeline analyses showing that the show's story and structure were still being actively developed and written during 2020 and 2021.
- These include public admissions from producers that key creative decisions, including character arcs and episode scripting, were being finalized during this period.
- Riot has produced no contemporaneous documents, such as drafts, outlines, or timestamped records, confirming that final scripts existed before mid-2019.

If such documentation existed, it would likely have been submitted as part of their Answering Brief. The absence of such evidence weakens their claim significantly.

Legal and Factual Relevance:

The timing of script completion is central to Riot's defence that Arcane was developed independently. The claim that all scripts were finalized by mid-2019 is designed to sever any causal link between the Plaintiff's 2020 submission and the final product. However, the overwhelming body of evidence contradicts this timeline and supports Plaintiff's argument that Riot continued to write and restructure the show after obtaining access to Bloodborg.

Conclusion:

The statement that final episode scripts were completed by mid-2019 is inaccurate and unsupported. It appears crafted to protect a legal narrative rather than reflect actual production history.

**Fabrication 7- Riot's attempt to draw a hard line.**

*"In other words, at the time you contend your manuscript was likely obtained (i.e., after Friday, September 18, 2020), all of the written material underlying the 'Arcane' program had been long completed."*

Analysis:

This statement is demonstrably false based on Riot's own timeline disclosures, public interviews, and behind-the-scenes material.

Why This Is False:

- Riot's own Art Book and Bridging the Rift docuseries clearly show that narrative and production development intensified and underwent restructuring in mid-to-late 2020. This includes:
- The hiring of Melinda Dilger in 2020 to build the production pipeline and team from the ground up.
- Statements in the docuseries confirming that "story breakthroughs" happened during COVID… well into 2020.
- Nowhere in the art book or docuseries is there confirmation that all writing was completed pre-2020.
- Instead, the materials discuss production, writing, and design decisions taking place through 2020 and into 2021.
- Netflix's involvement was not finalized until mid-2020, further undermining the idea that all creative work was finished before the manuscript was submitted.
- If the show's scripts were truly "long completed," there would be no logical reason for structural changes, production staff additions, and character evolution after September 2020.
- Statements by Riot executives conflict with this assertion, including: Amanda Overton's comments about character development and story alignment evolving with the team,
- And Fortiche's ongoing technical and animation work being tied to evolving scripts.

15

Legal and Factual Relevance:

The timing of manuscript access is critical. Riot's attempt to draw a hard line at September 2020 and claim the show was already complete is aimed at dismissing any possibility of infringement. However, their own publications and conduct contradict this assertion. The timing lines up closely with the Plaintiff's April 2020 submission and the show's major redevelopment phase.

Conclusion:

This statement misrepresents the timeline of creative development. It appears calculated to suppress claims of access and borrowing, despite clear evidence that Arcane's writing and structure were still actively evolving after September 2020.

ChatGPT said:

Here's a clean breakdown of Fabrication 8, fully structured for inclusion in your Exhibit B analysis:

**Fabrication 8- Sweeping False and Retconned Claim**

Statement:

*"And, as I previously noted, all of the main characters, themes, settings and motifs in Arcane are a decade old."*

Analysis:

This sweeping claim is demonstrably false and misleading. It compresses numerous factual inaccuracies into a single sentence and misrepresents both the evolution of League of Legends (LoL) canon and the specific creative direction taken by Riot in Arcane.

Why This Is False:

Retconning of Canon Characters and Lore:

Every major character in Arcane was reimagined. Riot publicly described Arcane as a reworking of LoL lore, not a faithful adaptation.

Jinx's trauma backstory, including her childhood loss and psychological break, did not exist in original LoL canon, but matches the plaintiff's writing.

Vi's backstory was vague in the original game lore and is reimagined in Arcane to match the narrative arc found in Plaintiff's Bloodborg manuscript.

Viktor and Warwick are drastically recharacterized. In Arcane, their stories bear striking resemblance to elements in Bloodborg, including the character-turned-creation narrative and themes of mechanical augmentation, both hallmarks of the Plaintiff's M.W. Wolf catalogue. Both of these characters were turned into actual Bloodborgs in season 2.

New Characters Invented Entirely for Arcane:

Mel Medarda and Ambessa Medarda were not present in League of Legends prior to Arcane. These characters were created specifically for the show.

17

Both characters, their archetypes, and backstories appear to draw from Plaintiff's submitted manuscript materials.

