Case No. 25-3163

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MARC WOLSTENHOLME,

*Plaintiff-Appellant,*

v.

RIOT GAMES, INC.,

*Defendant-Appellee.*

---

**EXHIBIT A**

**SCHEDULE OF DOCUMENTED CONTRADICTIONS, MISREPRESENTATIONS, OBSTRUCTION, HARASSMENT, DIGITAL INTERFERENCE, AND RESULTING PREJUDICE**

---

Appeal from the United States District Court For The Central District

Marc Wolstenholme

5 Shetland Close

Coventry, England CV5 7LS

Tel: 044-782-796-4404

Email: marc@mwwolf-fiction.co.uk

August 6th, 2025

Clerk of the Court

United States Court of Appeals for the Ninth Circuit

95 Seventh Street

San Francisco, CA 9410

I, Marc Wolstenholme, Appellant, submit this Exhibit A as a consolidated schedule of matters that, taken together, demonstrate a sustained pattern of contradiction, misrepresentation, stonewalling, evidentiary distortion, harassment, digital interference, and resulting prejudice. I submit that these matters are not isolated disagreements over interpretation. Rather, they reflect a broader course of conduct that has made fair and timely adjudication increasingly difficult, has impaired the integrity of the record, and has caused me serious emotional distress and a continuing sense of abuse through lies, evasion, gaslighting, and procedural bullying.

I do not ask the Court, through this exhibit alone, to make final criminal findings on every disputed matter. I do respectfully submit, however, that the pattern documented below is serious enough that it should not be treated as ordinary adversarial litigation conduct. At minimum, it warrants close judicial scrutiny, caution as to Riot's factual representations, preservation of all remaining evidence, and consideration of whether referral to appropriate authorities may be warranted.

## I. Core timeline contradiction

### 1. Riot advanced a fixed 2019 completion narrative that is contradicted by later Riot-origin materials.

Riot's 2021 solicitor letter stated that production-ready scripts of the first three episodes were completed in 2018 and that the scripts for the final episodes were completed by mid-2019. Riot further asserted that by the time my manuscript could have been obtained, all written material underlying *Arcane* had already long been completed. See Exhibit B of Dkt 14.

That position is materially undermined by Riot's own later *Art and Making of Arcane* materials, which state that Riot hired producer Melinda Dilger in 2020, that she devised the Los Angeles production pipeline at that time, and that Riot secured the Netflix distribution deal around that same period. See Exhibit A of Dkt 14..

My post-2020 timeline exhibit further compiles cast, production, and animation evidence showing substantial continuing work during 2020 and after. See Exhibit F of Dkt 14..

**Why this matters:** Riot's rigid 2019 timeline was used to defeat access and derivation arguments before the underlying facts were properly tested through discovery.

## 2. Riot presented certainty where the record was contested and evolving.

Riot's 2021 solicitor letter stated, in substance, that Riot simply could not have used my manuscript and that the issue was beyond doubt. See Exhibit B.

That certainty is incompatible with Riot's own later public-facing materials, which indicate continuing development activity, further production structuring, and post-2019 evolution. See Exhibit A and Exhibit F.

**Why this matters:** Riot used categorical factual certainty to pressure abandonment of the claim against a disadvantaged and disabled litigant in person, having been informed of the litigants brain injury, PTSD and period of extreme difficulty and hardship, and to shape the procedural posture of the case before meaningful factual testing occurred.

## II. Misrepresentation and stonewalling on manuscript review, access, and agency routes

## 3. Riot's position on manuscript solicitation and review is contradicted by Riot-linked public statements

I submit that Riot's litigation posture minimized or denied the practical significance of outside manuscript solicitation and review, while other materials point in the opposite direction. My Complaint, Second Amended Complaint materials, and related declarations state that Riot Forge received unsolicited story submissions and that manuscript solicitation and review were confirmed in *Bridging the Rift* and by Jane Chung Hoffacker. See Complaint, Opening Brief, and supporting declarations previously filed in the district court and on appeal.

My Reply Brief to Riot Games' Dkt. 14 further states that Alex Yee confirmed in Riot's own *Bridging the Rift* materials that, during the relevant 2020 period, Riot was soliciting manuscripts and writers, and that Amanda Overton came with manuscripts through UTA. I also rely on materials stating that Jane Chung Hoffacker confirmed that Riot was soliciting and reading manuscripts during the relevant period. See Appellant's Reply Brief to Riot Games' Dkt. 14, dated August 6, 2025.

