# EXHIBIT A

# ALLEGED ACCESS PIPELINES AND SUPPORTING EVIDENCE

**MARC WOLSTENHOLME, Plaintiff-Appellant**
**v.**
**RIOT GAMES, INC., Defendant-Appellee**

**Ninth Circuit No. 25-3163 • D.C. No. 2:25-cv-00053-FMO-BFM**

Curtis Brown Group submission route • Professional intermediary architecture • Supporting documentary evidence • Evidentiary assessment

# UNITED STATES COURT OF APPEALS

**FOR THE NINTH CIRCUIT**

## MARC WOLSTENHOLME

*Plaintiff-Appellant*

v.

## RIOT GAMES, INC.,

*Defendant-Appellee*

---

## NINTH CIRCUIT APPEAL NO. 25-3163

Nature of Suit: Copyright

Appeal from the United States District Court for the Central District of California

**District Court Case No. 2:25-cv-00053-FMO-BFM**

### ACCESS PIPELINE EVIDENCE

Visual exhibit illustrating the pleaded access theory

Prepared from the pleaded record, filed supporting material, and clearly identified subsequent corroborative material

# PURPOSE OF EXHIBIT A: CURTIS BROWN GROUP ACCESS PIPELINE

Why Plaintiff has presented the alleged access architecture in visual form

**Plaintiff prepared this exhibit to provide the Court with a clear visual representation of the complex web of alleged access surrounding Bloodborg: The Harvest. The purpose is to allow each asserted route, intermediary and evidentiary link to be followed sequentially, instead of requiring the Court to reconstruct the alleged pipeline from dispersed written material.**

## CLARITY & ACCESSIBILITY

Plaintiff is severely dyslexic. A visual structure assists him in presenting the access allegations accurately and coherently, and is intended to assist the Court in seeing the chronology and relationships with greater clarity.

## INTERCONNECTED ROUTES

The alleged access routes are unusually interconnected. Plaintiff alleges a Curtis Brown Group entrance point together with a wider professional architecture involving CBG, UTA, Riot Games and individuals connected to the Arcane development environment.

## PRESERVATION CONCERNS

Plaintiff further alleges interconnected professional relationships involving CBG and UTA, together with suspected digital intrusion and disappearance or deletion of case-relevant evidence. A visual evidentiary pipeline allows the surviving records and alleged connections to be preserved and presented in an organized form.

**PURPOSE: Exhibit A is intended as a visual aid to the alleged access theory, identifying where Bloodborg was submitted to Curtis Brown Group, the professional routes Plaintiff alleges were available thereafter, the evidence supporting each stage, and the points at which targeted discovery is required to determine what occurred inside systems and organizations outside Plaintiff’s control.**

# APRIL 2020: BLOODBORG ENTERS THE ALLEGED ACCESS NETWORK

Evidence of submission, evidentiary gaps, and preservation concerns alleged in the record

**PLEADED STARTING POINT**

The SAC alleged that in April 2020 Plaintiff submitted Bloodborg: The Harvest to Riot Forge, Curtis Brown Group, and other literary agencies.

**BLOODBORG: THE HARVEST**

Completed manuscript
Approx. 95,000 words
Submission campaign began April 2020

**15 APRIL 2020**
**CURTIS BROWN GROUP**

Submission directed to Felicity Blunt.
Contemporaneous submission acknowledgement preserved.
Later CBG review/rejection correspondence preserved.

STATUS: DOCUMENTED RECEIPT

**PARALLEL ROUTE**
**RIOT FORGE**

A separate direct Riot Forge route is addressed independently in Exhibit B.

STATUS: SEPARATE ACCESS ROUTE

**15 APRIL 2020**
**OTHER LITERARY SUBMISSIONS**

Timestamped contemporaneous email evidence shows Bloodborg was being circulated as a substantial full manuscript package on the same date.

STATUS: CORROBORATES APRIL 2020 SUBMISSION PRACTICE

## WHAT THE RECORD SHOWS, AND WHAT REMAINED OUTSIDE PLAINTIFF'S CONTROL

**KNOWN / PRESERVED EVIDENCE**

- CBG submission and response records
- Plaintiff's April 2020 submission chronology
- Riot Forge submission allegations preserved in filed materials
- Contemporaneous third-party manuscript submission records

**MISSING RIOT-CONTROLLED EVIDENCE**

No discovery produced the decisive internal records showing receipt, opening, retention, forwarding, routing, searching, access logs, or subsequent handling of the Riot Forge submissions.

**DIGITAL-INTRUSION / PRESERVATION CONCERN**

Plaintiff reported later compromise of the Yahoo account used for submission correspondence and recovery/deletion issues affecting relevant email evidence. Attribution and causation were not established.

**THE UNRESOLVED ACCESS QUESTION**

**Who received, opened, retained, forwarded, searched, routed or accessed Bloodborg after Curtis Brown Group's April 2020 receipt?**

RECORD BASIS: Document 58 submission chronology and declarations; Rule 26(f) access account; preserved CBG acknowledgement/review correspondence; contemporaneous 15 April 2020 submission records.

## ACCESS ROUTE 1

# CURTIS BROWN GROUP

OVERVIEW OF THE ALLEGED ACCESS ROUTE

**BLOODBORG → CURTIS BROWN GROUP → UTA → RIOT GAMES → ARCANE**

**FIRST STAGE: Bloodborg → Curtis Brown Group → Felicity Blunt**

15 April 2020 submission • acknowledgement / receipt • subsequent rejection

The following slides establish the CBG entrance point first. The later slides then break down, person by person and connection by connection, the alleged professional route from CBG through UTA and into the Riot Games / Arcane development environment.

# 15 APRIL 2020: BLOODBORG SUBMITTED TO CURTIS BROWN GROUP

Original submission identified in the filed evidentiary chronology as BBE7

**DATE & TIME**

**15 APRIL 2020**

**22:21**

**RECIPIENT**

**Felicity Blunt**
**Curtis Brown Group**

cbcsubmissions@
curtisbrown.co.uk

**FILED EVIDENCE**

**BBE7**

## BLOODBORG: THE HARVEST

Submission to Felicity Blunt / Curtis Brown Group

**Filed chronology records that on Wednesday, 15 April 2020 at 22:21, Plaintiff submitted Bloodborg to Felicity Blunt at Curtis Brown Group.**

### WHAT THIS SLIDE ESTABLISHES

- A specifically dated April 2020 submission to Curtis Brown Group.
- Felicity Blunt was the identified CBG recipient.
- The filed chronology identifies the submission evidence as BBE7.
- The next exhibit separately shows Curtis Brown's acknowledgement of Bloodborg: The Harvest.

Record reference: Document 58, filed February 23, 2025. Bloodborg submission chronology, identifying the 15 April 2020, 22:21 CBG submission and BBE7.

# BBE7- Screen shot of actual submission receipt to Felicity Blunt



# BBE7: CURTIS BROWN SUBMISSION ACKNOWLEDGEMENT

Contemporaneous Yahoo Mail screenshot preserved by Plaintiff

## ORIGINAL SCREENSHOT




Screenshot visibly records the message within Plaintiff's Yahoo mailbox, including the Bloodborg subject line and Curtis Brown Creative Submissions sender.

## LEGIBILITY AID

SUBJECT

**“Thank You for Your Submission: Bloodborg: The Harvest”**

SENDER

**Curtis Brown Creative Submissions**

ACKNOWLEDGEMENT TEXT

*“Thank you for your submission. We will reply within approximately six weeks with the outcome of the submission.”*

### EVIDENTIARY SIGNIFICANCE

**The screenshot preserves a contemporaneous acknowledgement expressly identifying Bloodborg: The Harvest.**

Only clearly legible wording is transcribed here. The screenshot remains the primary evidence.

# BLOODBORG EX 7: SURVIVING FILE METADATA PREDATES THE FEDERAL ACTION

Yahoo Bloodborg search-results screenshot preserved as a PNG exhibit

## FILE METADATA

**BLOODBORG EX 7.PNG**

**Date modified: 4 August 2024 at 19:27**

The file's present Windows “Date created” is 31 January 2025 at 00:21, while its recorded modification date is nearly six months earlier.

This metadata is consistent with a pre-existing image later being copied, transferred or placed into its present location while retaining the earlier modification timestamp.

**The earlier timestamp supports the chronology that the underlying Bloodborg email-search screenshot existed before the January 2025 federal filing.**

## WINDOWS FILE PROPERTIES




**Highlighted field: Date modified 04/08/2024 19:27**

The metadata should be considered together with the underlying Bloodborg Ex 7 screenshot and its displayed Yahoo search results.

# ALLEGED DIGITAL INTRUSION: DISAPPEARANCE OF CBG ACKNOWLEDGEMENT

Chronological preservation evidence concerning the 15 April 2020 Bloodborg submission receipt

## DOCUMENTED CHRONOLOGY

**AUGUST 2024**

**Surviving exhibit screenshot preserves the 15 April 2020 CBG acknowledgement inside Plaintiff's Yahoo account.**

**SAC EVIDENCE**

A later targeted Bloodborg Yahoo search preserved in Document 58 displays numerous submission records and the 9 June CBG rejection, while the 15 April acknowledgement does not appear among the displayed results.

**CURRENT**

**Plaintiff reports that the original CBG acknowledgement can no longer be located in his Yahoo account.**

**The surviving screenshots therefore preserve different points in the lifecycle of the same case-relevant email record.**

## PLAINTIFF'S ALLEGATION

**Plaintiff alleges that the disappearance of the CBG acknowledgement is consistent with a wider campaign of suspected unauthorised digital intrusion and deletion affecting electronic evidence relevant to his claims.**

## PRESERVATION ISSUE

**PRESENT AND CAPTURED**
**→ ABSENT FROM LATER BLOODBORG SEARCH**
**→ ORIGINAL NOW UNAVAILABLE**

The chronology documents the email's changing availability. Plaintiff separately alleges that its disappearance forms part of the wider digital-intrusion conduct described in his filings and complaints.

# PRESERVATION CONCERN: ORIGINAL BBE7 EMAIL NO LONGER PRESENT

The preceding screenshot preserves the contemporaneous Curtis Brown submission acknowledgement

## DOCUMENTED POSITION

**The preceding BBE7 screenshot preserves the Curtis Brown Group acknowledgement of Plaintiff's 15 April 2020 submission of Bloodborg: The Harvest to Felicity Blunt.**

Plaintiff reports that the original acknowledgement subsequently disappeared from his Yahoo email account.

Plaintiff has also reported a wider, ongoing pattern of suspected unauthorised digital intrusion affecting his accounts and case-relevant electronic material, including emails, submission records and other digital evidence which have disappeared, been deleted, or become inaccessible.

**The apparent concentration of losses among litigation-relevant material raises a preservation and forensic-discovery concern.**

## STATUS OF THE ALLEGATION

Plaintiff does not presently attribute the disappearance of BBE7 to any particular defendant or individual.

The actor, mechanism, timing and cause remain under investigation.

## WHY THIS MATTERS

**BBE7 concerns the submission through which Plaintiff alleges Curtis Brown Group received Bloodborg. Its disappearance reinforces the relevance of preservation and targeted forensic discovery concerning the access record.**

EVIDENTIARY DISTINCTION: the screenshot and filed submission chronology are preserved evidence. The subsequent disappearance of the original email, suspected intrusion, and any causal connection are separately alleged matters requiring investigation.

# SUBSEQUENT CBG SUBJECT ACCESS RESPONSES OMIT DISPUTED BLOODBORG RECORDS

The resulting data-protection complaint is presently before the Information Commissioner's Office

## SUBJECT ACCESS REQUESTS TO CURTIS BROWN GROUP

Following the Bloodborg submission and rejection, Plaintiff made multiple Subject Access Requests seeking personal data and records concerning his submissions and their handling by Curtis Brown Group.

### PLAINTIFF'S COMPLAINT CONCERNS OMITTED MATERIAL INCLUDING:

- records identifying who accessed, reviewed, handled or internally received the Bloodborg submission;
- relevant audit trails, access histories and processing records;
- internal records concerning the Bloodborg submission and its handling; and
- other submission-related personal data sought through the SAR process.

**Plaintiff contends that the SAR responses have not disclosed the internal records capable of showing who interacted with the Bloodborg material after receipt.**

## ICO INVESTIGATION

### Reference: IC-428562-L3Y7

The complaint has been referred to the UK Information Commissioner's Office. The ICO is currently investigating and has written to Curtis Brown Group concerning the issues raised.

## RELEVANCE TO ACCESS & DISCOVERY

**The surviving evidence establishes CBG's receipt and consideration of Bloodborg. The disputed SAR responses have not supplied the internal access and handling records sought by Plaintiff. Those records bear directly on the unresolved question of what occurred after receipt.**

EVIDENTIARY STATUS: receipt and rejection are supported by surviving documents. The scope and adequacy of CBG's SAR disclosures are disputed and form part of the pending ICO complaint.

# 15 APRIL 2020: CONTEMPORANEOUS FULL-MANUSCRIPT SUBMISSION PRACTICE

Same-day evidence corroborates the form in which Plaintiff was submitting Bloodborg: The Harvest

### SAME DAY

## 15 APRIL 2020

**22:21**

**Curtis Brown Group**
**Felicity Blunt**

**22:57**

**Madeleine Milburn**
**Literary Agency**

**Only 36 minutes separate the two documented submissions.**

### CONTEMPORANEOUS CORROBORATION

**22:57 EMAIL SUBMISSION RECORD**

**Plaintiff's same-day submission to submissions@madeleinemilburn.com described Bloodborg as approximately 95,000 words and attached the whole Bloodborg manuscript (394.7 KB), together with a synopsis and elevator pitch.**

### WHY THE SAME-DAY RECORD MATTERS

- It is independent, contemporaneous evidence of Plaintiff's submission practice on 15 April 2020.
- Within 36 minutes of the documented CBG submission, Plaintiff demonstrably sent the Bloodborg manuscript itself to another literary agency.
- This corroborates Plaintiff's account that his practice that evening was to submit the full manuscript, not merely a short concept or query.
- It therefore supports, but does not by itself prove, Plaintiff's account of what was transmitted to CBG.

EVIDENTIARY POINT: this slide uses a separate, same-day submission as corroboration of submission practice. The CBG receipt and rejection remain the direct documentary evidence establishing Curtis Brown's receipt and consideration of Bloodborg.

# Madeleine Milburn Literary Agency Whole Book Submission Evidence

07/09/2026, 20:31 Book Submissions (No new emails) - marc.wolstenholme@yahoo.co.uk - Yahoo Mail

Back

Inbox
Sent
Drafts
Deleted I...
Spam
Folders

Starred Contacts More

AD

## Marc Wolstenholme/ Bloodborg: The Harvest FOA Madeleine Milburn or Catherine Cho.

Book Submissions

Marc Wolstenholme
To: submissions@madeleinemilburn.com · Wed, 15 Apr 2020 at 22:57

From: Marc Wolstenholme, 07827964404, marc.wolstenholme@yahoo.co.uk

Book: Bloodborg: The Harvest, Cyberpunk/ Fantasy Trilogy.

Word count: 95,000

To Madeleine Milburn,

Bloodborg: The Harvest, is the first book of a Cyberpunk/ fantasy trilogy with a complex parallel story structure of six intersecting POVs and a backstory. The stories can each standalone but are also woven into each other to built conflict and tension; matching lulls with high points and inciting events with rug-pulling moments while watching the evolution of our protagonists as they each confront their battles. Time is an element of the storytelling, having a timeline that reaches backwards from the future present to different times in the future past, then back to Coventry in the Old-World (2025).

The book traverses the World; New Kowloon (Manhattan), Dunkirk, Zimbabwe, Coventry, Las Vegas and the river Wye. Human Diversity and the way we treat each other is also a central theme.

The world (Mother Gaia) is dying because of human activity and war. Biological weapons have been released around the world as part of the Ark's depopulation plan. The people of The Ark of Civilization (Britain) and the Assemblage (USA) built gigantic defensive walls to keep out the Nullifidian, which is a term used to dehumanize the none chosen so that the Ark Defence will commit genocide, to save humanity.

Blood is the most valued commodity in the world; Pregnant women are worth the most, chiefly women in the first eight weeks of pregnancy because the embryo produces trophoblasts, which is in high demand, to produce Fetal Sapien Serum which rejuvenates the consumer and extends their life expectancy. People are hunted for blood markers. The Founding Families have made the people of the Ark believe Gaia is dying to perpetuate war, a distraction while they harvest enough blood variance to create the perfect Bloodborg.

The Founding Families are gearing towards a world without resistance, a one-world slave machine where the survivors see them as gods. They plan to re-house their minds in Bloodborgs, the pinnacle of all creation, the ultimate cybernetic human beings; Merging AI, In-brain computers, robotics and synthetic human self-regenerating tissue with the perfect cocktail of endless blood to be immune to all diseases and ageing.

Our protagonists are all being radicalized in different and complex ways by B an

07/09/2026, 20:31 Book Submissions (No new emails) - marc.wolstenholme@yahoo.co.uk - Yahoo Mail

In August 2014, alone in the dark, after just experiencing sleep paralysis (a disorder I am well acquainted with), I wrestled Insomnia for a while but soon submitted. I turned on my laptop and began to research mental illness and its treatment. This led to me writing my first book; *After the Black: Buried at Bedlam*. This book has not yet been published. It's had a consultancy editorial report; it needs a lot of editing, which I will get around to doing.

Writing became an outlet for me, a release and a passion. I wish to become a successful novel writer. I believe the Bloodborg trilogy will be my first step in this direction. I have an awful lot of stored stories, longing to be written.

I hope you enjoy reading *Bloodborg: The Harvest*.

I plan to submit to selected agents. Thank you for your time and consideration. I look forward to hearing from you.