Setting Changes and Narrative Re-scope:

The original series was rumoured (and internally discussed) to be set in Bilgewater, a different LoL region. This has been confirmed by whistleblowers, cast members and released pre-2020 development materials.

In mid-2020, Riot pivoted the conflict and setting to Piltover and Zaun, aligning more closely with thematic material in Bloodborg.

These changes were not random, they occurred after the Plaintiff's manuscript submission and following the UTA/CBG deal that brought Arcane into active development with Netflix.

Theme Evolution Confirms Narrative Overhaul:

Riot's Bridging the Rift documentary and Art Book describe a "narrative refocus" during 2020, admitting major creative decisions were still underway post-2019.

Thematically, Arcane shifted toward class warfare, trauma, biotech corruption, and family betrayal, all central pillars in Bloodborg.

Rebuilding of Models and Production Pipeline:

Riot and Fortiche rebuilt the show's 3D assets in mid-2020, indicating the preexisting narrative and production were either discarded or heavily reworked.

Riot's own developers and producers, including whistleblower testimony, acknowledged that the entire pipeline was redesigned under Melinda Dilger's guidance after COVID began and after Plaintiff's submission.

Conclusion:

The statement that Arcane's core creative elements are "a decade old" is factually incorrect and grossly misrepresents both the development history and

18

content evolution of the show. Riot's own materials contradict this assertion. It is one of the clearest instances of retrospective narrative construction aimed at denying access and origin.

**Fabrication 9- Discredit the Plaintiff's timeline with industry generalizations**

*"Frankly, your assertions reflect a fundamental lack of understanding as to how long television production (especially animation) actually takes."*

This is a deliberate misdirection. Riot Games had access to unprecedented production capacity. They spent hundreds of millions of dollars on Arcane, hired more than 500 animators starting in 2020, and opened at least three new animation studios during the redevelopment phase. They also already possessed character animation models from the failed pilots, which were repurposed.

Moreover, Riot Games operates as a global, 22-billion-dollar organization with departments dedicated to art, animation, and creative production around the world. They are not a typical animation studio starting from scratch. Their pre-existing infrastructure, internal pipelines, and extensive labour pool drastically shorten production time compared to the industry average.

Therefore, while animated television projects may take time under normal conditions, Riot's production timeline was accelerated by their scale, resources, and reuse of assets. This is confirmed by Melinda Dilger in Bridging the Rift, when she states that it was a lot to do but Riot were tossing more money at it then anyone else could.

Conclusion

This statement is not just misleading; it is intended to discredit the Plaintiff's timeline with industry generalizations that do not apply to Riot's actual methods or operations.

**Fabrication 10-**

*"It would be physically impossible for Riot to have acquired source material during 2020, created scripts based on that material, and then have that material animated and ready for exhibition by 2021."*

This assertion is directly contradicted by Riot's own publications. In The Art and Making of Arcane (Exhibit A), Riot acknowledges a significant production and narrative restructuring occurring in 2020. This includes the hiring of new executive producer Melinda Dilger in mid-2020 to "cross the finish line" and the creation of a new production pipeline, story rework, and team expansion, all following the timeline of Plaintiff's submission.

Additionally, Riot's Bridging the Rift documentary series confirms that the show's story was re-scoped in 2020, the narrative arc redirected toward the Piltover–Zaun conflict, and animation production surged in that period with newly onboarded studios and staff.

Thus, Riot's own public record acknowledges that a full creative overhaul, production infrastructure setup, and accelerated animation work did, in fact, take place during and after 2020, precisely the timeline Riot's legal counsel now claims is "physically impossible." This statement is not only false, it is disproven by Riot's own evidence and public admissions.

**Fabrication 11- It is when you have the money.**

*"That's simply not how it works.*

**12 Fabrication - Pattern of misrepresentation used to shut down valid claims of access and creative misappropriation.**

*"Even you concede that the earliest Riot could have accessed your material was at the end of 2019, which is already after the date that all of the scripts for 'Arcane' had been completed and locked for production."*

Riot's claim that all scripts were "completed and locked for production" by the end of 2019 is directly contradicted by their own public statements and materials. As shown in The Art and Making of Arcane (Exhibit A), Riot brought in Melinda Dilger in 2020 to overhaul the production pipeline and narrative. Bridging the Rift further confirms that the show underwent a narrative re-scope in 2020, with newly prioritized themes and settings introduced post-2019.