**Why this matters:** Whether Riot personnel reviewed outside manuscripts goes directly to access, chronology, and plausibility. It should not have been obscured through selective characterization.

### 4. Riot was deceptive about Christian Linke's role in reviewing or receiving external narrative material

I submit that Riot sought to present a narrower picture of what was reviewed, by whom, and when than is supported by Riot's own public-facing materials and later disclosures. My position is that Riot's treatment of Christian Linke's role in reviewing manuscripts or external story material was misleading and designed to suppress the access issue. See Appellant's Reply Brief to Riot Games' Dkt. 14, dated August 6, 2025, and supporting excerpts.

**Why this matters:** Linke's role is central to the development and authorship narrative Riot advanced to the Court and the public.

### 5. Riot understated or obscured the practical significance of UTA and Curtis Brown Group relationships

I submit that Riot's litigation position did not candidly engage with the significance of United Talent Agency and Curtis Brown Group as intermediary access routes. My materials show submissions to Curtis Brown Group, the overlap period with UTA, and a monopoly of representation links involving Arcane cast and writer Amanda Overton. See Exhibit E.

Exhibit E identifies Arcane cast members represented by Curtis Brown Group and United Talent Agency, and states that Amanda Overton, a principal writer on *Arcane*, was represented by Abby Glusker at UTA. See Exhibit E.

**Why this matters:** These agency relationships were not peripheral. They were part of the factual access matrix and should have been addressed directly and tested through discovery.

### 6. Riot stonewalled the substance of access and timeline issues instead of giving straight answers

My Reply Brief states that Riot relied on procedural mischaracterization, forfeiture-style arguments, technical objections, and narrowing tactics rather than direct engagement with the substance of access, chronology, and post-submission development. See Appellant's Reply Brief to Riot Games' Dkt. 14, dated August 6, 2025.

**Why this matters:** This was not a straightforward factual rebuttal. It was, in my view, legal stonewalling that prevented a proper testing of the true dispute.

### III. Riot Forge portal misrepresentation and settlement-stage ambush

### 7. Riot misrepresented the Riot Forge portal as incapable of accepting long-form narrative submissions

Exhibit C states that Riot represented during confidential settlement proceedings and later filings that the Riot Forge portal never accepted narrative submissions, while my materials state that contemporaneous video, archival, support, and platform documentation confirm that the portal accepted full-length submissions and did not impose the claimed technical limits. See Exhibit C.

Exhibit D states that I recorded video showing that the submission field was digitally expandable, contained no visible warning barring original narrative content, and processed the submission without rejection or constraint. See Exhibit D.

**Why this matters:** Riot's position on portal functionality materially affected the Court's understanding of access.

### 8. The 2023 support ticket shows the portal remained open and capable of holding long-form material

Exhibit C states that Riot's own support records included an authenticated 2023 Riot Forge submission ticket, number 88552815, which I rely on as proof that long-form submission capabilities remained functional. See Exhibit C.

That exhibit also includes the support email acknowledging receipt of request #88552815 from Riot Forge support on 21 June 2023. See Exhibit C.

**Why this matters:** This directly undermines Riot's technical denials about portal functionality.

### 9. Riot used selective Wayback material during settlement in a misleading way and forced me to litigate access there by ambush

Exhibit C states that Riot relied on a limited Wayback presentation during confidential settlement to imply that the portal could not accept full narrative submissions, while my rebuttal and supporting materials were not accepted or meaningfully explored in that setting. The exhibit states that I was compelled to

litigate core access facts in an adversarial settlement environment without counsel and without normal evidentiary safeguards. See Exhibit C. Moreover, after, the Judge stated that she might be able to get me 10 grand out of them to settle the case.

**Why this matters:** In my view, the settlement process was used not for genuine settlement but as a procedural ambush to shape the record and prejudice my access case. It is not proper to misuse a confidential settlement conference to procedurally abuse a litigant and to seemingly cause me distress and to attempt to deceive him during a legal procedure where they believed they could get away with it. This was placed on record after the confidential conference on the court video recordings.