Warm wishes,

Marc Wolstenholme

3 attachments Download all

Synopsis normal.docx
DOCX · 25.5 KB

Bloodborg- The ... .docx
DOCX · 394.7 KB

Elevator Pitch.docx
DOCX · 18.5 KB

Reply Forward

Storage

# 9 JUNE 2020: CURTIS BROWN REJECTS BLOODBORG

Surviving PDF record of Curtis Brown's response to the April 2020 submission

## PRESERVED PDF / EMAIL RECORD


Find text or tools

Get an instant AI-powered summary whenever you open a document. Generative AI User Guidelines Turn on auto-summary

07/09/2026, 20:30 Book Submissions (No new emails) - marc.wolstenholme@yahoo.co.uk - Yahoo Mail

yahoo!mail Book-Submissions Search in Book-Submission Subscribe Home

Back

Submission review results Book Submissions

CB Creative
To: me · Tue, 9 Jun 2020 at 15:28

Dear marc, Thank you for sending in Bloodborg: The Harvest and for giving me the opportunity to consider your work. Unfortunately, I am unable to offer you representation, as I did not feel the work was right for my list. I am sorry not to be writing with better news, but I hope this response will not discourage you and I wish you all the best with your writing. Best wishes, Felicity Curtis Brown Group Ltd. Haymarket House 28-29 Haymarket London SW1Y 4SP http://www.curtisbrown.co.uk http://www.curtisbrowncreative.co.uk ________________________________ This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message and are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. Whilst we have taken reasonable precautions to ensure that this e-mail and any attachment has been checked for viruses, we cannot guarantee that they are virus free and we cannot accept liability for any damage sustained as a result of software viruses. We would advise that you carry out your own virus checks, especially before opening an attachment. Curtis Brown Group Limited. Registered in England and Wales No 00679620. Registered Office 5th Floor, Haymarket House, 28-29 Haymarket, LONDON SW1Y 4SP.

The preserved record shows "Submission review results," from CB Creative, dated Tue, 9 Jun 2020 at 15:28.

## KEY WORDING

**"Dear marc, Thank you for sending in Bloodborg: The Harvest and for giving me the opportunity to consider your work."**

*"Unfortunately, I am unable to offer you representation, as I did not feel the work was right for my list."*

**"Best wishes, Felicity"**

### EVIDENTIARY SIGNIFICANCE

- Expressly identifies Bloodborg: The Harvest.
- Records an opportunity to "consider your work."
- Response is signed "Felicity."
- Dated 9 June 2020, following the documented 15 April submission.

**The rejection remains preserved as a PDF.**

# Retained PDF rejection of Bloodborg By Felicity Blunt of CBG – 9 JUN 2020

Find text or tools

Get an instant AI-powered summary whenever you open a document. Generative AI User Guidelines Turn on auto-summary ×

07/09/2026, 20:30 Book Submissions (No new emails) - marc.wolstenholme@yahoo.co.uk - Yahoo Mail

yahoo!mail Book-Submissions Search in Book-Submission Subscribe Home M

Back

Starred Contacts More

AD

Inbox
Sent
Drafts
Deleted...
Spam
Folders

## Submission review results

Book Submissions

CB Creative
To: me · Tue, 9 Jun 2020 at 15:28

Dear marc, Thank you for sending in Bloodborg: The Harvest and for giving me the opportunity to consider your work. Unfortunately, I am unable to offer you representation, as I did not feel the work was right for my list. I am sorry not to be writing with better news, but I hope this response will not discourage you and I wish you all the best with your writing. Best wishes, Felicity Curtis Brown Group Ltd. Haymarket House 28-29 Haymarket London SW1Y 4SP http://www.curtisbrown.co.uk http://www.curtisbrowncreative.co.uk ________________________________ This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message and are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. Whilst we have taken reasonable precautions to ensure that this e-mail and any attachment has been checked for viruses, we cannot guarantee that they are virus free and we cannot accept liability for any damage sustained as a result of software viruses. We would advise that you carry out your own virus checks, especially before opening an attachment. Curtis Brown Group Limited. Registered in England and Wales No 00679620. Registered Office 5th Floor, Haymarket House, 28-29 Haymarket, LONDON SW1Y 4SP.

# EVIDENTIARY ASSESSMENT: THE APRIL 2020 CBG SUBMISSION

What the preceding documentary evidence supports before the parallel Riot Forge submission is considered

## WHAT SLIDES 2–11 SHOW

**On 15 April 2020, Bloodborg: The Harvest was submitted to Felicity Blunt at Curtis Brown Group. CBG acknowledged the submission.**

### SUBSEQUENT REJECTION

**On 9 June 2020, a response signed "Felicity" expressly identified Bloodborg: The Harvest and thanked Plaintiff for the opportunity to "consider your work."**

### CONTEMPORANEOUS SUBMISSION PRACTICE

A separate submission made only minutes after the CBG submission records the same work being sent with the full manuscript and supporting pitch material. This corroborates Plaintiff's account that his practice at the time was to submit the complete manuscript where possible.

## WHY PLAINTIFF SUBMITTED FULL MANUSCRIPTS

- Plaintiff was inexperienced in the publishing industry and did not fully appreciate conventional submission practice.
- He understood securing representation to be highly competitive and believed providing the completed work might improve his chance of attracting an agent.
- He did not consider Bloodborg's opening POV to be its strongest material and was concerned that an agent reading only the opening pages might never reach the sections he considered stronger.

### EVIDENTIARY INFERENCE

**The same-day evidence corroborates Plaintiff's account of full-manuscript submission practice. It supports, but does not independently reproduce, the contents of the CBG upload.**

**CHRONOLOGICAL BRIDGE: submission to Felicity Blunt → CBG acknowledgement → demonstrated same-day full-manuscript practice → Felicity rejection after consideration → parallel April 2020 Riot Forge submission.**

# ROUTE A: ALLEGED CBG / UTA → RIOT / ARCANE PIPELINE THEN

Document 58 only • filed 23 February 2025 • later strengthening evidence excluded




## WHAT DOCUMENT 58 ALREADY PLACED BEFORE THE DISTRICT COURT

CBG receipt of Bloodborg; Blunt and Geller as identified CBG access figures; Samuel Jefferson as an alleged CBG-to-Riot bridge; an alleged CBG / UTA professional network; Riot-to-UTA personnel through Travis Mynard; UTA representation of Amanda Overton through Abby Glusker; CBG-represented Arcane cast; and Arcane development evidence concerning Overton, Monica Macer and Jane Chung Hoffacker. Later-discovered evidence will be used separately to strengthen these already-identified nodes and relationships.

PURPOSE: This slide maps the fuller Route A theory actually presented in Document 58. It does not add the later evidence now available concerning CBG screen-rights infrastructure, ICM, additional UTA personnel, or strengthened professional links.

# CBG ↔ UTA: THE PRE-2022 WORKING RELATIONSHIP WAS ALREADY ALLEGED

Document 58 allegation compared with subsequently identified first-party corroboration

## WHAT DOCUMENT 58 ALLEGED

Filed 23 February 2025

**“The United Talent Agency (UTA) acquired the Curtis Brown Group in June 2022. However, transition periods and working relationships were likely in place far before the final public merger.”**

Document 58 also alleged that UTA and CBG had shared professional connections surrounding Arcane and separately identified pre-acquisition UTA personnel links into Riot Games.

## SUBSEQUENT FIRST-PARTY CORROBORATION

UTA acquisition announcement • 13 June 2022

**“UTA and companies in the Curtis Brown Group have collaborated successfully together for many years”**

UTA Co-President David Kramer also stated:

**“UTA and Curtis Brown Group have known each other and worked together for years”**

UTA identified shared representation involving actors and screenwriters as examples of the longstanding collaboration.

**EVIDENTIARY SIGNIFICANCE: The later first-party statement materially strengthens the pre-existing allegation. The 2022 acquisition did not create the CBG–UTA relationship from nothing. UTA itself publicly described successful collaboration extending back “many years,” supporting the pleaded proposition that a functioning professional relationship existed before Bloodborg was submitted to CBG in April 2020.**

SOURCE STATUS: Left panel = Document 58 allegation, pp. 770–771 / Page IDs 2732–2733. Right panel = UTA acquisition announcement, 13 June 2022. The later statement corroborates the existence of a pre-acquisition relationship; it does not by itself establish transmission of Bloodborg.

EXHIBIT A

# EVIDENCE: CBG AND UTA IDENTIFIED PRE-ACQUISITION SHARED CLIENTS

UTA's 13 June 2022 acquisition announcement expressly described years of prior collaboration

## UTA'S OWN STATEMENT

**"UTA and companies in the Curtis Brown Group have collaborated successfully together for many years"**

## UTA THEN IDENTIFIED SPECIFIC EXAMPLES OF THE PRE-2022 COLLABORATION

**DAMIAN LEWIS**
Talent

**LILY JAMES**
Talent

**ALICIA VIKANDER**
Talent

**BEL POWLEY**
Talent

**NCUTI GATWA**
Talent

UTA described these individuals as talent with whom UTA and Curtis Brown Group companies had worked together.

**DAVID FARR**
Shared representation
The Night Manager • Hanna

**GEORGIA PRITCHETT**
Shared representation
Succession • Veep

**TONY ROCHE**
Shared representation
Succession • The Thick of It

**EVIDENTIARY SIGNIFICANCE: This is concrete first-party evidence of an operating CBG–UTA professional relationship before the June 2022 acquisition. UTA did not describe a merely prospective relationship. It identified years of successful collaboration and named eight examples, including three screenwriters whose representation was expressly shared by the two ventures.**

SOURCE: United Talent Agency, acquisition announcement, 13 June 2022. The announcement was issued when the acquisition was announced and describes collaboration predating the transaction. This evidence supports the existence and character of the pre-acquisition professional relationship; it does not alone establish transmission of Bloodborg.

EXHIBIT A

# EVIDENCE: UTA'S OWN STATEMENTS CONFIRM A PRE-EXISTING CBG-UTA RELATIONSHIP

United Talent Agency acquisition announcement • 13 June 2022 • first-party source

## SOURCE DOCUMENT

UNITED TALENT AGENCY TO ACQUIRE CURTIS BROWN GROUP, EUROPE'S TOP LITERARY AND TALENT AGENCY

NEWS PROVIDED BY
**United Talent Agency →**
Jun 13, 2022, 11:45 ET

**Alliance between industry leaders will expand international opportunities for clients**

LONDON and BEVERLY HILLS, Calif., June 13, 2022 /PRNewswire/ -- United Talent Agency (UTA), a global leader in talent, entertainment and sports, today announced it has signed a definitive agreement to acquire Curtis Brown Group, one of the UK's largest and most prestigious literary and talent groups.

This alliance makes Curtis Brown Group the first prominent UK literary and talent representation group to join with a major global talent agency. For UTA, the deal significantly expands its global footprint in one of the world's most important and thriving creative markets. Under the terms of the deal London-based Curtis Brown Group, founded in 1899, will continue to operate under its current name and highly regarded management, including CEO Jonny Geller. This structure will allow both Curtis Brown Group and UTA to continue their fruitful and longstanding relationships with other agency partners in the UK and US.

The union is driven by a shared desire to ensure greater opportunities for clients across an increasingly global entertainment and culture landscape, in which traditional buyers and distributors such as studios and streaming services are expanding far beyond their home markets. The alliance provides Curtis Brown Group with resources to continue to build out its business, and the benefit of UTA's expertise across a wide range of capabilities in such areas as brands, podcasts, digital talent, endorsements, media rights, data analytics and more.

While the great majority of Curtis Brown Group's business is serving UK clients in their home market, UTA and companies in the Curtis Brown Group have collaborated successfully together for many years, in some cases working with talent such as Damian Lewis, Lily James, Alicia Vikander, Bel Powley, as well as rising star Ncuti Gatwa, who the BBC just named the next Dr. Who. The two ventures also share representation of screenwriters such as David Farr (*The Night Manager, Hanna*), Georgia Pritchett (*Succession, Veep and The Shrink Next Door*), and Tony Roche (*Succession, The Thick of It*).

For more than a century, Curtis Brown Group has been well known for its internationally recognized authors (including Margaret Atwood, Jojo Moyes, Lucy Foley, Lisa Jewell, Matt Haig, Nigella Lawson, and Ben Macintyre) and literary estates (including Ian Fleming, John le Carré, Daphne du Maurier, A.A. Milne, and John Steinbeck). Curtis Brown Group has grown and diversified over the last ten years, emerging as the UK's top talent agency with a string of acquisitions of other leading UK talent companies, including Markham Froggatt & Irwin in 2020, Tavistock Wood in 2018, Ed Victor in 2017 and C&W in 2013. Curtis Brown is also home to the world's first creative writing course run by an agency.

In addition to its eminence in publishing, Curtis Brown Group's many other industry-leading divisions include its global talent practice (representing actors, presenters, comedians, and other performers), and a prestigious theatre, film and television department (representing leading screenwriters, directors, producers, playwrights, and production arts talent).

For UTA, founded in 1991, the move further accelerates the company's momentum as it brings together ideas, opportunities and talent. This includes significant growth in its talent representation business as well as recent investments across entertainment, sports and marketing in leading ventures that continue to operate under their own names with ready access and close alignment to UTA's global platform and capabilities. This ongoing strategic expansion has included taking a significant stake in 2019 in Klutch Sports Group, which represents top U.S. athletes, and the 2021 acquisition of MediaLink, a leading strategic advisory and marketing firm that serves the world's leading brands.

David Kramer, Co-President of UTA, said: "This move is about the vanishing borders of the global entertainment business and our united determination to ensure artists and creators remain at the heart of the opportunities ahead. UTA and Curtis Brown Group have known each other and worked together for years, and we couldn't be more excited to be taking this step together at a time when the UK's creative industries are thriving. For UTA, this was driven by the profound respect we have for the Curtis Brown leadership, their deep roots in the UK, the team they've assembled, and their company culture. We're coming together in a way that is designed to ensure Curtis Brown's business and team – and their way of doing business in the markets they know best – continues to flourish and grow."

Said Jonny Geller, CEO of Curtis Brown Group: "We have long admired UTA under the leadership of David Kramer and its CEO, Jeremy Zimmer. Curtis Brown's deep understanding of the European market combined with their culture of collaboration and innovation offers our company and our clients many great opportunities. This partnership will allow Curtis Brown to grow and to respond to the demands of an increasingly globalised world. We have always prided ourselves on our ability to nurture new talent across all our departments and provide an open and inclusive culture, and we are excited to begin a new chapter in this wonderful company's 123-year-old history."

Pages 1-2 of UTA's 13 June 2022 announcement

### PAGE 1 • UTA DESCRIBES YEARS OF PRIOR COLLABORATION

**"UTA and companies in the Curtis Brown Group have collaborated successfully together for many years"**

### PAGE 2 • UTA CO-PRESIDENT DAVID KRAMER

**"UTA and Curtis Brown Group have known each other and worked together for years"**

### PAGE 1 • CONTINUING AGENCY-PARTNER RELATIONSHIPS

**"This structure will allow both Curtis Brown Group and UTA to continue their fruitful and longstanding relationships with other agency partners in the UK and US."**

**FIRST-PARTY SIGNIFICANCE: UTA itself described the CBG-UTA relationship as longstanding and confirmed years of prior collaboration before announcing the acquisition.**

SOURCE: United Talent Agency, "United Talent Agency to Acquire Curtis Brown Group, Europe's Top Literary and Talent Agency," 13 June 2022, pp. 1-2.

# DOCUMENT 58 ALREADY ALLEGED A WIDER AGENCY NETWORK

Existing pleaded agency-network theory → subsequent evidence particularising ICM

## DOCUMENT 58 • DISTRICT COURT RECORD

**"Additionally, Riot has a close working relationship with many of the agencies which Bloodborg was submitted to."**

Document 58, p. 770 of 1218 • Page ID #2732

**"Additionally, Riot worked closely with multiple talent agencies that were also in possession of Plaintiff's work."**

Document 58, p. 775 of 1218 • Page ID #2737

**"Moreover, CBG are just one of many agencies who had access to the Bloodborg manuscript in full."**

Document 58, p. 1183 of 1218 • Page ID #3145

## APPELLATE REPLY • SAME AGENCY-LINKED THEORY

**"submissions to CBG provided a conduit to UTA-affiliated projects"**

**"UTA-linked showrunners and CBG-linked voice talent"**

**"agency-linked talent following submission to a single literary agency"**

Appellant's Reply Brief, pp. 19–20
Section VII

## SUBSEQUENT EVIDENCE PARTICULARISES THE NETWORK

# ICM PARTNERS

**BRIDGE: Plaintiff had already alleged a wider network involving multiple agencies, UTA-affiliated projects and agency-linked professional relationships. Subsequent investigation now identifies ICM as a material component of this already-pleaded professional architecture. The following slides examine the supporting institutional evidence.**

# APPELLATE RECORD: EXISTING RECORD v. SUBSEQUENT CORROBORATION

Procedural treatment of later-obtained material supporting the already-pleaded access theory

## 1 EXISTING APPELLATE RECORD

Document 58 and the appellate briefs already alleged the CBG / UTA / Riot / Arcane intermediary theory, including multiple talent agencies and agency-linked professional relationships.

This material is cited to show what Plaintiff contends the panel overlooked or misapprehended.

## 2 SUBSEQUENT CORROBORATIVE MATERIAL

Later-obtained evidence particularises components of the previously alleged route, including CBG systems, screen-rights functions, ICM relationships and named professional links.

It is expressly identified as subsequent material, not silently treated as part of the District Court record.

## APPELLATE RECORD RULE

The court of appeals ordinarily reviews the record before the district court. A party may not unilaterally supplement the record with new evidence. Lowry v. Barnhart, 329 F.3d 1019, 1024–25 (9th Cir. 2003). Rule 10(e) permits correction of the record where material was omitted by error or accident; judicial notice and limited inherent authority are separate doctrines.

## PROCEDURAL RELEVANCE

Exhibit A separates the existing record from later corroboration. Any request concerning material outside the record is subject to the Court's procedural authority; the later material is used here to particularise the already-alleged access architecture, not to erase the distinction between record and non-record evidence.

AUTHORITY: Fed. R. App. P. 10(e); Lowry v. Barnhart, 329 F.3d 1019, 1024–25 (9th Cir. 2003).

# ICM AND THE PREVIOUSLY ALLEGED WIDER AGENCY NETWORK

ICM was not named specifically • its longstanding agency relationships were already within Plaintiff’s investigation

## POSITION AT THE TIME OF THE EXISTING ALLEGATIONS

**ICM Partners was not specifically named in Plaintiff’s existing material. However, when Plaintiff alleged relationships involving “many of the agencies,” “multiple talent agencies,” and wider “agency-linked” relationships, ICM was already within the scope of Plaintiff’s investigation because of its known longstanding professional relationships with both Curtis Brown Group and UTA.**

At that stage, further investigation was required to establish and document the nature and extent of those relationships.

## SUBSEQUENT INVESTIGATION

**The evidence now obtained documents an interconnected series of professional relationships between:**

**CURTIS BROWN GROUP** ⟷ **ICM PARTNERS** ⟷ **UTA**

**Those documented relationships existed before, during and after the period relevant to Plaintiff’s allegations. The following evidence sets out those relationships and their chronology.**

SEQUENCE: existing wider-agency allegation → ICM already under investigation → subsequent evidence documents the CBG–ICM–UTA relationship

# CBG ↔ ICM: LONGSTANDING INSTITUTIONAL RELATIONSHIP

The relationship substantially pre-dated both Bloodborg and Arcane.