This passage in the legal letter attempts to mischaracterize Plaintiff's position and relies on a provably false production timeline. It is part of a pattern of misrepresentation used to shut down valid claims of access and creative misappropriation.

**Fabrication 13- False in light of their actual conduct during litigation.**

"If required to do so in a court of law, Riot can easily corroborate these timelines, given the hundreds if not thousands of people who were involved in the production of its series."

This is misleading. Riot has in fact been required to do so in court and has not corroborated its timelines. Instead, Riot has evaded discovery, stonewalled factual inquiries, and relied on procedural technicalities to avoid producing

21

evidence. The suggestion that Riot would easily corroborate the development timeline is demonstrably false in light of their actual conduct during litigation.

Moreover, this assertion undermines Riot's own previous claims. If "hundreds if not thousands" of people were involved in the production of Arcane, then the show's development timeline should be faster, not slower. Riot's reliance on long development timelines, often framed as a defence against copying, is inconsistent with the scope of its manpower and funding. Fortiche, the original animation partner, was a small French studio before Arcane and has since grown substantially under Riot's control, now reportedly operating multiple studios with long-term exclusive rights to develop Arcane-related content.

Additionally, the Plaintiff has collected hundreds of public CVs, LinkedIn profiles, and production credits showing that a large number of animators, artists, and producers were hired en masse beginning in 2020, coinciding directly with the Plaintiff's submission and the mid-2020 narrative and production overhaul confirmed by Riot's own Art Book and Bridging the Rift documentary.

This statement is thus not only untrue in practice but also self-contradictory when compared to Riot's other defences.

### 5. Coercive Threats, Harm, and Denial of Access to Justice

Statement:

*"And to be clear, if you were to proceed with this matter in court, Riot would vigorously defend itself and, upon prevailing, would seek its attorneys' fees and other available sanctions against you. There will be no mediation, out of court settlement, or bestowed credit at any time. Rather than continue to send emails, I strongly suggest that you speak with competent U.S. copyright counsel who can properly explain the law to you as well as the risks you take by moving forward. All of Riot's rights and remedies are, of course, reserved."*

The closing paragraph of Riot Games' 2021 email response constitutes an improper and coercive threat against a disabled and unrepresented litigant. The assertion that Riot would seek attorney's fees and sanctions "at any time", combined with a categorical refusal of mediation or settlement, was not made in good faith but appears aimed at intimidating the Plaintiff into silence.

Such conduct contravenes both the spirit and the letter of access-to-justice principles enshrined in U.S. law. Particularly disturbing is Riot's insistence that Plaintiff must seek counsel "who can properly explain the law," as if to suggest the Plaintiff is not entitled to self-representation or the protections afforded to pro se litigants under federal rules. The implication is clear: pursue this claim and suffer personal and financial retaliation.

This threat caused tangible harm. It led to prolonged delay in the pursuit of this action due to a period of sustained stress, cognitive distress, and medical hardship that compounded the Plaintiff's pre-existing disabilities. The damage caused by this communication was not abstract, it materially obstructed the Plaintiff's ability to seek justice and contributed to several lost years of litigation opportunity. It should be viewed by the Court not only as relevant context but as further evidence of Riot's bad-faith litigation posture and suppression-by-intimidation tactics.

23

### 6. Follow-Up Communication That Reinforced Intimidation and Obstructed Justice

Following Riot Games' initial letter threatening the Plaintiff with sanctions and attorney's fees for seeking legal redress, their legal counsel, Mr. Aaron Moss of Greenberg Glusker, sent a brief message on December 8, 2021, stating:

*"As we've stated previously and repeatedly, your purported claims are meritless. The assertions in your latest correspondence are patently false on every count and do not warrant any more detailed response than this. Having put you on clear notice of Riot's position, we consider this matter closed."*

This message, sent to an unrepresented and disabled litigant, exemplifies procedural hostility and abuse of power. No meaningful legal analysis is offered. Instead, Riot's legal counsel summarily rejects the Plaintiff's assertions without consideration or evidence, reinforcing the prior coercive tone. By declaring the matter "closed," the firm presents an illusion of finality intended to deter the Plaintiff from pursuing his rights in court.

The effect of this correspondence was substantial: it led the Plaintiff to believe that legal action was futile, further delaying the filing of a complaint, and inflicting unnecessary emotional and cognitive harm. The Plaintiff submits this message as further evidence of obstruction, psychological intimidation, and denial of equal access to justice in violation of both ethical obligations and the rights of disabled litigants under federal law.