### 10. Riot withheld the better evidence it controlled while relying on a weaker public archive snapshot

Exhibit C states that Riot, as the platform operator, controlled internal submission logs, server-side records, and metadata, yet relied on a static public-facing archive snapshot rather than producing the authoritative internal records. See Exhibit C.

**Why this matters:** Riot benefited from the absence of records it alone controlled and did not produce.

### IV. *Bridging the Rift*, public narrative management, and post-2020 development

### 11. *Bridging the Rift* forms part of the timeline-management problem

Exhibit F states that Riot's own *Bridging the Rift* documentary contains footage and interviews showing *Arcane* still in core development stages between 2020 and 2022, including early concept discussions in 2019 and scripting sessions in 2021. See Exhibit F.

The same exhibit states that Riot's promotional materials and public statements claimed development was locked by 2019, while cast, writers, and production staff records showed ongoing work through 2024. See Exhibit F.

**Why this matters:** In my view, *Bridging the Rift* was not merely neutral background content. It became part of the chronology dispute itself by both revealing later development and helping manage public perception of timing.

**12. Riot used minors and cast publicity, as part of backdated timeline messaging**

My earlier exhibit materials compile public statements by cast and production figures that, reflect inconsistent or backdated accounts of when work occurred, including accounts involving younger cast members. See Plaintiff's earlier declaration regarding public statements by *Arcane* creators and others involved in the making of *Arcane*, filed in the district court.

**Why this matters:** I submit that this pattern contributed to a false public chronology that reinforced Riot's litigation position and intensified my emotional distress.

**V. *Yafa*, concealment, and hidden economic gain**

**13. The *Yafa* point is relevant as part of my broader concealment and hidden-gain argument**

My Supplemental Brief in response to the Court's order regarding *United States v. Yafa* expressly states that this case is not yet a criminal matter, but argues that *Yafa* is relevant where alleged misconduct involves concealment of profit mechanisms, misappropriation of source material, and gain that is difficult to quantify directly. See Appellant's Supplemental Brief in Response to Court Order Regarding *United States v. Yafa*, dated July 9, 2025.

That filing further states my position that Riot used concealed or distributed gain structures tied to *Arcane* and the wider Riot ecosystem, and that gain may therefore be an equitable proxy where direct loss has been obscured. See Appellant's Supplemental Brief in Response to Court Order Regarding *United States v. Yafa*, dated July 9, 2025.

**Why this matters:** The *Yafa* point supports my argument that Riot's economic story has been obscured, layered, and strategically misdescribed. Moreover, I believe these are criminal matters and should be viewed with wider lenses of fraud against me, stakeholders and the court.

**VI. Discovery obstruction, spoliation concerns, and evidence removal**

**14. Riot resisted meaningful discovery on access, portal records, and intermediary channels**

My Reply Brief states that Riot repeatedly avoided questions of access and refused to produce relevant server logs, portal records, or communications from

Curtis Brown Group and United Talent Agency, while I was procedurally blocked from substantiating access further. See Appellant's Reply Brief to Riot Games' Dkt. 14, dated August 6, 2025.

**Why this matters:** When access is disputed and the responding party controls the best records, refusal to engage in discovery causes extreme prejudice.

### 15. I have documented digital intrusions, deletion of submission-related emails, and repeated recovery problems affecting key evidence

My Notice of Digital Intrusion & Missing Evidence states that critical correspondence, including the April 15, 2020 Bloodborg submission and Cornerstones Literary Consultancy emails, was discovered deleted from both Inbox and Sent folders and had to be restored through Google Takeout. That filing also states that screenshots and PDFs documenting the recovery were themselves later deleted and had to be reconstituted. See Appellant's Notice of Digital Intrusion & Missing Evidence, dated August 18, 2025.

That same filing states that the April 15, 2020 Bloodborg submission to Curtis Brown Group had been confirmed in a later Subject Access Request, then disappeared from my account and had to be recovered. See Appellant's Notice of Digital Intrusion & Missing Evidence, dated August 18, 2025.

**Why this matters:** This materially affected my ability to preserve and present evidence of submission, access, and chronology.