### 2008: ESTABLISHED RELATIONSHIP

Collected evidence identifies a formal co-agency relationship between Curtis Brown Group and ICM dating to 2008, approximately twelve years before the April 2020 Bloodborg submission.

**“in partnership with Curtis Brown in London”**

### CBG'S OWN DESCRIPTION

CBG employment material described a “thriving partnership” with ICM and referred to personnel working closely with ICM partner teams, maintaining communications and keeping track of scripts.

**“thriving partnership”**

### EVIDENTIARY SIGNIFICANCE

The evidence supports an ongoing professional relationship involving personnel, communications, scripts and rights-related activity. It goes beyond an isolated transaction or coincidental shared representation.

**2008 CBG ↔ ICM → continuing cooperation → April 2020 Bloodborg submission**

**EVIDENCE** Contemporary industry material documenting the 2008 CBG/ICM relationship; industry description of ICM operating “in partnership with Curtis Brown in London”; CBG employment material describing a “thriving partnership,” close work with ICM partner teams, communications and scripts.

# CBG'S DOCUMENTED MANUSCRIPT-TO-SCREEN PIPELINE

CBG's own job material describes how literary material was evaluated and submitted into film and television markets.

## NOVEMBER 2016: CBG BOOK DEPARTMENT

The employee assisted Cathryn Summerhayes and Luke Speed, expressly identified as "a Book-to-Film/Media Rights Agent." Responsibilities included reading manuscripts, producing reports, compiling submission pitches, tracking submissions, and liaison with clients, producers, scouts and financiers.

**"Reading manuscripts, producing reports and compiling submission pitches"**

## EXTERNAL SCREEN SUBMISSIONS

The same CBG document required: "Submitting manuscripts and projects for film & TV to production companies, studios and financiers as directed by Luke Speed." CBG had announced Speed in 2015 as "a book to film agent in the book department." Jonny Geller said Speed would work closely with CBG's TV and film agents alongside Cuba Pictures.

**"Submitting manuscripts and projects for film & TV..."**

**MANUSCRIPT → READ / REPORT → SUBMISSION PITCH → BOOK-TO-FILM → TV & FILM AGENTS → STUDIOS / PRODUCERS / FINANCIERS**

**EVIDENCE** CBG Book Department Job Description, Nov. 2016; CBG announcement concerning Luke Speed joining in Aug. 2015; Jonny Geller statement concerning Speed, CBG TV/film agents and Cuba Pictures; Luke Speed statement concerning book-to-film work.

SLIDE 3 OF 4

# CBG'S INFORMATION, DATABASE AND CROSS-DEPARTMENT INFRASTRUCTURE

The evidence identifies databases and cross-department information sharing within CBG's Books and screen-facing operation.

### AGENTFILE

The November 2016 CBG Book Department document required relevant information to be entered into:

**"the Curtis Brown database (Agentfile)"**

### THEREFORE

The same document required material to be scanned into:

**"the Therefore database system."**

### CROSS-DEPARTMENT WORKING

Separate CBG material describes cooperation across Books, Theatre Film and Television, Talent and Cuba Pictures, including sharing:

**"information, systems, ideas and networks."**

**BOOKS ↔ DATABASES ↔ BOOK-TO-FILM / MEDIA RIGHTS ↔ TFTV / TALENT / CUBA PICTURES → EXTERNAL INDUSTRY**

**LIMITATION: This establishes CBG's use of Agentfile and Therefore. It does not, without separate evidence, establish direct ICM access to either database.**

**EVIDENCE** CBG Book Department Job Description, Nov. 2016: Agentfile, Therefore and database responsibilities; CBG operational/employment material concerning Books, TFTV, Talent and Cuba Pictures and sharing "information, systems, ideas and networks."

# THE CBG ↔ ICM RELATIONSHIP WAS ACTIVE IMMEDIATELY BEFORE BLOODBORG

The chronology places Felicity Blunt in a documented ICM rights transaction approximately five weeks before Plaintiff's submission.

**9 MARCH 2020** — **≈ FIVE WEEKS** — **15 APRIL 2020**

### BLUNT / CBG ↔ MACHINIST / ICM

Collected publishing evidence reports ICM Partners agent Alexandra Machinist conducting a United States rights transaction concerning Christina Sweeney-Baird's The End of Men "on behalf of Felicity Blunt at Curtis Brown UK."

### BLOODBORG → FELICITY BLUNT / CBG

Plaintiff submitted Bloodborg: The Harvest to Felicity Blunt on 15 April 2020. The chronology therefore places the receiving CBG agent in a documented working transaction with ICM immediately before the manuscript entered the alleged submission route.

**PARALLEL 2020 ROUTE: Jonny Geller → Luke Speed / CBG Book-to-Film → ICM Partners (His & Hers transaction evidence)**

Additional working evidence: Freefall (2018) and Taste (2020), to be used only with the underlying source attached.

**EVIDENCE** 9 Mar. 2020 publishing-rights report: Alexandra Machinist / ICM acting on behalf of Felicity Blunt / CBG concerning The End of Men; Plaintiff's 15 Apr. 2020 Bloodborg submission evidence; 2020 His & Hers transaction evidence involving ICM Partners / Luke Speed acting on behalf of Jonny Geller.

CBG ↔ ICM ACCESS ROUTE

# LUKE SPEED ↔ ICM PARTNERS

Direct evidence connecting CBG's Book-to-Film function with ICM during the relevant 2020 period.

**JONNY GELLER**
CBG literary agent

→

**LUKE SPEED**
CBG Book-to-Film / Media Rights

→

**ICM PARTNERS**
External agency relationship

### 2020: HIS & HERS

Collected transaction evidence identifies Alice Feeney's His & Hers as involving ICM Partners together with Luke Speed, with Speed acting on behalf of Jonny Geller. This places Speed personally within a documented CBG ↔ ICM rights transaction during 2020.

### WHY IT MATTERS

CBG's own records identify Speed as its Book-to-Film/Media Rights agent and show his function included manuscript evaluation, submission pitches and film/TV submissions. The His & Hers evidence therefore connects that screen-facing CBG function directly with ICM, rather than relying only on a general agency relationship.

**DOCUMENTED ROUTE: GELLER / CBG → SPEED / BOOK-TO-FILM → ICM PARTNERS**

**EVIDENCE** 2020 His & Hers transaction evidence: ICM Partners together with Luke Speed, acting on behalf of Jonny Geller. Cross-reference: CBG Book Department Job Description (Nov. 2016), identifying Speed as Book-to-Film/Media Rights Agent and documenting manuscript-to-screen submission functions. Use the underlying transaction source as the exhibit citation in the final court deck.

ICM ↔ UTA: INDUSTRY PACKAGING CONTEXT

# ICM AND UTA SAT INSIDE HOLLYWOOD'S DOMINANT PACKAGING SYSTEM

Important correction: the documented >90% figure applies collectively to UTA, ICM, CAA and WME, not to UTA and ICM alone.

### APRIL 2019: THE BIG FOUR

The Writers Guild sued UTA, ICM Partners, CAA and WME over packaging fees. The WGA described these four as the major agencies dominating writer representation and reported that they received more than 80% of packaging fees paid by studios and networks.

### PACKAGING AS A SCREEN PIPELINE

Packaging meant assembling creative elements for a project and bringing the package to a studio or network. UTA's own 2019 federal pleading described ongoing services after a package was purchased, including project development and suggestions for staffing.

### >90% OF PACKAGING FEE DEALS

Later reporting described UTA, ICM, CAA and WME collectively as accounting for more than 90% of Hollywood packaging-fee deals. This supports the scale and centrality of the four-agency system, but does not establish a 90% UTA-ICM bilateral share.

**UTA + ICM + CAA + WME → >90% OF PACKAGING-FEE DEALS (COLLECTIVELY)**

SOURCES

WGA East, Apr. 17, 2019, lawsuit announcement; UTA Answer & Counterclaims, Case No. 2:19-cv-05585 (Aug. 19, 2019), ¶¶121–123; later industry reporting on the Big Four's >90% collective packaging share.

ICM ↔ UTA: RELEVANT 2019–2020 WINDOW

# PACKAGING WAS UNDER SCRUTINY, BUT THE PRACTICE HAD NOT YET ENDED

The WGA dispute began before Bloodborg, but packaging remained an existing industry practice during the April 2020 submission period.

### APRIL 2019

The WGA instructed members to leave non-signatory agencies and sued the Big Four over packaging. ICM and UTA were both defendants in the dispute. The controversy therefore establishes scrutiny of the practice, not its disappearance.

### 15 APRIL 2020

Plaintiff submitted Bloodborg during this unresolved agency dispute. At this point neither UTA nor ICM had yet reached its later franchise agreement with the WGA ending the standoff.

### JULY–AUGUST 2020

UTA reached agreement with the WGA on 15 July 2020. ICM followed on 5 August 2020. Both agreements provided a packaging sunset extending to 30 June 2022, subject to the agreed terms.

**APR. 2019 SCRUTINY → APR. 2020 BLOODBORG → JUL./AUG. 2020 AGREEMENTS → JUNE 2022 SUNSET**

SOURCES WGA East, Apr. 17, 2019; WGA East, Agreement with UTA, July 15, 2020; WGA East, Agreement with ICM, Aug. 5, 2020; franchise agreement §9, packaging-fee sunset through June 30, 2022.

WHY THE PACKAGING EVIDENCE MATTERS TO THE ACCESS THEORY

# THE EVIDENCE SHOWS A HIGHLY NETWORKED SCREEN-MARKET MECHANISM

It supports industry connectivity and mechanisms of project/talent assembly. It does not, by itself, prove transmission of Bloodborg.

## WHAT THE DOCUMENTS ESTABLISH

• ICM and UTA were two of Hollywood's four dominant agencies in the packaging dispute.

• Packaging involved bundling writers, talent and creators and taking projects to studios/networks.

• UTA described post-sale project development and staffing activity as part of its packaging services.

• Packaging remained permissible during the later contractual sunset period under specified conditions.

## HOW IT FITS THE DEVELOPING ROUTE

The CBG evidence already identifies a manuscript-to-screen function and a direct Luke Speed ↔ ICM transaction. The packaging evidence supplies broader industry context for ICM's position inside a concentrated screen-facing agency network that included UTA.

Next evidentiary task: identify direct ICM ↔ UTA co-packages, shared projects, personnel or representation links during 2018–2021.

**CBG → SPEED / BOOK-TO-FILM → ICM → [DIRECT ICM ↔ UTA EVIDENCE STILL TO PARTICULARISE] → UTA / ARCANE PERSONNEL**

**SOURCES** Sources above. Court-use caution: distinguish the documented Big Four packaging structure from any separate proposition that ICM and UTA directly co-packaged a specific project or transmitted Plaintiff's work; those propositions require project-specific evidence.

CBG PERSONNEL CHAIN

# CAMILLA YOUNG INSIDE CBG'S BOOKS-TO-SCREEN NETWORK

The institutional machinery can be particularised through the personnel operating across literary and screen-rights functions.

**FELICITY BLUNT / JONNY GELLER**
Senior CBG literary agents

→

**LUKE SPEED**
Book-to-Film / Media Rights

→

**NICK MARSTON**
Film / TV / Media Rights

→

**CAMILLA YOUNG**
Theatre, Film & TV agent

### SPEED: BOOKS → SCREEN

CBG identified Speed as a Book-to-Film/Media Rights Agent. Its job material records manuscript reading, reports, submission pitches and submission of manuscripts/projects to production companies, studios and financiers.

### MARSTON → YOUNG

Young's own account states that she moved to Curtis Brown because she preferred reading scripts and began working with Nick Marston. Professional material places her in CBG's Theatre, Film & TV operation.

### GELLER / BLUNT CONTEXT

Geller's 2015 announcement stated Speed would work closely with CBG's TV and film agents. Separate rights records place Young handling screen rights for literary clients represented within CBG's Books operation.

**LITERARY REPRESENTATION → BOOK-TO-FILM → FILM / TV RIGHTS → SCREEN-FACING AGENT**

**EVIDENCE** CBG Book Department Job Description (Nov. 2016); CBG Luke Speed announcement (Aug. 2015); Televisual interview with Camilla Young; professional CBG/industry profiles. Personnel links should be paired with the underlying exhibit copies in the final deck.

CBG SHARED REPRESENTATION

# YOUNG ↔ GELLER / CBG: LITERARY CLIENTS AND SCREEN RIGHTS

Named client records demonstrate the practical division between literary representation and film/TV or adaptation-rights representation.

## MONICA ALI: DOCUMENTED CROSS-FUNCTION EXAMPLE

Monica Ali's official contact information identifies:

- Jonny Geller / Curtis Brown: UK literary agent
- Camilla Young / Curtis Brown: Theatre, Film & TV
- Amanda Urban / ICM: US literary agent

This places Geller, Young and ICM functions around the same represented author.

## ADDITIONAL SCREEN-RIGHTS EXAMPLES

Official author/estate records identify Young for screen-facing rights:

- Iain Banks estate: TV, streaming, film and stage adaptation enquiries
- Cesca Major: film/TV and screenwriting enquiries
- Matt Haig: CBG material identifies Young and Nick Marston in screen representation

These examples show recurring literary-to-screen rights handling inside CBG.

**BOOKS / LITERARY AGENT ↔ YOUNG / FILM & TV RIGHTS ↔ EXTERNAL U.S. AGENCY RELATIONSHIPS**

EVIDENCE Monica Ali official contact page; Iain Banks official adaptation-rights information; Cesca Major official contact information; CBG/industry representation material for Matt Haig. These records establish professional architecture, not manuscript transmission.

# CAMILLA YOUNG → SAMUEL JEFFERSON → RIOT GAMES

Jefferson's professional development and representation identify a screenwriter client of Young who later records work with Riot Games.

| 2015 | → | 2015 | → | 2018 | → | CBG | → | RIOT |
|---|---|---|---|---|---|---|---|---|
| LFS MA Screenwriting | | BAFTA / Rocliffe | | Serial Eyes | | Camilla Young representation | | Documented Riot Games work |

### DIRECT REPRESENTATION

Jefferson's professional website states that he is represented by Camilla Young at Curtis Brown for the UK. This directly places him within Young's screenwriting/client network.

### DIRECT RIOT REFERENCE

The same professional biography states that Jefferson "has worked with industry leaders, Riot Games, the creators of League of Legends." This establishes a Jefferson ↔ Riot professional node. The specific dates and nature of the engagement are not yet known.

**CHRONOLOGY STATUS: the specific dates of Jefferson's Riot Games engagement are not yet known.**

**EVIDENCE** Samuel Jefferson professional website; Serial Eyes alumni/profile material; London Film School / professional biography material; BAFTA Rocliffe references. The cited materials document Jefferson's professional development, CBG representation and Riot Games work.

# SAMUEL JEFFERSON: RIOT GAMES REFERENCE AND ARCHIVED-WEBSITE CHRONOLOGY

Jefferson's own website supplies the direct Riot reference. The surviving Wayback record is incomplete, so archived pages establish when the reference can presently be observed, not when the engagement began.

## JEFFERSON'S OWN WORDS

Jefferson's professional biography states that he "has worked with industry leaders, Riot Games, the creators of League of Legends." The same professional material identifies Camilla Young at Curtis Brown as his UK representative.

## WAYBACK RECORD

19 OCTOBER 2019: archived biography identifies Curtis Brown representation, with no Riot Games reference.

27 MARCH 2022: archived biography still contains no Riot Games reference.

2023–2024: relevant archived captures are inaccessible / non-working.

17 MARCH 2025: archived biography expressly identifies Jefferson as having worked as a writing consultant for Riot Games.

## CHRONOLOGY

The surviving archive brackets the public appearance of the Riot Games reference between 27 March 2022 and 17 March 2025. It does not establish when Jefferson's Riot engagement began. Professional work may predate public disclosure, including where confidentiality or contractual restrictions delay identification of a client or project.

## EVIDENTIARY SIGNIFICANCE

The evidence supports a documented Young / CBG → Jefferson → Riot Games professional connection while leaving the commencement date open. Employment, commissioning, contract and communications records can establish when the Riot relationship began and what work it concerned.

**COURT-SAFE POINT: the archived website record dates the public appearance of the Riot reference. It does not date the beginning of Jefferson's professional relationship with Riot Games.**

Source: Samuel Jefferson professional website and surviving Internet Archive / Wayback captures identified in Exhibit A.

# FELICITY BLUNT AND CAMILLA YOUNG: SAME BOOKS-TO-SCREEN INFRASTRUCTURE

The strongest presently verified evidence is structural and contemporaneous. It should not be overstated as proof of a direct Blunt-to-Young transmission.

### 2017 CBG INTERNAL FLOOR PLAN

CBG's internal Haymarket House plan places Felicity Blunt and Camilla Young inside the same Books Department open-plan area. The same plan also identifies Jonny Geller, Nick Marston and Luke Speed within that Books area, while a separate Theatre, Film & Television open-plan area sits immediately within the same agency layout.

This is first-party CBG evidence of the physical and departmental structure in which the personnel worked.

### YOUNG: SCREEN-FACING FUNCTION

Young's professional evidence identifies her work in Theatre, Film & TV and her development under Nick Marston. Other client records show Young handling film/TV or adaptation rights for CBG literary clients.

This establishes Young as a screen-facing rights node operating inside the same CBG Books ecosystem in which Blunt worked.

### BLUNT: LITERARY + MEDIA RIGHTS

Blunt joined Curtis Brown in 2005 and represents literary clients. Current professional material also records her work with clients on domestic, international and media rights, and her executive-producer role on the television adaptation Rivals.

The evidence therefore places both Blunt and Young within CBG's literary-to-screen rights infrastructure, though a direct shared-client transaction between them still requires separate proof.

**BLUNT / BOOKS ↔ SAME OPEN-PLAN BOOKS OPERATION ↔ YOUNG / SCREEN-RIGHTS FUNCTION**

**COURT-SAFE POINT: contemporaneous proximity + complementary rights functions + shared CBG infrastructure. No claim of direct transmission without further evidence.**

**EVIDENCE** CBG internal Haymarket House floor plan (2017), curtisbrowninternal.org: Blunt, Young, Geller, Marston and Speed in Books Department open-plan area; Young professional/industry material on screen-facing role; professional material on Blunt's literary/media-rights work. Direct Blunt ↔ Young shared-client evidence remains to be particularised.