24

### 7. Conclusion: A Pattern of Misrepresentation and Coercive Threats

The 2021 legal letter from Riot Games (Exhibit B), along with the December 8 follow-up communication, embodies a pattern of strategic misinformation, procedural coercion, and abuse of legal authority. Virtually every key assertion in the letter, from the claim that all scripts were "locked" in 2019, to the suggestion that the Plaintiff's claims are meritless, speculative, or legally impossible, has now been contradicted by Riot's own public disclosures, whistleblower accounts, and internal records.

Instead of addressing the Plaintiff's detailed submissions and timeline evidence in good faith, Riot's legal counsel issued sweeping denials followed by threats of sanctions and attorney's fees. These threats were not only inaccurate in substance, but also knowingly directed at a disabled and unrepresented litigant, contributing to years of trauma, confusion, and delay in pursuit of rightful legal redress.

Each fabrication, now disproven by Riot's own Art Book, documentary series, public interviews, and production hiring records, must be understood not as isolated inaccuracies, but as part of a systemic effort to mislead, discourage, and suppress a vulnerable litigant's claims.

When a Plaintiff discloses that they are in the midst of severe trauma and operating without legal representation due to disability and financial hardship, responses of this nature, layered with falsehoods, dismissals, and veiled threats, should not be treated as standard legal posturing. They constitute coercion, obstruction, and potentially sanctionable conduct.

These come after the November 28, 2021, letter from the same attorneys Arron Moss and Joss Geller. In this letter they wrote:

*"I note that you have stated in your correspondence that you do not want the stress of having to fight for years over your supposed copyright claims. Because your allegations of infringement are entirely misguided and based on a*

25

*serious misunderstanding of copyright law, I urge you to follow your own advice and not waste any more of your energy pursuing these meritless allegations.”*

Thus, there really is no defence for acting like this against me during the worse period of my life. They cannot claim they didn't know or that they didn't understand the severity of their actions and lies.

To better understand this dark period, please see, Dkt 43, PRELIMINARY NOTICE OF DAMAGES FOR THE FORTHCOMING - PLAINTIFF'S MOTION FOR DAMAGES EVALUATION AND SUMMARY OF RELIEF SOUGHT.

### 8.  Legal Section: Grounds for Judicial Concern and Action

Coercive Litigation Tactics and Ethical Violations

The language in the 2021 Riot Games letter and follow-up email raises serious concerns under the Model Rules of Professional Conduct (Rule 4.4 – "Respect for Rights of Third Persons"), which prohibits attorneys from using legal process to intimidate or harass unrepresented individuals. The Court should take notice of the disparity in power and access to counsel and recognize that these communications likely contributed to material delay and obstruction of justice.

Violation of Disability and Access-to-Justice Principles

The Plaintiff's disclosed cognitive and psychological vulnerabilities, compounded by PTSD and learning differences,  warrant reasonable accommodation under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. The denial of access to justice via intimidation, particularly when aimed at a self-disclosed disabled litigant, implicates these protections and violates the principle of equal access.

Fabrications as Evidence of Bad Faith and Spoliation Risk

At least thirteen materially false or misleading statements were made in the course of Riot's December 1, 2021 communication. These statements were not opinions, but factual assertions about timelines, production history, and script development. As such, they may constitute fraud on the court if knowingly false and used to suppress litigation (Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944)).

Furthermore, Riot's unwillingness to produce records in discovery, despite asserting that "thousands" of people could corroborate their timeline, should be understood as strategic noncooperation, justifying limited discovery or

27

evidentiary inference under Rule 37(e) of the Federal Rules of Civil Procedure (spoliation).

Judicial Imperative to Investigate Before Dismissing Serious Allegations

Just as a homicide investigation cannot dismiss a lead without investigation, civil courts must not dismiss a credible, evidence-backed claim of IP misappropriation, coordinated misconduct, and fraud simply due to resource imbalances or procedural obfuscation. This case implicates broader public concerns around access to justice, disability accommodation, and the responsibility of global media companies to litigate ethically and transparently.

### 9. DECLARATION OF MARC WOLSTENHOLME REGARDING RIOT GAMES' 2021 LEGAL CORRESPONDENCE

I, Marc Wolstenholme, declare as follows:

I am the Plaintiff-Appellant in this matter and make this declaration based on personal knowledge unless otherwise indicated.