### 16. I reported cyber intrusion concerns through UK channels, and that reporting trail supports the seriousness of the interference concerns

My Notice of Digital Intrusion & Missing Evidence states that on August 21, 2024 I reported a cyber intrusion to Action Fraud UK, that the matter was transferred to the Economic Crime Victim Care Unit, and that West Midlands Police Professional Standards later acknowledged referral. The target of these intrusions seemed to be the word "Allegations." See Appellant's Notice of Digital Intrusion & Missing Evidence, dated August 18, 2025.

**Why this matters:** I do not ask this Court to determine those reports here, but they support the seriousness of the interference concerns and the instability of the evidentiary record.

### 17. I rely on the Chronodisk and moved-computers point as part of my spoliation and evidence-removal concerns

My Reply Brief states that insider whistleblower evidence, as I described it, showed Riot used a Paris and Montreal based company called Chronodisk to wipe evidence and move Fortiche computers used during 2019/2020 to Fortiche's Spain division in Las Palmas, with further concerns that data and assets were being moved out of practical reach. See Appellant's Reply Brief to Riot Games' Dkt. 14, dated August 6, 2025.

The same filing describes Chronodisk as a professional digital recovery and wiping company with facilities in Paris and Montreal, and ties those allegations to broader concerns about fabrication of legal evidence, destruction of digital records, and failure to honor litigation hold notices. See Appellant's Reply Brief to Riot Games' Dkt. 14, dated August 6, 2025.

Moreover, my evidence shows content on my website was accessed from the same regions as mentioned on the same days in question.

**Why this matters:** These allegations are serious enough that the Court should not assume the evidentiary record remained intact.

## VII. Harassment, intimidation, emotional damage, and Riot's refusal to address it honestly

### 18. I have documented an ongoing harassment bundle tied to this litigation

My Notice of Ongoing Harassment and Threats Received states that on August 9, 2025 I received a threatening message through my website stating, among other things, "Riot is gonna pay 20$ to a crackhead to kill you," and that I regarded this as part of an ongoing pattern of intimidation and abuse received while litigating the case. See Appellant's Notice of Ongoing Harassment and Threats Received by Appellant, dated August 9, 2025.

My later harassment filing also describes escalating abuse, including "Go kill yourself antisemitic warpig," tied in my materials to the same or similar hostile pattern. See Declaration of Marc Wolstenholme Regarding Continued Harassment From Riot Games-Affiliated Community Members, dated August 14, 2025.

Moreover, I've had my family and daughter and disability targeted in these emails, including bomb threats which had to be reported to police. These threats are still ongoing.

**Why this matters:** These threats were not collateral noise. They were part of the real-world pressure surrounding the litigation.

**19. Riot and their legal team refused to meaningfully address the harassment and instead, gaslit me by suggesting I was making it up.**

My earlier harassment filing states that Riot's counsel refused to denounce these behaviours and instead suggested they did not exist or that I was effectively imagining them. See Appellant's Notice of Ongoing Harassment and Threats Received by Appellant, dated August 9, 2025.

**Why this matters:** This compounded the emotional harm, intensified the sense of abuse and attempts to gaslight and weaken my resolve, and forms part of my emotional damage case.

**20. I feel abused by the lies, cheating, stonewalling, gaslighting, and procedural bullying documented in this record.**

I respectfully state that the repeated falsehoods, evasions, contradictory timelines, refusal to give straight answers, dismissal of harassment, digital interference, and suppression of meaningful scrutiny have caused me serious emotional distress. I feel abused by these lies and cheating and stonewalling. That is not a rhetorical phrase. It is my sincere account of what this litigation process has felt like from my side, as a disabled, unrepresented litigant facing a powerful corporate defendant with a history of abuse, and what I view as a coordinated wall of misrepresentation, delay, and pressure.

**Why this matters:** These matters are directly relevant to my emotional damage case and to the Court's evaluation of the fairness and human impact of the process that has unfolded.

**VIII. Broader pressure and monitoring concerns**

**21. I have observed repeated monitoring of my website and litigation-related content by entities and networks I believe may be relevant.**

I respectfully note that, in addition to the matters above, I have observed repeated monitoring of my website and litigation-related content by entities or networks I believe may be relevant to the wider factual background. I do not ask the Court to make findings on every such observation in this exhibit, but I ask that this broader context be understood as part of the continuing pressure environment surrounding this case.