# JONNY GELLER ↔ ICM: MULTIPLE DOCUMENTED PROFESSIONAL ROUTES

The evidence particularises Geller's connection to ICM through rights transactions, CBG's Book-to-Film function and shared client representation.

### 2020: HIS & HERS

Collected transaction evidence identifies Alice Feeney's His & Hers as involving ICM Partners together with Luke Speed, with Speed acting on behalf of Jonny Geller.

This is significant because CBG separately identifies Speed as its Book-to-Film/Media Rights agent. The transaction therefore supplies a documented route:

GELLER → SPEED / BOOK-TO-FILM → ICM.

### MONICA ALI: SAME CLIENT NETWORK

Monica Ali's official contact information identifies:

- Jonny Geller / Curtis Brown as UK literary agent
- Camilla Young / Curtis Brown for Theatre, Film & TV
- Amanda Urban / ICM as US literary agent

This independently places Geller and ICM representation around the same author, with Young handling the screen-facing function.

### INSTITUTIONAL CONTEXT

These individual routes sit inside the broader CBG ↔ ICM relationship already documented elsewhere: a longstanding co-agency relationship, CBG material describing a “thriving partnership,” and close work with ICM partner teams.

The Geller evidence therefore does not depend on a generic agency association alone.

**GELLER → SPEED / BOOK-TO-FILM → ICM | GELLER ↔ ALI ↔ ICM | YOUNG / FILM & TV**

**COURT-SAFE POINT: multiple documented professional routes connect Geller's CBG literary operation with ICM. These facts do not alone prove transmission of Bloodborg.**

**EVIDENCE** 2020 His & Hers transaction evidence: ICM Partners / Luke Speed acting on behalf of Jonny Geller; CBG Book Department Job Description (Nov. 2016), identifying Speed as Book-to-Film/Media Rights Agent; Monica Ali official contact page: Geller (UK literary), Young (Theatre/Film/TV), Amanda Urban / ICM (US literary); cross-reference CBG ↔ ICM institutional evidence.

CBG: BLOODBORG RECEIPT → INTERNAL LITERARY NETWORK

# FELICITY BLUNT ↔ JONNY GELLER: DOCUMENTED OPERATIONAL PROXIMITY

The evidence places Bloodborg's receiving agent inside the same senior Books operation as Geller, with both connected outward through CBG's rights and agency network.

## SAME BOOKS OPERATION

CBG's internal Haymarket House plan places Felicity Blunt and Jonny Geller within the same Books Department open-plan area.

The same plan places Luke Speed, Nick Marston and Camilla Young within the Books operation, identifying the personnel already documented in CBG's literary-to-screen infrastructure.

## PROFESSIONAL INTEGRATION

Geller was a senior CBG literary figure and publicly described Luke Speed's book-to-film role as working closely with CBG TV and film agents.

Blunt operated in the same Books department and handled literary, international and media-rights matters for clients. Their work therefore sat within the same integrated rights environment.

## OVERLAPPING CLIENT / RIGHTS NETWORK

CBG's Books model divided literary and screen-facing functions across agents and media-rights personnel. Existing client evidence shows Geller-linked authors using Young for Theatre/Film/TV, while Blunt's clients likewise entered CBG's wider adaptation and media-rights structure.

Named shared-client overlaps should be added where the underlying records are attached.

## BOTH CONNECT OUTWARD

Blunt: March 2020 evidence places ICM agent Alexandra Machinist acting on Blunt's behalf, approximately five weeks before Bloodborg.

Geller: 2020 His & Hers evidence places Luke Speed acting on Geller's behalf in a transaction involving ICM Partners.

Separate UTA links should be stated only through the specific underlying transactions.

**BLOODBORG → BLUNT ↔ GELLER / SAME BOOKS OPERATION → SPEED / BOOK-TO-FILM → ICM**

**Court-safe inference: receipt by Blunt occurred within a documented, interconnected literary and screen-rights operation. This evidence does not itself prove onward transmission.**

**EVIDENCE** CBG internal Haymarket House floor plan (2017); CBG Luke Speed announcement (2015); CBG Book Department Job Description (2016); 9 Mar. 2020 Blunt / Alexandra Machinist / ICM rights evidence; 2020 His & Hers Geller / Luke Speed / ICM evidence. Add specific UTA and shared-client exhibits before making those propositions categorical.

# GELLER ↔ MARSTON: EXTENSIVE SHARED REPRESENTATION / MARSTON → YOUNG

The client evidence shows a recurring division of literary and screen-facing representation, while Young's own account places her professional development directly under Marston.

## GELLER ↔ MARSTON: RECURRING CLIENT OVERLAP

Collected CBG/client records identify repeated overlap between Jonny Geller's literary representation and Nick Marston's film, television or media-rights work.

Examples collected in the project include authors and creators represented through Geller's literary operation whose screen/adaptation interests were handled through Marston or the CBG screen-rights team.

For court use, the final exhibit version should reproduce the underlying client records and list only names for which both sides of the representation are documented.

## MARSTON'S SCREEN-FACING FUNCTION

Marston operated in CBG's film/television and media-rights environment. This complements Geller's literary function and helps explain why repeated shared representation matters structurally: literary clients did not remain confined to a literary-only silo when screen and adaptation rights were being exploited.

CBG's own material separately documents its Book-to-Film and cross-department screen infrastructure.

## MARSTON → CAMILLA YOUNG

Camilla Young's own professional account explains that she moved toward agenting because she preferred reading scripts and then began working with Nick Marston at Curtis Brown.

Young subsequently became a CBG Theatre, Film & TV agent and handled screen/adaptation rights for literary clients.

This places Young as a continuation of the same screen-facing network surrounding Marston's work.

**GELLER / LITERARY CLIENTS ↔ MARSTON / SCREEN & MEDIA RIGHTS → CAMILLA YOUNG / THEATRE, FILM & TV**

**Evidentiary point: repeated shared representation supports an integrated literary-to-screen professional structure. It does not alone establish transmission of Bloodborg.**

**EVIDENCE** Camilla Young interview / professional profile describing her move to Curtis Brown and work with Nick Marston; CBG and official client representation records documenting Geller literary representation and Marston/CBG screen-rights functions; cross-reference CBG Book-to-Film and cross-department evidence. Insert the verified shared-client schedule/exhibits beside this slide in the final court bundle.

CBG: NAMED LITERARY ↔ SCREEN CLIENT OVERLAP

# GELLER ↔ MARSTON: SEVEN NAMED SHARED CLIENT / PROPERTY ROUTES

The collected research identifies repeated co-representation between Geller's literary client base and Marston's screen-facing operation.

**JONNY GELLER**

Literary representation

**LITERARY IP / AUTHORS** →

**NAMED OVERLAPS IDENTIFIED IN THE RESEARCH**

1. **Estate of John le Carré**
2. Susanna Clarke
3. Glen Duncan
4. Lisa Jewell
5. David Mitchell
6. Michael Marshall Smith
7. **Nazanin Zaghari-Ratcliffe & Richard Ratcliffe**

→ **FILM / TV SCREEN RIGHTS**

**NICK MARSTON**

Screen representation

**MARSTON → YOUNG**

Camilla Young's own account states that she moved to Curtis Brown and began working with Nick Marston. The research also identifies shared Young/Marston screen clients including Rebecca Daly, Annie Griffin, Ian FitzGibbon, Enda Walsh and Arinzé Kene.

**GELLER / LITERARY ↔ REPEATED NAMED CLIENT OVERLAP ↔ MARSTON / SCREEN → YOUNG / THEATRE, FILM & TV**

Evidentiary point: the identified names particularise a recurring literary-to-screen representation structure inside CBG. The representation evidence does not itself prove transmission of Bloodborg.

SOURCE BASIS: uploaded cross-agency research memorandum, §§ II and VII, including its Geller/Marston client table and Marston/Young shared-client discussion. Attach the underlying representation records for final court use.

CBG BOOK-TO-SCREEN INTERMEDIARY

# LUKE SPEED: GAMES / INTERACTIVE → BOOK-TO-FILM → NETFLIX / SCREEN MARKET

Speed's career places video-game/interactive rights experience inside the CBG function responsible for moving literary IP toward film and television buyers.

### 1 GAMES + INTERACTIVE BACKGROUND

Before Curtis Brown, Speed worked at Marjacq, including its interactive / video-game division.

The collected professional history describes work involving authors, screenwriters, directors and video-game development studios, together with packaging, rights management and international exploitation.

This experience preceded his move into CBG's Book-to-Film role.

### 2 CBG: MANUSCRIPTS → SCREEN

CBG identified Speed as Book-to-Film / Media Rights.

Its 2016 job material records manuscript reading, reports, submission pitches and submissions of manuscripts/projects for film and TV to production companies, studios and financiers.

Geller said Speed would work closely with CBG TV/film agents and Cuba Pictures.

### 3 NETFLIX + MAJOR SCREEN DEALS

Contemporaneous evidence places Speed brokering screen rights into the major production market.

March 2019: Netflix acquired television rights to Caroline MacKenzie's One Year of Ugly, with the TV rights handled by Luke Speed at Curtis Brown.

2019–20 records also show Speed brokering competitive TV/film rights transactions.

### 4 ABBY GLUSKER / UTA CONTEXT

A 2016 Tracking Board / Launch Pad industry record places Abby Glusker of UTA among its competition judges and separately identifies Luke Speed of Curtis Brown among industry representatives appearing in the same screenwriting-market document.

This supports shared professional-market proximity, not a proven direct Speed ↔ Glusker transaction.

Separately, 2018 evidence identifies Glusker as Amanda Overton's UTA representative while Overton was already connected to Arcane.

**GAMES / INTERACTIVE → SPEED / BOOK-TO-FILM → MANUSCRIPTS & IP → NETFLIX / STUDIOS / PRODUCERS**

**Parallel U.S. screen-literary environment: ABBY GLUSKER / UTA → AMANDA OVERTON → ARCANE**

Court-safe point: Speed bridges games/interactive experience and CBG's literary-to-screen machinery. Current evidence does not establish a direct Speed-to-Glusker communication or Bloodborg transmission.

EVIDENCE: CBG Book Department Job Description (2016); collected Speed/Marjacq professional history; March 2019 One Year of Ugly / Netflix rights report; 2016 Tracking Board / Launch Pad record; 2018 Young & Hungry List for Glusker / Overton.

PERSONALISED CBG → RIOT PROFESSIONAL LINK

# CAMILLA YOUNG → SAMUEL JEFFERSON → RIOT GAMES

The present evidence documents both ends of the relationship. The remaining issue is chronology: when Jefferson's Riot Games engagement began.

**CAMILLA YOUNG**
Curtis Brown Group
Theatre, Film & TV agent

→

**SAMUEL JEFFERSON**
Screenwriter
CBG-represented client

→

**RIOT GAMES**
Jefferson's biography records professional work with Riot

→

**CRITICAL DATE**
15 APRIL 2020
Bloodborg → CBG

### 1 DIRECT REPRESENTATION

Jefferson's professional website states that he is represented by Camilla Young at Curtis Brown for the UK. This directly places Jefferson within Young's screenwriting/client network.

### 2 DIRECT RIOT REFERENCE

The same professional biography states that Jefferson "has worked with industry leaders, Riot Games, the creators of League of Legends." This documents a Jefferson ↔ Riot Games professional node.

### 3 CHRONOLOGY STATUS

Jefferson's professional materials document work with Riot Games. The specific dates of that engagement are not yet known.

**DOCUMENTED: YOUNG / CBG → REPRESENTED JEFFERSON → JEFFERSON RECORDS WORK WITH RIOT GAMES**

**CHRONOLOGY STATUS: THE SPECIFIC DATES OF THE JEFFERSON ↔ RIOT ENGAGEMENT ARE NOT YET KNOWN.**

Evidentiary significance: the evidence places a CBG screenwriting client represented by Young in a documented professional relationship with Riot Games. The specific dates of the Riot engagement remain to be established from the relevant records.

EVIDENCE: Samuel Jefferson professional website, identifying Camilla Young / Curtis Brown representation and work with Riot Games; cross-reference Exhibit A personnel-chain evidence. The specific dates of engagement are not yet known.

ASSESSMENT OF THE CBG / ICM BASE LAYER

# WHAT THE DOCUMENTED SYSTEMS, PERSONNEL AND RIGHTS NETWORK SHOW

Bloodborg entered an agency with identifiable manuscript systems, cross-department screen functions and an active external ICM relationship. The evidence now particularises the professional architecture surrounding receipt.

### 1 SUBMISSION + RECORD SYSTEMS

Bloodborg was received through Curtis Brown's submission infrastructure.

CBG's own material identifies Agentfile as "the Curtis Brown database" and Therefore as a database system into which material was scanned.

Plaintiff's later SAR/ICO material separately identifies Brightfount, Curtis Brown Creative and other online submission portals as systems for which backend records, metadata, routing and audit information were sought.

### 2 INTERNAL MOVEMENT CAPABILITY

CBG's 2016 Book Department material expressly required staff to work across Books, Theatre Film & TV, Talent and Cuba Pictures while sharing "information, systems, ideas and networks."

The same operation read manuscripts, produced reports and pitches, tracked submissions and sent manuscripts/projects to production companies, studios and financiers.

### 3 IDENTIFIABLE PEOPLE + RIGHTS ROUTES

Blunt and Geller sat inside the senior Books operation. Speed supplied the Book-to-Film / Media Rights function. Marston and Young supplied screen-facing representation.

Named shared clients demonstrate recurring literary ↔ screen handling. Young represented Samuel Jefferson, whose professional material records work with Riot Games. The specific dates of that engagement are not yet known.

### 4 ACTIVE EXTERNAL ICM LAYER

CBG and ICM had a longstanding institutional relationship described as a "thriving partnership," involving close work with ICM partner teams, communications and scripts.

The relationship is particularised by 2020 rights evidence involving Blunt / Machinist and Geller / Speed / ICM immediately around the Bloodborg period.

**DOCUMENTED BASE: SUBMISSION SYSTEMS ↔ CBG DATABASES ↔ BOOKS ↔ BOOK-TO-FILM ↔ TFTV / TALENT / CUBA ↔ ICM**

**CUMULATIVE ASSESSMENT: The evidence supports an operating literary-to-screen infrastructure with identifiable systems, personnel, rights functions and external agency relationships. Bloodborg's documented receipt therefore occurred inside a professional environment capable of routing literary material into screen-facing markets.**

REMAINING DISCOVERY ISSUE: the base layer establishes architecture, connectivity and opportunity. It does not identify who, if anyone, forwarded Bloodborg. That question turns on internal submission metadata, access logs, audit trails, routing records, communications and rights/submission records outside Plaintiff's possession.

EVIDENCE BASIS: Exhibit A slides 24–40; CBG Book Department Job Description (Nov. 2016); CBG/ICM institutional and 2020 transaction evidence; Plaintiff's SAR/ICO material identifying Brightfount, Curtis Brown Creative and requested backend records. Brighton is not stated here because the presently located source material does not independently establish it as a CBG submission system/location.

PERSON-SPECIFIC CBG ↔ ICM OPERATIONAL EVIDENCE

# LAWRENCE TEJADA (ICM) WITHIN THE CBG OFFICE STRUCTURE

The evidence identifies a named, long-serving ICM finance employee inside CBG's internal office plan, adding person-specific corroboration to the documented CBG–ICM institutional relationship.

### CBG INTERNAL FLOOR PLAN • 2017

Expressly identifies:
“LAWRENCE TEJADA (ICM)”

→

### INDEPENDENT EMPLOYMENT RECORD

ICM • Bookkeeper
April 2003 → June 2022

→

### RELEVANT PERIOD

Tejada remained an ICM employee through 15 April 2020

### WHAT IS DOCUMENTED

The CBG office plan names Tejada with an ICM designation. His professional profile independently records 19 years at International Creative Management, including the 2017 floor-plan date and the April 2020 Bloodborg period.

### WHY THE ROLE MATTERS

A bookkeeping role is financial and operational in character. Combined with his appearance in CBG's internal office structure, it supports an inference of practical CBG–ICM interworking beyond occasional arm's-length rights transactions.

### WHAT STILL REQUIRES RECORDS

The evidence does not establish Tejada's system permissions, the client or project records he handled, continuous physical placement at CBG through 2020, or access to Bloodborg. Those questions require accounting records, permissions, audit trails and internal role documentation.

**CBG OFFICE STRUCTURE → NAMED ICM EMPLOYEE → FINANCIAL / OPERATIONAL FUNCTION → RELEVANT-PERIOD ICM EMPLOYMENT**

**EVIDENTIARY ASSESSMENT: Tejada provides person-specific corroboration of institutional interworking between CBG and ICM. His bookkeeping role makes the financial and administrative dimension of the relationship a concrete discovery issue, including what client, rights, commission, payment or project information his role required him to handle.**

Court-safe limit: the present evidence supports operational proximity and a basis for targeted discovery. It does not itself prove Tejada accessed, received or transmitted Bloodborg.

EVIDENCE: CBG internal 2017 office plan identifying “LAWRENCE TEJADA (ICM)”; Lawrence Tejada professional profile: International Creative Management (ICM), Bookkeeper, Apr. 2003–Jun. 2022; CAA from Jun. 2022.

EVIDENTIARY ASSESSMENT: CBG / ICM / UTA BASE LAYER

# WHAT THE ACCUMULATED PROFESSIONAL ARCHITECTURE ALREADY SHOWS

Taken cumulatively, the evidence describes an established cross-media agency environment operating before Bloodborg entered Curtis Brown Group on 15 April 2020.

### CROSS-MEDIA OPERATION

CBG's own material connects Books with Book-to-Film / Media Rights, Theatre Film & TV, Talent and Cuba Pictures.

Personnel read manuscripts, prepared reports and pitches, tracked submissions and submitted projects to production companies, studios and financiers.

### SYSTEMS + RETAINED DATA

CBG identified Agentfile as its database and Therefore as a system into which material was scanned.

Its materials also describe sharing “information, systems, ideas and networks” across departments.

These records support stored information and inter-working systems. They do not establish direct ICM or UTA access to CBG databases.

### LONGSTANDING ICM RELATIONSHIP

CBG and ICM maintained a relationship dating to 2008. CBG material described a “thriving partnership,” close work with ICM partner teams, communications and tracking scripts.

2020 transactions particularise the relationship through Blunt / Machinist and Geller / Speed / ICM.