On December 1, 2021, I received a legal letter from Riot Games' attorneys at Greenberg Glusker, which included numerous factual assertions concerning the development timeline of Arcane, and the alleged impossibility of any use of my submitted manuscript, Bloodborg.

This letter, as well as the follow-up email dated December 8, 2021, contained at least thirteen (13) provable misrepresentations. These misstatements include false claims about the timeline of script completion, the nature and origin of characters and themes in Arcane, and the impossibility of adaptation or overlap with my work.

Subsequent public evidence, including Riot Games' own Art and Making of Arcane book, the Bridging the Rift documentary series, statements by producers and animators, whistleblower disclosures, and numerous CVs, contradicts nearly every material assertion in Riot's legal correspondence.

Additionally, the letter issued direct threats of legal sanctions and attorney's fees if I continued pursuing my claims. These threats were issued despite my clearly stated status as an unrepresented, disabled litigant navigating extreme personal trauma.

The coercive and dismissive nature of these communications, made in bad faith and steeped in misinformation, contributed to severe psychological distress,

29

delay in pursuing litigation, and confusion about my legal rights. I believed, incorrectly, that my claims could not proceed due to the power, unethical practice and reach of the opposing party.

I respectfully request that the Court take judicial notice of these documents and the surrounding circumstances and recognize the serious ethical and procedural concerns raised by Riot Games' conduct in the early stages of this dispute.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 6th day of August 2025

Coventry, England

Signed: *M.WOLSTENHOLME.*

Marc Wolstenholme

**10. PDF print format of the 2021 Riot Games Solicitor Letter.**

01/08/2025, 22:21 (No new emails) – marc.wolstenholme@yahoo.co.uk – Yahoo Mail

Find messages, documents, photos or people    Advanced ⌄                                    Home

Compose

Inbox
Unread
Starred
Drafts                    479
Sent
Archive
Spam
Deleted Items
⌃ Less

Views            Hide
🖼 Photos
📄 Documents
📧 Subscriptions
✈ Travel

Folders          Hide
＋ New folder
Book Submissions
Bulk Mail
Child Maintenance S...
harassments BS
M.W. Wolf Stuff
N
Notes
reporting abuse    299
saved              14
Wind-up Dolls

← Back   📤  📤  ➡   🗄 Archive   📁 Move   🗑 Delete   🚫 Spam          👤  📅  📝  ❓        ⚙

amoss@greenbergglusker.com
**To:** Marc Wolstenholme
**Cc:** Geller, Joshua

AD

Mr Wolstenholme,

To be clear: Riot did not purchase or otherwise acquire any manuscripts from Austin Macaulay Publishers, Maximilian Ximenez, Sandra Dijkstra And Associates, Image comics or any other third party.  Aside from the fact that  your assertions are the type of sheer speculation and conjecture that cannot support a claim of access under the U.S. Copyright Act as a matter of law, the timeline indicated in your email demonstrates beyond any doubt that Riot simply could not have used your Manuscript to create "Arcane."

The "Arcane" story was conceived by Riot beginning in 2016.  Production-ready scripts of the first three episodes were completed in 2018. The scripts for the final episodes were completed by mid-2019.  In other words, at the time you contend your manuscript was likely obtained (i.e., after Friday, September 18, 2020), all of the written material underlying the "Arcane" program had been long completed.  And, as I previously noted, all of the main characters, themes, settings and motifs in Arcane are a decade old.

Frankly, your assertions reflect a fundamental lack of understanding as to how long television production (especially animation) actually takes.  It would be physically impossible for Riot to have acquired source material during 2020, created scripts based on that material, and then have that material animated and ready for exhibition by 2021.  That's simply not how it works.  Even you concede that the _earliest_ Riot could have accessed your material was at the end of 2019, which is already _after_ the date that all of the scripts for "Arcane" had been completed and locked for production.

If required to do so in a court of law, Riot can easily corroborate these timelines, given the hundreds if not thousands of people who were involved in the production of its series.  And to be clear, if you were to proceed with this matter in court, Riot would vigorously defend itself and, upon prevailing, would seek its attorneys' fees and other available sanctions against you.  There will be no mediation, out of court settlement, or bestowed credit at any time.  Rather than continue to send emails, I strongly suggest that you speak with competent U.S. copyright counsel who can properly explain the law to you as well as the risks you take by moving forward.  All of Riot's rights and remedies are, of course, reserved.

Sincerely,
Aaron J. Moss

;