**IX. Resulting prejudice**

**22. The cumulative effect has made a fair and timely trial increasingly difficult**

I submit that the cumulative effect of:

- disputed and later contradicted timelines,

- misleading portal representations,

- denial or minimization of manuscript review,

- obscuring of UTA and CBG access pathways,

- discovery resistance,

- digital intrusions and deletion of submission-related emails,

- harassment and intimidation,

- alleged spoliation and evidence removal,

- and public-facing timeline management

has made it exceptionally difficult to secure a fair and stable factual record.

In my view, the truth has been repeatedly obscured, narrowed, or retconned and merged into Riots content with their "Treasured Gateways Policy" of merging US and UK, and Japanese IP into their own, then redistributing profits and markets. The result is that a fair and timely trial has become increasingly difficult to obtain because relevant evidence has been lost, deleted, moved, suppressed, recast, or surrounded by contradictory public narratives.

**X. Requests to the Court**

Based on the foregoing, I respectfully ask the Court to:

1. Accept this Exhibit A into the record as a consolidated schedule of prejudice, contradiction, misrepresentation, obstruction, harassment, digital interference, and emotional harm.

2. Approach Riot's factual representations with caution in light of the documented contradictions and later Riot-origin materials that undermine earlier positions.

3. Preserve my right to seek supplementation of the record, further evidentiary review, and any later appropriate motion concerning fraud, spoliation, or relief from rulings materially affected by misrepresentation.

4. Direct Riot Games' counsel, if the Court deems appropriate, to address in plain and direct language the major contradictions identified here, including, but not limited to:

- the 2019 script-lock narrative,
- manuscript solicitation and review,
- Riot Forge portal functionality,
- agency-linked access routes,
- harassment dismissal,
- and the preservation status of relevant evidence.

5. Consider whether the cumulative pattern described here should be referred to appropriate authorities or otherwise addressed beyond ordinary civil-case management, if the Court concludes that the conduct cannot be adequately remedied within the normal course of appellate proceedings.

6. Consider appropriate adverse credibility or evidentiary inferences where material contradictions, missing records, or misleading technical presentations remain unexplained.

## XI. Legal authorities supporting judicial concern and action

The matters described above implicate established principles concerning candor, bad-faith litigation conduct, fraud on the court, spoliation, pro se fairness, and pleading-stage plausibility.

Under **Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944)**, fraud on the court includes conduct that corrupts the judicial process itself and prevents the machinery of justice from functioning impartially.

Under **Chambers v. NASCO, Inc., 501 U.S. 32 (1991)**, courts possess inherent authority to address bad-faith litigation conduct, including deception, suppression, and abuse of process.

Under **Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003)**, spoliation of electronically stored information and failures of preservation may justify sanctions, adverse inferences, and additional scrutiny.

Under **Nationwide Life Ins. Co. v. Richards, 541 F.3d 903, 911 (9th Cir. 2008)**, bad-faith destruction of evidence may support adverse inference principles.

Under **Erickson v. Pardus, 551 U.S. 89 (2007)**, pro se filings are to be read liberally, and courts should not allow form-based technicality to defeat plainly raised substantive issues.

Under **Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)** and **Ashcroft v. Iqbal, 556 U.S. 662 (2009)**, the question at the pleading stage is plausibility, not certainty. A defendant may not properly evade scrutiny by demanding trial-level proof before discovery while withholding the best records in its possession.

Under **Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 2010)**, access may be plausibly inferred through intermediary channels tied to the alleged infringer.

I respectfully submit that these principles support careful judicial scrutiny of the conduct summarized in this Exhibit A.


**Conclusion**

I respectfully submit that the conduct summarized in this Exhibit A is not defensible as ordinary hard-fought litigation. In my view, it reflects a sustained pattern of contradiction, misrepresentation, stonewalling, discovery obstruction, evidentiary asymmetry, harassment-related prejudice, digital interference, and record instability. I ask that this full background be considered in evaluating preservation, abeyance, supplementation, later evidentiary review, and any further action the Court deems just and proper.


**DECLARATION OF TRUTH**

I, Marc Wolstenholme, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.


Executed on: 04 May 2026

at Coventry, England, United Kingdom.

Respectfully submitted,

Marc Wolstenholme

Appellant, Pro Se

5 Shetland Close

Coventry, England CV5 7LS

United Kingdom

marc@mwwolf-fiction.co.uk

+44 7827 964404