### UTA + PACKAGING ENVIRONMENT

UTA later stated that it and CBG had collaborated successfully for “many years” and named pre-acquisition shared clients and screenwriters.

UTA and ICM also operated inside Hollywood's dominant packaging environment, where agencies assembled creative personnel and projects for studios and networks.

### WEB OF NAMED PERSONNEL

The route is increasingly particularised through identifiable people:

Blunt • Geller • Speed • Marston • Young • Jefferson • Machinist • Glusker • Overton

The evidence places these figures across literary receipt, media rights, screen representation, external agencies and Riot / Arcane-related professional nodes.

**BLOODBORG → CBG RECEIPT → STORED / TRACKED INFORMATION → BOOK-TO-SCREEN FUNCTIONS → ICM / UTA PROFESSIONAL NETWORK → RIOT / ARCANE NODES**

**CUMULATIVE ASSESSMENT: the subsequently obtained evidence particularises the previously alleged access route. It shows a pre-existing, cross-media professional network with identifiable systems, personnel, rights transactions, shared representation, packaging mechanisms and external agency relationships through which literary and screen projects were routinely handled.**

REMAINING FACTUAL ISSUE: this establishes professional architecture, connectivity and opportunity. It does not itself identify the person, communication or system event by which Bloodborg was forwarded. Those facts require the internal audit trails, submission records, communications and access histories outside Plaintiff's possession.

SOURCE BASIS: Exhibit A, especially slides 19–40: CBG/UTA first-party statements; CBG/ICM institutional evidence; CBG Book Department systems and manuscript-to-screen functions; 2020 rights transactions; packaging evidence; named personnel and shared-client evidence.

# WALL OF POSSIBLE ACCESS ROUTES LEAVING CBG

Documented relationships and functions only. Lines show possible professional pathways, not proven transmission of Bloodborg.




EVIDENTIARY POINT: CBG's own materials describe manuscript evaluation, databases, book-to-film functions, cross-department working and submission of projects into screen-facing markets. The exact Bloodborg handling route, if any, remains unproven.

# WHY THE EXACT INTERNAL ROUTE CANNOT YET BE IDENTIFIED

The access map particularises possible intermediary routes while preserving the distinction between capability and proven transmission.

## NINTH CIRCUIT ACCESS LAW

Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000): circumstantial access may be shown through a “particular chain of events.”

Loomis v. Cornish, 836 F.3d 991, 995–96 (9th Cir. 2016): access requires a reasonable possibility, not a bare possibility.

**Loomis rejects reliance on “bare corporate receipt.” The purpose of this map is to particularise the intermediary architecture beyond receipt alone.**

The evidence identifies named personnel, manuscript-handling systems, media-rights functions, external agency relationships and screen-facing submission mechanisms. It does not establish which route, Bloodborg actually followed.

## EVIDENCE NEEDED TO IDENTIFY THE ACTUAL ROUTE

The precise handling history depends upon internal evidence outside Plaintiff’s possession, including submission records, communications, database histories, audit trails, permissions, forwarding records and project files.

Plaintiff disputes the completeness of CBG’s SAR production; the matter is under ICO investigation. Plaintiff has also reported digital intrusion affecting relevant records.

**Those matters are preservation and discovery concerns. They do not independently prove transmission, identify a recipient, or establish which possible route was used.**

Accordingly, Plaintiff cannot truthfully select one internal route without the records capable of establishing the actual handling history.

LEGAL RELEVANCE: Three Boys, 212 F.3d at 482; Loomis, 836 F.3d at 995–96.

# CBG ↔ UTA: CLOSE WORKING RELATIONSHIP PREDATING THE 2022 ACQUISITION

UTA's own acquisition announcement described an established relationship existing for years before the corporate combination.

### UTA FIRST-PARTY DESCRIPTION

UTA stated that the two agencies had "collaborated successfully together for many years" and that their leadership had "known each other and worked together for years."

### WHY THE 2022 DATE MATTERS

The June 2022 acquisition formalised an existing professional relationship. It did not mark the beginning of contact between CBG and UTA. UTA itself identified years of prior collaboration.

### NAMED PRE-ACQUISITION SHARED CLIENTS / PROFESSIONAL OVERLAP

Actors: Damian Lewis • Lily James • Alicia Vikander • Bel Powley • Ncuti Gatwa

Screenwriters: David Farr • Georgia Pritchett • Tony Roche

These named examples demonstrate repeated CBG–UTA representation and screen-industry overlap predating the acquisition.

EVIDENTIARY POINT: CBG and UTA were established professional counterparts before 2022, with repeated shared-client and screenwriting relationships.

# CBG ↔ UTA: NAMED PRE-ACQUISITION CROSSOVERS

Repeated shared representation across acting and screenwriting provides person-specific evidence of the pre-existing agency relationship.

## CBG SIDE

CURTIS BROWN GROUP

Literary representation
Book-to-film / media rights
Theatre, Film & Television
Talent representation

Existing CBG layer:

**Felicity Blunt**
**Jonny Geller**
**Luke Speed**
**Nick Marston**
**Camilla Young**

## DOCUMENTED CROSSOVERS

Damian Lewis
Lily James
Alicia Vikander
Bel Powley
Ncuti Gatwa

David Farr
Georgia Pritchett
Tony Roche

UTA identified these as examples of clients shared by the two agencies before acquisition.

## UTA SIDE

UNITED TALENT AGENCY

Talent representation
Television literary
Screenwriting
Film / television packaging and representation

Relevant later-researched UTA personnel include Abby Glusker and Matt Baldovsky.

STRUCTURAL POINT: the CBG → UTA connection rests on UTA’s own description plus named shared professional relationships, not merely the later acquisition.

# CBG BASE LAYER → UTA: CONVERGENCE TOWARD THE ARCANE DEVELOPMENT ENVIRONMENT

This stage connects the established CBG professional architecture to the separately researched UTA layer.

## CBG BASE LAYER

Felicity Blunt
Jonny Geller

Luke Speed
Nick Marston
Camilla Young

Books / Media Rights / TFTV
CBG manuscript systems
CBG ↔ ICM institutional relationship

Multiple documented internal and outward-facing routes.

## CBG ↔ UTA BRIDGE

UTA first-party confirmation:
- collaborated for many years
- leadership worked together for years

Named shared clients:
Damian Lewis
Lily James
Alicia Vikander
Bel Powley
Ncuti Gatwa

Shared screenwriters:
David Farr
Georgia Pritchett
Tony Roche

## UTA / ARCANE-RELEVANT LAYER

Abby Glusker
UTA television literary agent
Amanda Overton representative

Amanda Overton
Arcane writer / producer

Matt Baldovsky
UTA television literary context

Additional historical UTA representation within the Arcane cast / professional environment is addressed in the following evidence.

EVIDENTIARY PURPOSE: this bridge particularises how the CBG access architecture connects into an agency with documented professional relationships relevant to the Arcane development environment.

# UTA WALL: MULTIPLE DOCUMENTED ROUTES NOW REACH RIOT / ARCANE

The UTA layer no longer rests on one contact: personnel, gaming transactions and Arcane story representation converge on the Riot environment.




**THREE INDEPENDENT UTA ROUTES REACH THE RIOT ENVIRONMENT: (1) Riot personnel moved into UTA Games before April 2020; (2) UTA represented an Arcane story-development writer; (3) later UTA Games records expressly identify development/distribution deal work involving Riot.**

Chronology is preserved: the Mynard route is pre-April 2020; the contractual evidence is later corroboration of an actual UTA Games ↔ Riot commercial relationship.

# OPHIR LUPU: UTA GAMES CONNECTS TO RIOT BY PERSONNEL AND TRANSACTIONS

Lupu's role is a central UTA gaming node, with a pre-submission Riot personnel bridge and later documentary confirmation of Riot-facing deal work.

## PRE-APRIL-2020: RIOT → UTA

June 2019: UTA recruited Travis Mynard directly from Riot Games.

Mynard had spent about six years at Riot, including League of Legends esports and leadership of global player management.

At UTA he reported to Damon Lau, Head of Esports. Lau reported into the UTA Games structure headed by Ophir Lupu.

This personnel bridge existed about ten months before 15 April 2020.

## WHAT LUPU'S PRACTICE DID

Contemporary reporting described UTA Games as handling:

- publishing deals
- intellectual-property deals
- employment agreements
- corporate development
- corporate and project financing

This identifies a substantive IP and development operation, not simply esports-player representation.

## LATER DOCUMENTARY CONFIRMATION: RIOT DEAL WORK

A résumé from Lupu's Executive Assistant, July 2021–January 2022, records reviewing UTA client contracts for:

"development and distribution deals with Microsoft, Tencent, Riot, and Electronic Arts"

It also records assisting Hollywood clients adapting existing IP into gaming and transmedia projects.

This independently confirms Riot-facing transactional work inside Lupu's UTA Games environment.

**EVIDENTIARY POINT: the Lupu node combines an actual Riot-to-UTA personnel movement before the Bloodborg submission with later records identifying Riot development/distribution work inside the same UTA Games operation.**

# LUPU ↔ THOMAS VU: LATER CONVERGENCE WITH A SENIOR RIOT / ARCANE FIGURE

Post-UTA evidence is chronologically later, but it further demonstrates that Lupu's professional network directly intersects senior Riot creative leadership.

### THOMAS VU / RIOT

Thomas Vu is publicly identified as a former senior Riot Games creative and franchise executive and an Executive Producer on Arcane.

His Riot history places him within the senior creative/IP side of the company relevant to the Arcane production environment.

### POST-UTA LUPU / VU CONVERGENCE

After Lupu's UTA tenure, public investment and company records place Ophir Lupu and Thomas Vu within the same gaming-investment ecosystem.

Both are publicly associated with Omeda Studios as investors/supporters, and later records place both within the Haveli/Fictions professional structure.

This evidence is later than April 2020 and is used as relationship corroboration.

### WHY IT STRENGTHENS THE MAP

The UTA Games route already reaches Riot through Mynard and documented Riot deal work.

The later Lupu–Vu convergence adds a person-specific intersection between the former head of UTA Games and a senior Riot/Arcane creative executive.

It therefore reinforces the reality of the professional network shown by the earlier evidence without changing the chronology.

**CUMULATIVE CONNECTION: LUPU / UTA GAMES → MYNARD / RIOT (2019) + UTA GAMES → RIOT DEAL WORK (2021–22) + LUPU ↔ VU / SENIOR RIOT-ARCANE CREATIVE FIGURE (later corroboration).**

# THE CBG / ICM / UTA WALL NOW REACHES THE RIOT / ARCANE DEVELOPMENT ENVIRONMENT

The developing access architecture contains multiple independent professional routes converging from literary receipt toward Riot and Arcane.

**CBG BASE LAYER**
**Blunt • Geller • Speed**
**Marston • Young • systems**

**ICM LAYER**
**co-agency • rights transactions**
**packaging**

**UTA LAYER**
**longstanding CBG relationship**
**shared clients / writers**

**UTA GAMES**
**Lupu • Lau • Mynard**
**IP / development functions**

**RIOT / ARCANE EDGE**
**personnel • transactions**
**story development**

## ROUTE A: CREATIVE WRITING

CBG / UTA bridge
→ Abby Glusker + Matt Baldovsky
→ Amanda Overton
→ Arcane story development
→ Riot production environment

## ROUTE B: GAMING PERSONNEL

CBG / UTA bridge
→ UTA Games / Ophir Lupu
→ Damon Lau
→ Travis Mynard
→ Riot Games / League of Legends

Pre-April-2020 Riot-to-UTA personnel crossover.

## ROUTE C: GAMING TRANSACTIONS

UTA Games / Lupu environment
→ development and distribution contracts
→ Riot expressly named
→ IP / transmedia capability

Later corroboration of an actual commercial UTA–Riot relationship.

**ADDITIONAL CORROBORATION: Lupu later converges professionally with Thomas Vu, a senior former Riot creative/franchise executive and Arcane Executive Producer. The wall therefore reaches Riot through separate creative, personnel and transactional paths.**

Purpose: particularise the alleged intermediary architecture with named people, functions, chronology and documented professional relationships.

# AMANDA OVERTON: UTA REPRESENTATION REACHES ARCANE'S STORY FUNCTION

The district-court record already placed Overton inside the Arcane development evidence; later material particularises the UTA route.

## ALREADY BEFORE THE DISTRICT COURT

Document 58, pp. 935-936 / Page IDs 2897-2898, contained a dedicated Amanda Overton section. The filing addressed her script, interview, viewing of the Arcane pilot, and her role in changing and developing the story.

The District-Court Access Matrix therefore classifies Overton as already before the court.

## SUBSEQUENT UTA PARTICULARISATION

A 2018 industry record identifies Amanda Overton as represented at UTA by Abby Glusker and Matt Baldovsky while describing her as Executive Story Editor on Arcane for Riot Games.

This places named UTA representatives directly behind a writer already performing an Arcane story-development function.

## SUBJECT-MATTER NEXUS

The route does not terminate with an actor, casting contact, or generic corporate employee.

It reaches a writer and story editor whose work concerned Arcane's narrative development.

That creative function is material to the intermediary-access nexus addressed by Loomis.

**COURT POINT: CBG/UTA evidence leads to a named UTA-represented Arcane story professional, not merely corporate receipt.**

# OVERTON'S ROUTE INTO RIOT: AGENTS → INTERVIEW → PILOT → STORY DEVELOPMENT

Overton's account supplies a person-specific mechanism linking agency representation to Riot's creative material.

## AGENCY REFERRAL

Overton publicly explained that her agents alerted her to opportunities for a new animated series and considered her suitable for the project.

The later 2018 industry evidence identifies her UTA representatives as Abby Glusker and Matt Baldovsky.

The route into Riot therefore begins with identified professional representation.

## RIOT INTERVIEW AND PILOT

Document 58 already relied on Overton's account of the interview process and viewing the Arcane pilot.

Her later public account likewise describes going to Riot, seeing the pilot, and participating in structural development as the season and series took shape.

This places the intermediary inside Riot's creative-material process.

## WRITERS' ROOM FUNCTION

The filed Arcane-development evidence described story and script work continuing through the writers' room. Overton's account describes collaborative work on character motivations, backstories, outlines, scripts and structural development.

Her function therefore overlaps directly with the subject matter of the alleged copying.

**CHAIN: UTA REPRESENTATION → OVERTON → RIOT INTERVIEW/PILOT → ARCANE STORY AND SCRIPT DEVELOPMENT.**

# APRIL 2020 ACCESS PRECEDES THE DOCUMENTED PRODUCTION ACCELERATION

The relevant chronology is earlier development, April 2020 alleged access, then the substantial 2020 production and distribution build-out.

### 15 APRIL 2020: ALLEGED ACCESS

Bloodborg: The Harvest was submitted to Curtis Brown Group on 15 April 2020, with the parallel Riot Forge submission route separately addressed in Exhibit B.

Document 58 already alleged CBG/UTA/Riot access routes and placed Overton, Hoffacker, Macer and the Arcane writers' process within the development chronology.

### RIOT'S ARTBOOK: 2020 BUILD-OUT

The Art and Making of Arcane, p. 10, states that Riot hired producer Melinda Dilger in 2020 to help Arcane “cross the finish line.” It says she devised an L.A. production pipeline with Fortiche to complete Season 1's nine episodes.

The same passage states that around this time they obtained the greenlighting and Riot obtained its Netflix distribution deal, with Netflix signing on based on the pilot “alone, really, not much else.”

### PRODUCTION SCHEDULE EVIDENCE

Document 58, pp. 854-855 / Page IDs 2816-2817, relied on Melinda Dilger's production schedule and statements showing writing, storyboards, animation, casting, voice recording and other production functions continuing through the later 2020-2021 production period.

The filing quoted Dilger explaining that additional time would be taken to finish scripts.

**TEMPORAL POINT: Plaintiff alleged access before the documented 2020 pipeline, Netflix deal and continuing script/production work.**

# HOFFACKER: RIOT WAS USING AGENTS, SUBMITTED SCRIPTS AND A WRITERS' ROOM

This evidence was already before the District Court and supplies context for Overton's agent-mediated entry into Arcane.

## DOCUMENT 58: JANE CHUNG HOFFACKER

Document 58, pp. 927-934, especially pp. 927-928 / Page IDs 2889-2890, contained a dedicated Hoffacker section.

The filing recorded her discussing unsuccessful efforts to greenlight the project, working the story out in the writers' room, reading submitted scripts, learning to work with agents, and hiring scriptwriters / writers-room personnel.

## OVERTON FITS THE SAME MECHANISM

Overton's evidence describes an agent-mediated opportunity, a Riot interview, access to the pilot, and subsequent story-development work.

Hoffacker's evidence independently describes Riot's use of agents, submitted writing material and writers-room recruitment during Arcane development.

The two accounts describe compatible parts of the same professional process.

## WHY THIS MATTERS TO ACCESS

The panel held that Plaintiff failed to allege facts sufficient to show Riot access.

But the pleaded evidence did not stop at receipt by CBG. It identified agency relationships and Riot's own creative-development process involving agents, scripts and writers, including Overton and Hoffacker.

Later evidence particularises the named UTA intermediaries.

**EVIDENTIARY POINT: the alleged route enters the same agent-and-writer process Riot personnel described for Arcane.**

# LOOMIS: THIS ALLEGED ROUTE IS MORE THAN 'BARE CORPORATE RECEIPT'

The evidence particularises successive intermediaries and terminates inside the creative work allegedly copied.

**BLOODBORG CBG RECEIPT 15 APR 2020** → **CBG / UTA PROFESSIONAL BRIDGE** → **GLUSKER + BALDOVSKY UTA** → **AMANDA OVERTON** → **RIOT PILOT / STORY PROCESS** → **ARCANE WRITERS' ROOM** → **ARCANE CREATIVE CORE**

### LOOMIS v. CORNISH

836 F.3d 991, 995-996 (9th Cir. 2016): bare corporate receipt is insufficient, but intermediary dealings may establish access where the relationships contain a nexus and overlap in subject matter. The question is whether it was reasonably possible for the paths of the work and alleged infringer to cross.

### THREE BOYS / ART ATTACKS

Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482, permits access to be shown through a "particular chain of events." Art Attacks Ink v. MGA, 581 F.3d 1138, 1143, likewise requires a reasonable possibility rather than speculation.

### APPLICATION

Plaintiff's alleged chain identifies the manuscript recipient, established agency bridges, named UTA representatives, a named Arcane story editor/writer, Riot's pilot and writers' process, and continuing 2020 production development.

That is the pleaded nexus Plaintiff contends the panel overlooked when characterising access as insufficient.

**COURT POINT: the alleged access theory is a layered intermediary chain ending in Arcane's story-development function, not an inference based solely on a manuscript arriving somewhere inside a corporation.**

Record: Document 58 pp. 927-936, 854-855; later corroboration: UTA representation evidence and The Art and Making of Arcane, p. 10.

# CUMULATIVE ASSESSMENT: THE UTA / OVERTON LAYER REACHES RIOT'S CREATIVE PROCESS

This section reorganises and particularises an access theory already presented in the District Court filings; it does not substitute a new theory.

BLOODBORG CBG RECEIPT — CBG INTERNAL / RIGHTS ROUTES — CBG ↔ ICM / UTA BRIDGES — UTA INTERNAL NETWORK — GLUSKER / BALDOVSKY — AMANDA OVERTON — RIOT / ARCANE STORY PROCESS

## ALREADY PRESENTED IN THE FILINGS

Document 58 already alleged the CBG-to-UTA-to-Riot/Arcane intermediary route and separately placed Amanda Overton, Jane Chung Hoffacker, Monica Macer, the Arcane writers' process and Riot's development chronology before the District Court.

The present exhibit makes those pleaded relationships cleaner, dated and easier to evaluate.

## WHAT THE LATER EVIDENCE ADDS

Subsequent material particularises the previously alleged architecture with named CBG/UTA relationships, identified UTA representatives, Overton's 2018 Riot/Arcane story role, her agent-mediated entry into Riot, and the documented 2020 production build-out.

It strengthens the route without changing its essential theory.

## CUMULATIVE RESULT

The route now identifies successive professional functions from manuscript receipt through literary and screen-rights networks into a named Arcane writer/story editor and Riot's creative-development process.

Plaintiff contends this is materially different from an inference based only on corporate receipt.

**ASSESSMENT: the alleged path is now particularised layer by layer, with the UTA branch reaching the hands of personnel working directly on Arcane's story development.**

Record references include Document 58 pp. 854-855 and 927-936; subsequent corroboration is separately identified throughout Exhibit A.

# LEGAL ASSESSMENT: THE PARTICULARISED ROUTE ADDRESSES THE LOOMIS NEXUS

The controlling Ninth Circuit authorities distinguish speculative corporate receipt from a particular chain connecting the work to the relevant creative project.

### LOOMIS v. CORNISH

836 F.3d 991, 995-996 (9th Cir. 2016).

Loomis rejects “bare corporate receipt” where the recipient has no nexus to the alleged copier or relevant work unit. It also recognises intermediary access where dealings contain sufficient subject-matter overlap and make it reasonably possible for the paths of the work and alleged infringer to cross.

The panel relied on Loomis in affirming dismissal.

### THREE BOYS / ART ATTACKS

Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000), permits access to be proved circumstantially through a “particular chain of events” connecting the work and defendant.

Art Attacks Ink v. MGA, 581 F.3d 1138, 1143 (9th Cir. 2009), likewise requires evidence supporting a reasonable possibility of access, not speculation.

### APPLICATION TO THIS LAYER

Plaintiff's route does not stop with CBG receipt. It proceeds through identified literary/screen-rights and agency relationships, named UTA representatives, Amanda Overton, her Riot interview and pilot access, and her Arcane story-development function.

Plaintiff contends those pleaded and corroborated facts supply the intermediary nexus the panel's “bare corporate receipt” analysis did not address.

**LEGAL CONCLUSION: the question is whether the pleaded chain plausibly created a reasonable possibility that the paths of Bloodborg and the Arcane creative process crossed.**

# WHY THE CLEANER PRESENTATION MATTERS TO REHEARING

The evidentiary map clarifies what Plaintiff contends the panel overlooked or misapprehended when treating the access allegations as insufficient.

## THE PANEL'S DISPOSITION

The memorandum held that Plaintiff "failed to allege facts sufficient to show that Riot Games had access to his copyrighted material" and relied on Loomis's rule concerning bare corporate receipt.

Rehearing therefore turns on whether the filings actually alleged more than receipt by an unrelated corporate employee.

## THE EXISTING THEORY, MADE CLEAR

The District Court filings already identified intermediary routes and named Arcane-development personnel. The present visual sequence consolidates those allegations into one readable chain and separates the existing record from later corroborative evidence.

The theory remains the same: access through professional intermediaries into the relevant creative environment.

## POINT FOR THE COURT

Plaintiff asks the Court to evaluate the pleaded route as a whole, not as isolated corporate contacts.

Viewed cumulatively, the alleged chain contains named intermediaries, relevant professional functions, subject-matter overlap, and a terminus inside Arcane's story-development process.

Those are the features relevant under Loomis and Three Boys.

**THIS SECTION DOES NOT INVENT A NEW ACCESS THEORY. IT ORGANISES THE THEORY ALREADY FILED AND SHOWS, MORE CLEANLY, WHY PLAINTIFF CONTENDS IT EXCEEDS BARE CORPORATE RECEIPT.**

# DISCOVERY IS NECESSARY TO IDENTIFY THE INTERNAL ROUTE

Plaintiff can particularise the external intermediary chain; the precise internal movement of a manuscript is information held by the organisations controlling the relevant systems and records.

## THE INFORMATION ASYMMETRY

A plaintiff outside CBG, ICM, UTA and Riot cannot personally observe internal routing, database access, forwarding, downloads, rights submissions, project records, shared workspaces or later retrieval of material.

Once the pleaded route reaches identified organisations and creative personnel, the remaining internal steps are principally evidenced by records controlled by those organisations.

Plaintiff contends targeted discovery was therefore necessary to determine the route actually used.

## MODERN SYSTEMS DO NOT REQUIRE HAND-TO-HAND DELIVERY

Modern manuscript and entertainment workflows may operate through databases, document-management systems, cloud storage, shared project spaces, retention systems, rights-management platforms and searchable archives.

Accordingly, access need not leave a simple person-to-person email chain. A retained document may be accessible, routed, retrieved or incorporated through interconnected systems without a conventional physical hand-off.

The CBG materials in this exhibit identify database and cross-department infrastructure relevant to this issue.

## PRESERVATION AND DISCOVERY CONCERNS

Plaintiff has separately alleged incomplete disclosure, missing submission records, stonewalling, disputed timelines, digital intrusion and other preservation or litigation-conduct concerns. Those allegations do not themselves prove transmission.

They reinforce, however, why the internal route cannot fairly be resolved by demanding evidence uniquely held behind the defendants' and intermediaries' systems while denying discovery directed to those records.

The requested records include audit trails, access logs, submission histories, communications and project-routing records.

**ASSESSMENT: Plaintiff has particularised the route to the relevant organisations and Arcane creative personnel. Identifying the precise internal transmission mechanism requires the records and system evidence controlled by those entities.**

# HISTORICAL PACKAGING MECHANISM: THE THREE-AGENCY STRUCTURE PREDATES ARCANE

The proposed convergence is grounded in documented industry practice and a pre-Arcane CBG–ICM–UTA example.

### ICM ↔ UTA: DOCUMENTED CO-PACKAGING

ICM and UTA had an established history of assembling television packages. The working evidence identifies Modern Family as a joint ICM/UTA package.

By 2019, packaging economics and agency conflicts were already the subject of the WGA dispute with the major agencies.

This establishes the mechanism as an existing Hollywood business practice, not a structure inferred solely from Arcane.

### 2019: SOMETIMES I LIE

Underlying literary IP:
Jonny Geller / Curtis Brown Group

Television package:
ICM Partners

Screenwriting talent:
Robin Swicord / UTA

The transaction supplies a pre-Arcane example in which CBG literary property, an ICM television package and UTA writing talent converged on one adaptation.

### EVIDENTIARY SIGNIFICANCE

The evidence demonstrates a functioning commercial architecture capable of combining literary rights, packaging and represented screen talent across CBG, ICM and UTA before the relevant 2020 period.

The question for Arcane is therefore factual: whether a comparable cross-agency talent or packaging arrangement operated around the production and what records it generated.

Source basis: Suspected Cross-Agency Packaging and Talent Assembly, §§ XI–XII.

# CBG, ICM AND UTA WERE PROFESSIONALLY INTERCONNECTED BEFORE APRIL 2020

The agencies did not first encounter one another through Arcane or UTA's 2022 acquisition of Curtis Brown.

## CBG ↔ ICM

Formal co-agency relationship dating to 2008.

CBG later described a “thriving partnership” involving close work with ICM partner teams, communications and script tracking.

Contemporaneous rights transactions connected Felicity Blunt, Jonny Geller and Luke Speed with ICM around the relevant period.

## CBG ↔ UTA

UTA's 2022 acquisition announcement stated that UTA and Curtis Brown companies had “collaborated successfully together for many years.”

Pre-2020 shared representation and screen relationships included David Farr and other writers/performers.

The collaboration therefore predates Bloodborg's April 2020 CBG receipt.

## ICM ↔ UTA

The agencies had historically co-packaged television and operated within the same Hollywood talent-assembly market.

Together with the 2019 Sometimes I Lie structure, the evidence places all three agencies inside an established pre-Arcane professional network spanning literary rights, packaging and screen talent.

This slide consolidates relationships developed in the preceding access layer; it does not present a new access theory.

# THE SAME THREE-AGENCY NETWORK APPEARS ACROSS ARCANE'S CREATIVE ASSEMBLY

The identified connections extend beyond performers into writing, production and casting.

### WRITING / STORY

Amanda Overton

UTA
Abby Glusker
Matt Baldovsky

Executive Story Editor, writer and producer on Arcane.

UTA representation therefore reaches directly into the story-development function.

### PRODUCTION

Monica Macer

ICM Partners

Consulting Producer across all nine Season 1 episodes.

The ICM connection therefore extends into Arcane production personnel.

### CASTING

Jen Rudin

Riot / Arcane casting
Later ICM Animation & Voice-Over

Rudin joined ICM in July 2020 after prior Riot/Arcane casting work. Mia who voiced powder was cast by Rudin.

### PRINCIPAL TALENT

Seven significant performers are identified through direct CBG, ICM or UTA representation.

Two additional performers were recruited through the Overton and Rudin routes.

Working total: nine significant cast connections.

The evidence therefore reaches four distinct production functions: story, production, casting and principal performance.

# UTA: AMANDA OVERTON CROSSES FROM STORY DEVELOPMENT INTO TALENT RECRUITMENT

Overton's significance in this layer is functional: a UTA-represented Arcane creative also participated directly in recruitment.

**UTA**
**Glusker + Baldovsky**

**AMANDA OVERTON**
**Arcane story / production**

**DIRECT OUTREACH**
**for Arcane**

**KATY TOWNSEND**
**Maddie Nolen**

## DOCUMENTED ROUTE

The working evidence identifies Overton's UTA representatives while she was already associated with Arcane. Townsend later publicly described Overton personally contacting her after hearing her prior game voice work.

## WHY IT MATTERS

The route demonstrates that the UTA-connected Arcane writing/producing layer was not isolated from talent assembly. A represented creative participant could also function as a recruitment point into the production.

This recruitment evidence concerns the production network; it is not offered as proof that Townsend had access to Bloodborg.

# ICM: JEN RUDIN CONNECTS ARCANE CASTING TO THE AGENCY'S VOICE OPERATION

The chronology is specific: Rudin's ICM employment began in July 2020, so this evidence shows production convergence, not April 2020 transmission.

**RIOT / ARCANE CASTING** — **JEN RUDIN** Casting professional — **ICM PARTNERS** Animation & Voice-Over

**MIA SINCLAIR JENNESS** Powder

## AGENCY CONVERGENCE

Rudin worked on Riot/Arcane casting and joined ICM Partners in July 2020 to establish its Animation and Voice-Over department. Her discussions with ICM reportedly began before the pandemic.

## RECRUITMENT ROUTE

The working evidence identifies Mia Sinclair Jenness, voice of Powder, as having been brought into Arcane through Rudin. This supplies a second identified recruitment route into significant Arcane talent.

Chronology limitation preserved: Rudin's ICM employment postdates the April 2020 submission.

# ICM: MONICA MACER PLACES THE AGENCY INSIDE ARCANE SEASON 1 PRODUCTION

This connection is distinct from casting and acting representation.

### MONICA MACER

Publicly identified as represented by ICM Partners in contemporary industry reporting.

Her agency connection predates Arcane's release and places an ICM-represented television professional within the relevant production environment.

### ARCANE ROLE

Consulting Producer

Season 1

All nine episodes

The identified ICM footprint therefore reaches a production-level creative professional across the complete first season.

### SIGNIFICANCE

When considered with Overton in story development and Rudin in casting, Macer closes another functional gap.

The same agency network appears not only around represented actors, but within personnel involved in assembling and developing the production.

Source basis: Suspected Cross-Agency Packaging and Talent Assembly, § XVII; Cast Update.

# HARRY LLOYD: A PRE-2020 CBG + ICM REPRESENTATION CROSSOVER INSIDE THE PRINCIPAL CAST

Lloyd provides a direct overlap between two agencies in the network before the relevant April 2020 period.




**EVIDENTIARY POINT**

Contemporary 2016 and 2019 sources identify Lloyd as represented simultaneously by CBG and ICM Partners. He later voiced Viktor, one of Arcane Season 1's highest-screen-time characters.

The significance is the pre-existing dual-agency representation, not an inference that Lloyd transmitted Plaintiff's work.

# NINE IDENTIFIED SIGNIFICANT CAST CONNECTIONS WITHIN THE CBG / ICM / UTA NETWORK

Seven performers are directly connected through representation; two additional performers entered through identified agency-connected Arcane personnel.

## DIRECT REPRESENTATION: CBG / ICM

Ella Purnell — Jinx — CBG

Katie Leung — Caitlyn — CBG

Harry Lloyd — Viktor — CBG + ICM

Harry Lloyd is especially significant because the dual CBG/ICM representation is documented before April 2020.

## DIRECT REPRESENTATION: UTA

Hailee Steinfeld — Vi- Linked

Kevin Alejandro — Jayce

Jason Spisak — Silco

Brett Tucker — Singed

Historical representation evidence places these performers within UTA's talent network; exact period evidence should remain attached to the underlying sources.

## IDENTIFIED RECRUITMENT ROUTES

Katy Townsend — Maddie
Amanda Overton → Townsend

Mia Sinclair Jenness — Powder
Jen Rudin → Jenness

Together with the seven directly represented performers, the working evidence identifies nine significant cast connections.

Working evidentiary count: 7 directly represented performers + 2 recruited through identified agency-connected Arcane personnel = 9.

# HAILEE STEINFELD: DOCUMENTED UTA PROXIMITY, WITH THE ARCANE CASTING ROUTE RESERVED

The evidence supports longstanding professional and social proximity to UTA. The presently assembled record does not independently confirm that UTA itself delivered the Arcane / Vi role to Steinfeld.

## DOCUMENTED UTA PROXIMITY

Historical evidence places Steinfeld within the wider ICM / CAA / UTA professional network before Arcane. In 2015, Meredith Wechter at ICM was reported as working with clients including Steinfeld. Steinfeld was also present at a 2011 Oscar-week gathering at the home of UTA co-founder Jim Berkus.

## WHAT THIS SUPPORTS

A further crossover appears through David Klein, who worked with Steinfeld at CAA and moved to UTA in April 2017. Contemporary reporting did not establish which clients would follow him. Taken together, the evidence documents multiple historical professional links connecting Steinfeld to personnel and institutions within the ICM / CAA / UTA agency network.

## ARCANE ROLE: PRESENT STATUS

The presently assembled evidence does not independently establish that UTA supplied or secured Steinfeld's Arcane role as Vi. The stronger proposition is the documented network: Steinfeld ↔ ICM / Meredith Wechter; Steinfeld ↔ CAA / David Klein → UTA; and Steinfeld ↔ Jim Berkus / UTA. The precise Arcane casting mechanism remains to be established from representation, audition, offer and negotiation records.

## EVIDENTIARY SIGNIFICANCE

Steinfeld remains relevant to the agency-convergence analysis because the historical record places her within overlapping ICM, CAA and UTA professional relationships before Arcane. This evidence supports professional proximity and crossover. It does not assign an unverified agency as the source of the Vi role.

**COURT-SAFE POINT: documented ICM / CAA / UTA professional crossovers are established; the precise agency route by which Steinfeld obtained the role of Vi remains a separate factual question.**

Source basis: historical Steinfeld agency material identified in Exhibit A, including Meredith Wechter / ICM, David Klein's 2017 CAA→UTA move, and the Jim Berkus Oscar-week gathering.

# THE SIX HIGHEST-SCREEN-TIME SEASON 1 CHARACTERS ALL FALL WITHIN THE IDENTIFIED NETWORK

Using the supplied Season 1 screen-time dataset, the concentration is measurable.




**MEASURED CONCENTRATION**

473 minutes

≈ 74.5%

of the measured Season 1 character screen time in the supplied dataset.

All six characters fall within the identified CBG / ICM / UTA representation network.

**EVIDENTIARY USE**

A concentration indicator supporting targeted discovery, not proof by itself of a package or transmission.

Screen-time figures reproduced from the supplied working dataset identified in the packaging/talent-assembly document.

# FINANCIAL AND PACKAGING QUESTION: WHAT COMMERCIAL ARRANGEMENT PRODUCED THE CONVERGENCE?

The evidence supports targeted inquiry into packaging, commissions and talent assembly; it does not yet establish a specific Arcane profit-sharing arrangement.

## DOCUMENTED INDUSTRY MECHANISM

Historical packaging allowed agencies to assemble writers, actors, directors and producers around productions.

ICM and UTA had co-packaged television, and the 2019 Sometimes I Lie adaptation shows CBG literary IP, ICM packaging and UTA writing talent converging before Arcane.

## ARCANE CONVERGENCE TO BE EXAMINED

The working evidence identifies the same agency network across Arcane writing, production, casting and principal talent.

That concentration raises a legitimate discovery question concerning referrals, representation commissions, package economics, rights exploitation and talent-assembly incentives surrounding the production.

## RECORDS CAPABLE OF ANSWERING IT

Package records
Casting submissions
Talent grids
Referral records
Commission arrangements
Rights records
Deal memoranda
Agency communications
Riot communications
Fortiche communications
Netflix communications

Court-safe proposition: grounds for targeted discovery into whether a coordinated cross-agency packaging or talent-assembly arrangement existed.

# CUMULATIVE CONVERGENCE: THE ACCESS NETWORK REAPPEARS ACROSS ARCANE'S ASSEMBLY

The same agencies identified along Plaintiff's alleged access route recur across multiple creative and commercial functions surrounding the accused production.




## CUMULATIVE EVIDENTIARY POINT

The same CBG / ICM / UTA network identified around Plaintiff's alleged access route subsequently appears across story development, production, casting and a concentrated group of principal performers.

## TARGETED DISCOVERY

The convergence supplies grounds to examine whether a coordinated packaging or talent-assembly arrangement existed, how it operated, who participated, and what rights, referral, casting, commission and communications records it generated.

This section develops and substantiates the access theory already placed before the District Court and appellate record; later evidence is separately identified.

# PRE-EXISTING RIOT VOICE TALENT: SEPARATED FROM THE EXTERNAL CAST ANALYSIS

Several Arcane performers already voiced Riot / League of Legends characters before 15 April 2020, giving them an established route into Riot's voice-talent pool before the relevant access date.

| PERFORMER | ARCANE ROLE | PRE-EXISTING RIOT / LoL ROLE | BY | EVIDENTIARY TREATMENT |
|---|---|---|---|---|
| **JB Blanc** | Vander | Braum | 2014 | Pre-existing Riot voice relationship |
| Yuri Lowenthal | Mylo | Taric | 2016 | Pre-existing Riot voice relationship |
| Mara Junot | Shoola / Jules | Evelynn | 2017 | Pre-existing Riot voice relationship |
| Erica Lindbeck | Elora | Taliyah; Zoe; Morgana | 2016–2019 | Pre-existing Riot voice relationship |
| Krizia Bajos | Ximena | Akali | 2018 | Pre-existing Riot voice relationship |
| Fred Tatasciore | Benzo | Mordekaiser | 2019 | Pre-existing Riot voice relationship |
| Dave B. Mitchell | Hoskel / Enforcers | Warwick | 2017 | Pre-existing Riot voice relationship |

**CONSERVATIVE TREATMENT: These performers are separated from the external CBG / ICM / UTA cast-convergence analysis because their pre-15-April-2020 Riot voice work provides an independent pre-existing route into Riot's talent pool.**

Sources: Document 58, pp. 750–751 / Page IDs 2712–2713 (JB Blanc); League of Legends voice-cast records and Arcane credits. Cutoff: 15 April 2020.

# DAVID LYERLY: THE IDENTIFIED ROUTE FOR FILLING THE REMAINING ARCANE CAST

Document 58 identifies Lyerly as Arcane's casting / voice director and records his own account of moving from ADR work into casting the remaining episodes, talent management and voice production.

**ALEX YEE** → **"HIT UP" LYERLY** → **ADR / PILOT RE-RECORDS** → **CAST REMAINING EPISODES** → **SEASON 1 VOICE CAST**

### 1. LYERLY'S ROLE EXPANDED BEYOND ADR

Document 58 records Lyerly saying he first joined as ADR director. His involvement then "eventually led to casting the remaining episodes and tweaking the first episode." It also records him assisting with talent management, contract negotiations and coordination with recording studios.

### 2. HE REUSED AN EXISTING PERFORMER POOL

When asked whether he used actors he had worked with before, Document 58 identifies JB Blanc, Dave B. Mitchell, Mara Junot and Josh Keaton. It states these performers had small pilot roles and later played different characters in the series.

### 3. LYERLY DESCRIBED FILLING SEASON 1 ROLES

Lyerly told Christian Linke and Alex Yee the earlier performers had worked hard on the pilot and proposed: "As a thank you let's bring them in and let's find roles for them in season one." Mick Wingert separately stated David Lyerly cast them.

**CASTING STRUCTURE**

**PRE-EXISTING RIOT / PILOT TALENT → LYERLY REASSIGNS / FINDS SEASON 1 ROLES | REMAINING EPISODES → LYERLY CASTING FUNCTION | PRINCIPAL EXTERNAL SEARCHES → separate agency route, including Jinx / Ella Purnell**

**EVIDENTIARY POINT: Document 58 did not leave the residual cast unexplained. It identified a named casting decision-maker, his recruitment by Alex Yee, his role in casting the remaining episodes, and his stated practice of reusing performers already known from the pilot.**

Source: Document 58, pp. 697–702, Page IDs 2659–2664; see also pp. 630–631, Page IDs 2592–2593.

# DOCUMENT 58 ALREADY CHALLENGED RIOT'S PRE-ACCESS PRODUCTION CHRONOLOGY

Plaintiff's chronology challenge was before the District Court. Document 58's "FINDINGS OVERALL" expressly alleged conflicting accounts concerning when Arcane was written, developed, cast and produced.

### AARON MOSS

Plaintiff alleged Moss misrepresented the production chronology, including the proposition that the relevant scripts/material were completed and locked before Plaintiff's alleged April 2020 access date.

### CHRISTIAN LINKE + ALEX YEE

Plaintiff alleged Linke misrepresented development dates and Yee misrepresented script / production progress. Document 58 relied on later accounts of continuing development to challenge the asserted early-completion narrative.

### AMANDA OVERTON

Plaintiff alleged inaccurate statements concerning script completion while also relying on Overton's descriptions of writers-room work, structural changes, character development and continuing creative revision.

### MELINDA DILGER

Plaintiff alleged production material was back-scheduled. Dilger's account was also relied upon for continuing production infrastructure and development activity during the later production period.

### OVERARCHING ALLEGATION

Document 58 alleged Riot pushed the development chronology backwards while rewrites, adaptation, casting, recording and production activity continued into 2020–21.

**RECORD POINT: The later access evidence is being advanced against an already-pleaded dispute over Riot's chronology. The chronology challenge was not created after dismissal.**

Source: Document 58, "FINDINGS OVERALL" and cited chronology sections.

# CASTING AND RECORDING ACCOUNTS: CONTRADICTIONS ALREADY ALLEGED IN DOCUMENT 58

Document 58 did not accept the public casting chronology at face value. It identified specific performers and production pers onnel whose accounts were alleged to conflict with the asserted development timeline.

### MIA SINCLAIR JENNESS

Plaintiff expressly challenged Mia's claimed recording dates and the age-based chronology attached to the Powder material. Her account is therefore treated as disputed evidence, not as an independent date anchor.

### REED SHANNON

Plaintiff alleged Reed Shannon supplied a misleading casting chronology. Document 58 compared inconsistent public accounts concerning when he began work on Arcane.

### DAVID LYERLY

Plaintiff alleged Lyerly misrepresented casting / production chronology. His accounts are significant because he also describes recruitment by Alex Yee, ADR work, casting remaining episodes and assigning Season 1 roles.

### ELLA PURNELL / CAST & CREW EVIDENCE

Document 58 relied on Purnell and other cast / crew accounts as evidence placing voice-recording and casting activity within the 2020–21 production period, contrary to Plaintiff's understanding of Riot's asserted pre-access completion chronology.

### INFORMAL RECRUITMENT ROUTES

Plaintiff also alleged informal "hit-up" recruitment routes. This matters to access because the production was alleged to use identifiable personal and professional pathways, not a single formal corporate channel.

**RECORD POINT: Document 58 already alleged material inconsistencies in the casting and recording chronology. The present access analysis should be read alongside those pleaded inconsistencies.**

Source: Document 58, "FINDINGS OVERALL"; casting, voice-recording and recruitment sections.

# THE POWDER "CRYING SCENE": DOCUMENT 58 ALLEGED AN INTERNALLY CONFLICTING CHRONOLOGY

The point is not to adopt Mia's claimed age/date. Document 58 challenged that account itself and compared it with the stated involvement chronology of adults said to have participated in the same recording event.

**CLAIMED EARLY DATE**

Mia's disputed age / recording account

→

**2017 / LATE 2017**

Lyerly's Riot / Arcane involvement chronology

→

**JULY 2018**

Cavaiola's Riot employment chronology

**LYERLY'S DESCRIPTION OF THE PERFORMANCE**

Document 58 records Lyerly describing himself directing Mia through the crying performance, asking for another take and observing Alex, Brad, Kathy and the engineers reacting emotionally to the result.

**THE CONFLICT PLAINTIFF ALLEGED**

The supposed early recording date was challenged because it could not readily be reconciled with Lyerly's stated Riot / Arcane involvement chronology or Cavaiola's stated Riot employment chronology, although both are placed within the described event.

**COURT POINT: Document 58 placed the internal chronology conflict before the District Court. Plaintiff did not rely upon the disputed age claim as proof of the date; Plaintiff challenged the reliability of the claimed date by comparing the participants' own accounts.**

Source: Document 58, Powder crying-scene, Lyerly and Cavaiola chronology sections.

# DOCUMENT 58 ALLEGED CREATIVE DEVELOPMENT CONTINUED INTO 2020–21

The chronology challenge extended beyond casting. Plaintiff relied upon writing, character-development, voice-production and music evidence to dispute the proposition that the relevant Arcane material was fixed before April 2020.

### SCRIPT DEVELOPMENT / ADAPTATION

Document 58 alleged script development and adaptation continued into 2021, including rewrites and continuing work inconsistent with Plaintiff's understanding of Riot's asserted early-completion chronology.

### BRIDGING THE RIFT

Plaintiff relied upon Bridging the Rift material as evidence of continuing character, story and script development during the production period.

### VOICE-ACTOR / PRODUCTION EVIDENCE

Plaintiff relied upon voice-actor evidence to show recording and production activity continuing beyond the chronology advanced against him.

### MUSIC CHRONOLOGY

Document 58 also challenged public claims concerning the length and timing of Arcane's music-production chronology.

### YOUNG PERFORMERS

Plaintiff alleged manipulation or unreliability in accounts attributed to young performers and treated those accounts as part of the chronology dispute.

### CUMULATIVE ALLEGATION

Riot's asserted development chronology was alleged to conflict with its own writers', producers', casting personnel's and performers' accounts.

**TRANSITION TO ACCESS ASSESSMENT: The casting-access evidence now particularises the professional routes surrounding a production whose timing and continuing creative development Plaintiff had already placed in dispute below.**

Source: Document 58, "FINDINGS OVERALL"; Bridging the Rift, script-development, voice-production and music sections.

# DOCUMENT 58: CHRONOLOGY CONTRADICTIONS ALREADY ALLEGED BELOW

Document 58's "FINDINGS OVERALL" already placed the following chronology challenges before the District Court:

1. Moss misrepresented the production chronology.
2. Mia Sinclair Jenness gave false recording dates.
3. Reed Shannon gave a misleading casting chronology.
4. Melinda Dilger back-scheduled production material.
5. Amanda Overton made inaccurate statements concerning script completion.
6. Christian Linke misrepresented development dates.
7. Alex Yee misrepresented script / production progress.
8. David Lyerly misrepresented casting / production chronology.
9. Script development / adaptation continued into 2021.
10. Cast / crew evidence, including Purnell and Dilger, placed voice recording and casting during 2020–21.
11. Plaintiff challenged the claimed early date of the Powder "crying scene."
12. Plaintiff alleged manipulation of young performers' accounts.
13. Plaintiff alleged informal "hit-up" recruitment routes.
14. Plaintiff challenged claims about the length of Arcane's music-production chronology.
15. Plaintiff alleged Riot backdated the development chronology while rewrites continued into 2021.
16. Plaintiff relied on Bridging the Rift and voice-actor evidence showing continuing character, script and production activity beyond the chronology advanced against him.

**Record significance: these chronology challenges were alleged before dismissal; later access evidence particularises an already-pleaded dispute.**

# LEGAL SIGNIFICANCE OF THE CHRONOLOGY CONTRADICTIONS

The alleged chronology inconsistencies do not independently establish access. Their significance is circumstantial and cumulative when considered with the identified intermediary and professional-access routes.

### THREE BOYS: ACCESS MAY BE CIRCUMSTANTIAL

Copyright proof is often circumstantial. Access may be established through a “particular chain of events” connecting the plaintiff’s work to the alleged infringer. Three Boys Music Corp. v. Bolton, 212 F.3d 477, 481–82 (9th Cir. 2000).

### THREE BOYS: CREDIBILITY IS FACTUAL

Three Boys also states: “The credibility of witnesses is an issue for the jury.” Id. at 484. This is relevant where Document 58 alleged conflicting accounts concerning when Arcane was written, cast, recorded and revised.

### LOOMIS: DID THE PATHS REASONABLY CROSS?

Loomis requires more than bare corporate receipt, but recognizes circumstantial access through an intermediary chain. The inquiry asks whether there was a reasonable possibility that the paths of the copyrighted work and alleged infringer crossed. Loomis v. Cornish, 836 F.3d 991, 995–96 (9th Cir. 2016).

## APPLICATION TO DOCUMENT 58

Document 58 alleged repeated, specific and internally conflicting accounts concerning the period relevant to access, including when Arcane was written, cast, recorded and revised. Those alleged contradictions are relevant circumstantial evidence when assessed together with the particularised CBG–ICM–UTA, recruitment, casting and production pathways.

**COURT POINT: The chronology evidence strengthens the factual challenge to Riot’s asserted pre-access completion narrative; it is not offered as a standalone substitute for proof of access.**

Authorities: Three Boys Music Corp. v. Bolton, 212 F.3d 477, 481–84 (9th Cir. 2000); Loomis v. Cornish, 836 F.3d 991, 995–96 (9th Cir. 2016).

# THE ALLEGED INCONSISTENCIES GO TO THE RELIABILITY OF RIOT'S PRE-ACCESS CHRONOLOGY

Document 58 did not identify a single isolated discrepancy. It alleged multiple chronology conflicts across writers, producers, casting personnel, performers and continuing production activity.

### SUBJECT MATTER

The alleged inconsistencies concern the same material issue: whether Arcane's relevant scripts, characters, casting, recording and production were already fixed before Plaintiff's April 2020 submission.

### DIRECTION OF THE CONFLICTS

Plaintiff alleged the disputed accounts repeatedly pushed material creative activity earlier, while other cited evidence placed writing, rewriting, casting, recording and production later.

### PERSONNEL

Moss, Jenness, Shannon, Dilger, Overton, Linke, Yee and Lyerly were each identified in Document 58's chronology allegations.

### PRODUCTION EVIDENCE

Document 58 relied on continuing script/adaptation work, cast and crew evidence, Bridging the Rift, voice-actor evidence and disputed music-production chronology.

### FACTFINDER ISSUE

Where competing accounts bear directly upon the access-period chronology, Three Boys supports treating witness credibility as a factual question rather than resolving the conflict merely by accepting one account.

**PLAINTIFF'S INFERENCE: The number, subject matter and direction of the alleged inconsistencies permit Plaintiff to argue that they are not isolated discrepancies, but evidence from which a factfinder could question the reliability of Riot's asserted pre-access chronology.**

Document 58 chronology allegations; Three Boys, 212 F.3d at 484.

# CUMULATIVE ACCESS THEORY: CHRONOLOGY + IDENTIFIED PROFESSIONAL PATHWAYS

The chronology evidence and access-route evidence perform different functions. Together they address both opportunity and the disputed timing of the allegedly infringing creative development.

**1. RECEIPT**

Bloodborg submitted to the identified CBG recipient / route.

→

**2. PROFESSIONAL NETWORK**

Later evidence particularises CBG, ICM and UTA relationships, personnel and screen / talent functions.

→

**3. ARCANE DECISION-MAKERS**

Named recruitment and casting routes connect the professional network to people working directly on Arcane.

→

**4. DISPUTED TIMING**

Document 58 had already challenged Riot's claim that relevant creative development was completed before access.

## WHY THE CHRONOLOGY EVIDENCE MATTERS TO ACCESS

If the relevant creative development remained active during and after the alleged access period, the identified intermediary, agency, recruitment and casting pathways become materially more significant. Plaintiff therefore relies on the chronology contradictions as circumstantial support for the pleaded access theory, not as an independent presumption of copying.

**LEGAL FRAME: Three Boys permits circumstantial proof through a particular chain of events; Loomis asks whether the paths of the work and alleged infringer could reasonably have crossed. Plaintiff contends the combined evidence satisfies a materially more particularised inquiry than "bare corporate receipt."**

Three Boys, 212 F.3d at 481–84; Loomis, 836 F.3d at 995–96.

# RIOT'S OWN ARTBOOK CORROBORATES THE 2020 PRODUCTION CHRONOLOGY

Document 58 had already challenged Riot's asserted pre-access "completed and locked" chronology. Riot's later first-party publication supplies independent corroboration that substantial Season 1 production work remained underway during 2020.

**DOCUMENT 58: PLEADED CHALLENGE**

Plaintiff disputed the proposition that Arcane's relevant creative and production material had been completed and locked before the alleged April 2020 access date.

**RIOT ARTBOOK: LATER FIRST-PARTY ACCOUNT**

The Art and Making of Arcane, p. 10, states Riot hired producer Melinda Dilger in 2020 to help Arcane "cross the finish line." It describes her devising an L.A. production pipeline with Fortiche to complete Season 1's nine episodes.

**CHRONOLOGY**

| | |
|---|---|
| **15 APR 2020** | Alleged Bloodborg access |
| **2020** | Dilger hired to help Arcane "cross the finish line" |
| **2020** | L.A. pipeline with Fortiche for nine Season 1 episodes |
| **AROUND THIS PERIOD** | Netflix distribution based principally on the pilot |
| **2020–21** | Writing / casting / voice production evidence continues |
| **NOV 2021** | Season 1 released |


To further help *Arcane* cross the finish line, Riot hired producer Melinda Dilger in 2020. She devised an L.A. production pipeline in coordination with Hervé Dupont at Fortiche to complete the first season's nine episodes. It was around this time that Riot secured a distribution deal with Netflix. At the time the streamer's executives signed on based on the pilot and, really, not much else. That's because that one episode (which was further refined after the version delivered at the end of 2017) made the project's uniqueness evident: In less than an hour, viewers were introduced to a fully formed, visually and sonically sophisticated universe. Immediately, it established a sense of history and people you cared for, as well as a virtuosic mise en scène—the introductory parkour scene alone could be taught in film schools.

A major reason for *Arcane*'s success is that the show skillfully weaves seemingly irreconcilable perspectives and sensibilities into a cohesive whole. Think about it: A Los Angeles game company and an artsy French studio joined forces to create a series that delights players while also welcoming those who have never heard of Runeterra—or aren't into

**COURT POINT: Riot's subsequent first-party publication independently corroborates the central proposition underlying Plaintiff's pleaded chronology challenge: significant production infrastructure and Season 1 completion activity remained underway during 2020, after Plaintiff's alleged April 2020 access date.**

Source: The Art and Making of Arcane, p. 10; Document 58 chronology allegations. Source: The Art and Making of Arcane, p. 10.

# FINAL ASSESSMENT: CBG–ICM–UTA PACKAGING / TALENT CONVERGENCE

The cumulative evidence identifies an established cross-agency professional environment surrounding Arcane. The conclusion is deliberately narrow: the concentration supplies a concrete basis for targeted discovery into whether a coordinated talent or packaging arrangement operated on the production.

## PRE-EXISTING AGENCY ARCHITECTURE

CBG and ICM had a documented institutional relationship predating 2020. CBG and UTA later publicly described years of successful collaboration. Historical CBG→ICM→UTA screen packaging examples demonstrate a real cross-agency mechanism, independent of Arcane.

## CREATIVE / PRODUCTION CONVERGENCE

The identified network reaches writing, production and casting: Amanda Overton through UTA; Monica Macer through ICM; Jen Rudin's Arcane casting role and later ICM connection; plus CBG's manuscript-to-screen and media-rights functions.

## TALENT CONVERGENCE

Nine identified performer / recruitment routes connect Arcane talent to CBG, ICM or UTA-linked pathways. Pre-existing Riot voice talent has been separately identified and excluded from the external-agency concentration analysis.

## PRINCIPAL CAST CONCENTRATION

The six highest-screen-time Season 1 characters in the supplied dataset, Vi, Jinx, Jayce, Caitlyn, Silco and Viktor, all fall within the identified network and together account for approximately 74.5% of measured Season 1 character screen time.

## NARROW DISCOVERY CONCLUSION

This evidence does not itself establish a specific Arcane packaging contract or manuscript transmission. It provides a concrete factual basis for targeted discovery into agency participation, talent assembly, referrals, communications, package structures and related records surrounding Arcane.

**CUMULATIVE POINT: the concentration is sufficiently specific to justify asking who assembled the package, which agencies and personnel participated, what information moved through those routes, and what records memorialise those transactions.**

# ACCESS LAW: THE ALLEGED ROUTE NOW EXTENDS BEYOND "BARE CORPORATE RECEIPT"

The evidence particularises professional intermediaries, functions and Arcane-facing personnel. The remaining disputed step is internal transmission, not the existence of the surrounding professional architecture.

### LOOMIS v. CORNISH

Loomis rejects access based only on receipt somewhere within a common corporate employer. But it recognizes intermediary access where dealings and functions supply a meaningful nexus. The practical inquiry is whether it was reasonably possible for the paths of the work and alleged infringer to cross.

### KAMAR INTERNATIONAL

Kamar recognizes circumstantial access through a common intermediary dealing with both sides. The significance here is the identification of actual literary, screen-rights, agency, recruitment and casting functions occupying the alleged route.

### THREE BOYS MUSIC

Three Boys permits access to be shown circumstantially through a "particular chain of events" connecting the copyrighted work and alleged infringer. Plaintiff contends the cumulative evidence now particularises such a chain sufficiently to require factual inquiry.

### REMAINING INTERNAL RECORD QUESTION

The map no longer ends with CBG's receipt of Bloodborg. It proceeds through documented CBG screen-rights infrastructure, CBG–ICM and CBG–UTA relationships, agency-linked writers / producers / casting personnel, identified talent routes and the Arcane creative environment. What remains unresolved is the precise internal transmission history, information held principally within the organisations' records.

**LEGAL POINT: Plaintiff does not rely on corporate receipt alone. He identifies a professional chain and seeks the internal records needed to determine whether the paths actually crossed.**

Authorities: Loomis v. Cornish, 836 F.3d 991, 995–96; Kamar Int'l, Inc. v. Russ Berrie & Co., 657 F.2d 1059, 1062; Three Boys Music Corp. v. Bolton, 212 F.3d 477, 481–82 (9th Cir.).

# THE DISCOVERY BARRIER: THE REMAINING TRANSMISSION EVIDENCE IS CONTROLLED INTERNALLY

The particularised route identifies where discovery should be directed. Internal communications, access histories and document-handling records are not ordinarily available to an outside author before discovery.

**KNOWN EXTERNALLY**

Receipt of the manuscript; identified literary and screen-rights personnel; documented agency relationships; recruitment routes; Arcane writers, producers, casting personnel and performers; public chronology statements.

**INTERNAL RECORDS REQUIRED**

Who accessed the submission; internal routing; searches; forwarding or exports; repository access; permissions; communications between personnel; agency referrals; document-access histories; deletion / retention events.

**TARGETED DISCOVERY**

Audit trails, submission records, email and messaging, repository logs, search histories, metadata, permissions, exports / downloads, retention policies, agency communications and records tied to the identified people and relevant period.

**RULE 12 PROBLEM IDENTIFIED BY PLAINTIFF**

A plaintiff can plead the externally observable route, but cannot ordinarily prove the final internal handoff before obtaining the records which document it. Plaintiff's position is that the pleaded facts and subsequent particularisation identify a concrete discovery target, not a request to search an unidentified corporation for a hypothetical connection.

**DISCOVERY POINT: the unresolved question is narrow and testable. The relevant entities possess the records capable of confirming or disproving the alleged internal transmission.**

# MODERN DOCUMENT SYSTEMS: TRANSMISSION NEED NOT APPEAR AS A SIMPLE EMAIL HANDOFF

The access inquiry should not assume a manuscript could move only through a linear person-to-person email chain. The relevant question is how retained submissions and information were actually stored, indexed, accessed, searched, routed and retrieved.

## DOCUMENTED CBG SYSTEMS

The evidence identifies CBG's use of Agentfile and Therefore and describes an organisation in which Books, TFTV, Talent and Cuba Pictures shared "information, systems, ideas and networks." These facts justify inquiry into actual storage and access architecture.

## MODERN RETENTION / RETRIEVAL

A stored document may potentially be surfaced through repositories, metadata, indexing, search, permissions, shared records or retrieval workflows without a conventional Blunt→Speed→UTA→Riot email chain. The actual capabilities used during the relevant period require evidence.

## SCOPE OF SYSTEMS EVIDENCE

The relevant systems inquiry concerns the retention, search, retrieval, summarisation, indexing and other document-handling capabilities operating during the relevant period, together with the treatment of the Bloodborg submission.

## RECORDS CAPABLE OF ANSWERING THE QUESTION

Retention / ingestion records; metadata; repository locations; user permissions; searches; access histories; generated extracts or summaries where applicable; exports; downloads; routing; deletion events; audit trails; and policies governing retained submissions during the relevant period.

**MODERN-SYSTEMS POINT: absence of a presently known email handoff does not answer the access question. Discovery should determine the actual information architecture and whether the retained work was accessible or surfaced through it.**

# EXHIBIT A: CUMULATIVE ACCESS MAP AND UNRESOLVED TRANSMISSION QUESTION

Exhibit A's purpose is to particularise the alleged access route, identify the professional architecture surrounding it, and isolate the factual question which the organisations' internal records can answer.

**1. BLOODBORG RECEIPT**

April 2020 submission enters the identified CBG route.

→

**2. CBG ARCHITECTURE**

Literary, media-rights, book-to-film, information and document systems.

→

**3. CBG–ICM–UTA NETWORK**

Documented relationships, historical packaging and shared professional pathways.

→

**4. ARCANE ENVIRONMENT**

Agency-linked writers, producers, casting personnel, principal talent and Riot-facing recruitment routes.

→

**5. INTERNAL TRANSMISSION**

Exact access / routing history remains unresolved and is controlled by entity records.

**WHAT EXHIBIT A ESTABLISHES FOR THE MOTION**

A particularised alleged route containing named organisations, personnel, professional functions, recruitment mechanisms and an Arcane-facing endpoint, supported by the underlying evidence assembled in the exhibit.

**REMAINING FACTUAL QUESTION**

The precise internal act by which Bloodborg was transmitted, accessed or surfaced to an Arcane participant. Plaintiff identifies this as the remaining factual issue for targeted discovery.

**FINAL POINT: the alleged route no longer depends upon speculation between corporate receipt and Riot. Exhibit A identifies the intervening architecture and the records capable of resolving the final transmission question.**

# MELINDA DILGER: PRE-ARCANE PROFESSIONAL CONNECTION TO THE BLUNT FAMILY ENVIRONMENT

A documented Mary Poppins Returns connection places a later Arcane production figure within the professional environment of Emily Blunt before Felicity Blunt received Bloodborg.

### 2018 | MARY POPPINS RETURNS

Melinda Wunsch Dilger worked within the animation production operation on Mary Poppins Returns. The film starred Emily Blunt, sister of Curtis Brown literary agent Felicity Blunt.

### 15 APRIL 2020 | BLOODBORG

Felicity Blunt subsequently received Bloodborg: The Harvest at Curtis Brown. This places the manuscript recipient one familial step from Emily Blunt, whose earlier production included Dilger.

### DILGER → RIOT / ARCANE

Dilger subsequently occupied a senior production role on Arcane. The documented professional sequence therefore connects an Arcane production figure to the Blunt family environment before the alleged access period.

### DOCUMENTED PROFESSIONAL SEQUENCE

FELICITY BLUNT ↔ EMILY BLUNT → MARY POPPINS RETURNS ← MELINDA DILGER → RIOT / ARCANE

WIDER CONTEXT: Plaintiff’s wider RICO materials separately allege a Blunt–Blunt–Tucci professional-networking pattern involving screenings, productions and associated industry events, with the asserted history extending back to The Devil Wears Prada period in 2006. This wider allegation is preserved separately and is not relied upon here as proof of transmission.

Source basis: Mary Poppins Returns production credits / Melinda Wunsch Dilger credit; Emily Blunt starring credit; Plaintiff’s 15 Apr. 2020 Bloodborg submission record; Arcane production credits. Wider RICO context addressed separately.

# NETFLIX ENDPOINT I: LUKE SPEED / CBG HAD A DOCUMENTED NETFLIX RIGHTS ROUTE BEFORE BLOODBORG

CBG's Book-to-Film / Media Rights operation was already conducting television-rights business reaching Netflix more than a year before the 15 April 2020 Bloodborg submission.

### CBG'S SCREEN-RIGHTS FUNCTION

CBG's 2016 Book Department material identified Luke Speed as Book-to-Film / Media Rights Agent and described the function as submitting manuscripts and projects for film and television to production companies, studios and financiers.

### 13 MARCH 2019: NETFLIX

Contemporary reporting on Caroline MacKenzie's One Year of Ugly states that Netflix acquired the television rights and identifies Luke Speed at Curtis Brown as handling those television rights. This transaction predates Bloodborg's CBG receipt by approximately thirteen months.

### OPERATIONAL SIGNIFICANCE

Speed later described himself as having run CBG's Media Rights division and as having brokered major global film and television rights deals, including The White Tiger for Netflix. The evidence establishes an operational CBG → Speed → Netflix screen-rights pathway.

### CHRONOLOGY

MARCH 2019: CBG / SPEED → NETFLIX TV-RIGHTS TRANSACTION | 15 APRIL 2020: BLOODBORG → CBG | 3 MAY 2021: NETFLIX / RIOT PUBLICLY ANNOUNCE ARCANE

**EVIDENTIARY POINT: before Bloodborg entered CBG, the same screen-rights infrastructure already had a documented commercial route into Netflix.**

Sources: CBG Book Department job description (2016); Stabroek News, "Trinidad author lands deal with Netflix," 13 Mar. 2019; Luke Speed professional profile / CV.

# NETFLIX ENDPOINT II: GELLER, BLUNT AND THE CBG CROSS-MEDIA STRUCTURE

The evidence places Bloodborg's senior CBG recipients inside an agency whose literary, film/TV and transatlantic rights functions were interconnected with Speed's Netflix-facing screen-rights operation.

### JONNY GELLER → SPEED

Public author records identify Jonny Geller for literary rights and Luke Speed separately for Book-to-Film rights. CBG material also records Speed working closely with its television/film agents and Cuba Pictures. Geller's own 2019 description of modern literary representation contemplated development across television and other media.

### FELICITY BLUNT → SCREEN / U.S. RIGHTS

Blunt's representation materials identify film and foreign-rights functions. 2020 transactions document U.S. agency participation acting on behalf of Blunt / Curtis Brown UK, including ICM-linked rights activity. This places Blunt within the same transatlantic rights environment surrounding CBG's screen exploitation.

### CBG → NETFLIX: WHAT IS DIRECTLY SHOWN

The direct pre-Bloodborg Netflix transaction presently identified is Speed's March 2019 One Year of Ugly deal. The significance for Geller and Blunt is structural: manuscripts received at senior literary level sat inside the same CBG organisation containing the documented Netflix-facing Book-to-Film / Media Rights function.

### DOCUMENTED INTERNAL ARCHITECTURE

GELLER / LITERARY RIGHTS ↔ BLUNT / LITERARY + FILM / FOREIGN RIGHTS ↔ SPEED / BOOK-TO-FILM & MEDIA RIGHTS → NETFLIX / STUDIOS / PRODUCERS

**EVIDENTIARY POINT: the Netflix connection is tied to CBG's documented screen-rights machinery, not merely to Netflix appearing later as Arcane's distributor.**

Sources: Fiona Neill official representation page; Susanna Kearsley representation material; CBG 2016 job material; Publishers Weekly 2020 Blunt / U.S. co-agency transactions; March 2019 Netflix rights report.

# NETFLIX ENDPOINT III: UTA / OVERTON AND THE ARCANE–NETFLIX CONVERGENCE

UTA's identified Arcane writing route also carried an independent pre-existing Netflix connection, while Riot later recruited a senior Netflix executive during Arcane's 2020 production build.

### UTA → AMANDA OVERTON

The 2018 Young & Hungry List identifies Amanda Overton's UTA representatives as Abby Glusker and Matt Baldovsky and identifies Overton as having worked on Arcane for Riot Games. This places a named UTA-represented writer inside Arcane before Bloodborg's April 2020 CBG receipt.

### OVERTON → NETFLIX

The same 2018 industry profile records Overton's prior work on Netflix's Marco Polo. Overton therefore had professional experience inside both the Netflix production environment and Riot's Arcane development environment before the relevant 2020 submission period.

### NETFLIX → RIOT

Shauna Spenley served as a Netflix Vice President until September 2020 and joined Riot in December 2020 as President of Entertainment. Netflix and Riot publicly announced Arcane on 3 May 2021. This supplies a further documented personnel bridge at the distribution endpoint.

### CUMULATIVE ENDPOINT MAP

CBG / SPEED → NETFLIX | CBG ↔ UTA → GLUSKER / BALDOVSKY → OVERTON → RIOT / ARCANE | OVERTON → PRIOR NETFLIX WORK | NETFLIX / SPENLEY → RIOT ENTERTAINMENT → ARCANE

**CUMULATIVE POINT: the alleged intermediary route converges at an Arcane / Netflix environment already connected to both CBG screen-rights activity and UTA-represented Arcane personnel.**

Sources: 2018 Young & Hungry List; UTA 13 June 2022 acquisition announcement; Shauna Spenley professional chronology; Netflix / Riot Arcane announcement, 3 May 2021.

# CUMULATIVE RECORD, INFORMATION ASYMMETRY AND THE MODERN ACCESS PROBLEM

Plaintiff respectfully submits that the access question should be assessed against the complete alleged evidentiary circumstances and the realities of modern corporate information systems.

### WIDER ALLEGED EVIDENTIARY CIRCUMSTANCES

Plaintiff alleges digital intrusion; deletion or disappearance of relevant evidence; disputed preservation practices; litigation abuse; fabricated or inaccurate development timelines; concealment of access routes; disputed presentation and interpretation of Wayback evidence; and representations concerning access and chronology which Plaintiff contends are contradicted by subsequently obtained evidence.

These allegations sit alongside the extensive similarities Plaintiff identified between Bloodborg and Arcane Season One across characters, narrative structure, scenes, dialogue, relationships, visual concepts and chronology.

### THE INFORMATION ASYMMETRY

Plaintiff cannot independently reconstruct Riot's internal electronic history. Evidence concerning receipt, retention, indexing, searching, routing, forwarding, repository activity, communications and subsequent internal access resides principally within systems controlled by Riot and associated custodians.

Plaintiff contends it would be inequitable and practically impossible to require proof of the final internal transmission step while withholding access to the records capable of establishing or refuting it.

### MODERN TECHNOLOGY AND ACCESS

Plaintiff respectfully submits that traditional access doctrine requires clarification when applied to modern multinational creative enterprises. Contemporary systems can involve centralized repositories, global digital access, automated retention, metadata indexing, semantic retrieval, AI-assisted systems, cloud infrastructure and electronic movement of material between personnel, departments and jurisdictions.

Older physical or linear transmission assumptions may not capture how information can now be retained, discovered and surfaced.

### QUESTION OF EXCEPTIONAL IMPORTANCE

**How can a copyright plaintiff plausibly establish internal access where the defendant exclusively controls the digital systems capable of proving the final transmission step, particularly where the plaintiff has already identified specific submission points, professional intermediaries, internal crossovers, continuing development and substantial alleged similarities?**

Plaintiff respectfully submits that the complexity of the alleged access architecture, technological information asymmetry, alleged evidentiary and litigation conduct, and volume of similarity evidence warrant reconsideration and clarification of how existing access doctrine applies to modern digital, AI-assisted and globally integrated corporate environments.

**Plaintiff respectfully submits that proof uniquely contained within a defendant's internal systems should not become the prerequisite for obtaining the records capable of supplying that proof.**

# DECLARATION OF MARC WOLSTENHOLME

In support of Exhibit A: Alleged Access Pipelines and Supporting Evidence

I, Marc Wolstenholme, declare:

1. I am the Plaintiff-Appellant in Wolstenholme v. Riot Games, Inc., Ninth Circuit No. 25-3163. I have personal knowledge of the submissions, correspondence, records and litigation materials created, sent, received or preserved by me and identified in this exhibit.

2. Exhibit A has been prepared to organise and present the alleged access routes and supporting evidence concerning Bloodborg: The Harvest. Where the exhibit relies upon third-party publications, professional biographies, industry records or subsequently obtained materials, those sources are identified within the relevant slides.

3. To the best of my knowledge, the screenshots and records reproduced from my own accounts and files are true and accurate copies of the materials preserved by me. The descriptions of my submissions, correspondence and preservation history are true and correct to the best of my knowledge and recollection.

4. Exhibit A distinguishes documented evidence, supported inference, allegations, and matters for which internal records or discovery remain necessary. The specific dates of Samuel Jefferson's Riot Games engagement are not yet known.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 09 Sep 2026

Signature: M. Wolstenholme

Marc Wolstenholme, Plaintiff-Appellant