UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MARC WOLSTENHOLME,

Plaintiff-Appellant,

v.

RIOT GAMES, INC.,

Defendant-Appellee.

No. 25-3163

D.C. No. 2:25-cv-00053-FMO-BFM

**APPELLANT'S MOTION CONCERNING MATERIAL PARTICULARIZING AND STRENGTHENING ACCESS, DISCOVERY, AND EMOTIONAL-DISTRESS ALLEGATIONS ALREADY PRESENTED IN THE SECOND AMENDED COMPLAINT**

**Leave to Submit and Request for Reasonable Accommodation**

Appellant respectfully requests leave of Court to submit and have considered the accompanying material particularizing allegations already pleaded in the Second Amended Complaint. Appellant further requests such review and other appropriate relief as the Court determines necessary to permit the disputed factual issues concerning access, unfair competition and emotional distress to be determined upon an evidentiary record.

Appellant prosecutes this appeal pro se from the United Kingdom. He has an acquired brain injury, severe dyslexia and Complex Post-Traumatic Stress Disorder with comorbid conditions. These conditions substantially affect the speed at which Appellant can read, process, organise and prepare complex legal material. Anxiety associated with litigation can further impair those functions.

These are longstanding conditions. Appellant has required additional time and reasonable adjustments in other legal and administrative proceedings in the United Kingdom. The difficulties are particularly significant here because Appellant has been required simultaneously to learn and apply unfamiliar United States federal law and appellate procedure while investigating a technically and factually complex copyright dispute without counsel.

The Ninth Circuit expressly recognises requests for reasonable accommodation affecting the prosecution of an appeal. Its published disability-accommodation guidance specifically identifies additional time to file briefs or pleadings, permission concerning filing requirements, and other litigation-related assistance as matters which may be requested by motion in a pending Ninth Circuit case.

Appellant respectfully invokes that accommodation process.

The additional material accompanying this motion was not assembled casually or for purposes of prolonging proceedings. Appellant has undertaken extensive continuing investigation because much of the evidence relevant to access remains within systems unavailable to him. That investigation has required examination of corporate relationships, submission routes, archived material, technological infrastructure, production chronology, communications, recorded conferences and hundreds of threatening or abusive communications.

The investigation has continued to develop. Among the matters subsequently identified are MediaHound's Entertainment Graph, UTA IQ, UTA's pre-existing relationship with MediaHound, UTA's December 2021 acquisition of MediaLink and MediaLink's data-and-technology advisory capabilities, UTA and CBG's professional relationships, technological capabilities involving analysis of story arcs and character identities, additional evidence bearing upon Riot's production chronology, and a preserved archive exceeding 600 hostile or threatening communications.

The accompanying motion explains why these matters particularize allegations already contained within the SAC, including access, Unfair Competition under California Business and Professions Code § 17200, and intentional infliction of emotional distress.

Appellant has also been required to investigate numerous disputed matters arising during the litigation itself, including access, chronology, preservation, document collection, contested archival material, harassment, threats, and representations made during recorded conferences. Each investigation consumed substantial time which a represented litigant could ordinarily divide among counsel, investigators, experts and support staff. Appellant has undertaken those functions personally while managing his disabilities.

The consequences of Appellant's disabilities are practical. Tasks involving substantial quantities of written material require considerably more time for him to complete accurately. Complex cross-referencing, exhibit preparation, chronological reconstruction and legal drafting are particularly demanding. Rushing those processes substantially increases the risk of transcription errors, misplaced evidence, incorrect references and pleadings which fail accurately to express the evidence Appellant is attempting to place before the Court.

Appellant's circumstances have improved substantially from the most difficult periods of this litigation, but the underlying disabilities remain. He continues to require reasonable additional time to process complex information and prepare accurate legal documents.

Appellant therefore respectfully asks the Court to consider his disability-related limitations when determining whether to permit this submission following completion of the ordinary briefing process. The request is for a reasonable procedural accommodation permitting the accompanying material to be considered despite the additional time required for Appellant personally to investigate, organise and prepare it.

The requested accommodation would not determine the truth of Appellant's allegations. It would permit the Court to consider the material and determine what procedural or substantive significance, if any, it warrants.

Appellant has continued prosecuting this action despite substantial personal, cognitive and procedural difficulties because the disputed questions concerning access have never been tested through merits discovery. He has preserved evidence, investigated the disputed access routes, documented the harassment, researched the subsequently identified technological infrastructure and continued attempting to place the relevant evidence before the Court.

Appellant respectfully requests that his disabilities not operate as an additional procedural barrier preventing consideration of material which required him substantially longer than an ordinarily situated represented litigant to investigate and prepare.

Accordingly, Appellant respectfully requests:

1. leave to submit and have considered the accompanying motion, declaration and supporting exhibits;

2. reasonable accommodation for the additional time required by Appellant's acquired brain injury, severe dyslexia and Complex PTSD to investigate, organise and prepare complex legal and evidentiary material;
3. consideration of the accompanying material as particularizing and strengthening allegations already pleaded in the SAC; and
4. such further review and relief as the Court considers appropriate to permit the disputed factual issues concerning access, unfair competition and emotional distress to be determined upon an adequate evidentiary record.

**Introduction**

Plaintiff-Appellant Marc Wolstenholme respectfully submits this motion concerning material which particularizes and strengthens factual allegations already presented in the 1,218-page Second Amended Complaint ("SAC"), Dkt. 58.

The material addressed here does not originate a new theory of access. The SAC alleged direct submission of *Bloodborg: The Harvest* to Riot Forge and Curtis Brown Group ("CBG") in April 2020; identified Riot Forge, UTA, CBG and other professional agencies as routes through which Riot could have obtained access; relied upon metadata, digital submission records and digital-forensic evidence; identified working relationships involving agencies possessing the complete manuscript; and expressly sought discovery into access.

The SAC also pleaded Unfair Competition under California Business and Professions Code § 17200. It alleged Riot engaged in unlawful and unfair business practices through the alleged misappropriation and commercial exploitation of Appellant's copyrighted material, causing barriers to market entry, financial harm and reputational damage. The access routes, professional relationships, technological infrastructure and subsequent conduct documented in this motion materially strengthen the factual basis underlying that already-pleaded claim.

The subsequently identified MediaHound and UTA IQ infrastructure is particularly relevant. The evidence identifies technology capable of analysing books, story arcs, character identities and hundreds of content traits, integrating those analyses with other data sources, and identifying commercially valuable patterns. Appellant had already alleged that his manuscript entered professional channels connected to Riot and that those channels included CBG and UTA. Whether Appellant's submitted material, metadata, descriptions, constituent creative elements or derived information entered or passed through those systems is therefore material both to access and to the pleaded allegation that Appellant's creative work was commercially exploited through unfair business practices.

The conduct surrounding the litigation also bears upon the § 17200 claim to the extent it evidences or furthered the business practices already challenged in the SAC. Appellant alleges that Riot repeatedly disputed or obscured the routes of access, resisted factual development of those routes, made contested representations concerning the production chronology, and opposed discovery into records capable of resolving those disputes. The recorded statements and documentary chronology addressed below permit those allegations to be tested against the preserved record. Appellant contends that the alleged acquisition or exploitation of a submitted author's work, followed by obstruction of the factual mechanisms through which the author could establish how his work travelled, forms part of the unfair course of commercial conduct already pleaded under § 17200.

The SAC likewise pleaded intentional infliction of emotional distress ("IIED") as a separate cause of action. It alleged intimidation, threats concerning legal fees and dismissal, prolonged litigation pressure, malicious communications, hate mail, harassment and severe emotional

and psychological injury. The SAC included allegations concerning a bomb threat, abuse directed at Appellant's mental health and threats involving his young daughter.

Access, unfair competition and intentional infliction of emotional distress were therefore already before the district court.

Subsequent investigation has materially strengthened and particularized the factual basis underlying each.

On access and unfair competition, Appellant has identified MediaHound's Entertainment Graph, UTA IQ, UTA's longstanding investment relationship with MediaHound, UTA's acknowledged synthesis of information from multiple sources since 2018, MediaHound's express inclusion of books within its Entertainment Graph, UTA's December 2021 acquisition of MediaLink, whose stated services included data and technology solutions, UTA's acknowledged longstanding collaboration with CBG companies, and UTA's public description of technology capable of analysing “specific story arcs or character identities, among hundreds of other traits.”

On emotional distress and litigation prejudice, Appellant has preserved a 593-email archive permitting the harassment alleged in the SAC to be quantified. He has also preserved written notices and recorded conferences documenting when Riot's counsel was informed of threats, including bomb threats, and what counsel subsequently said concerning those communications and Appellant's filed evidence.

These materials particularize allegations already made. They identify systems, records, dates, communications, statistics and witnesses through which the pleaded claims of access, unfair competition and intentional infliction of emotional distress can be tested.

The action terminated before merits discovery tested them.

## I. ACCESS WAS ALREADY PLEADED THROUGH SPECIFIC DIGITAL AND PROFESSIONAL ROUTES

The SAC alleged that Appellant created *Bloodborg: The Harvest* between 2018 and 2019 and submitted the manuscript to Riot Forge, CBG and other professional recipients in April 2020.

Its chronology records a Riot online-portal submission on April 15, 2020.

It separately records Appellant's April 15, 2020 submission of *Bloodborg* to Felicity Blunt at CBG at approximately 22:21 and an acknowledgement titled "Thank You for Your Submission: Bloodborg: The Harvest."

The chronology records another Riot submission on April 19, 2020.

The SAC expressly identified "Riot Forge, UTA, CBG and many other agents" as avenues through which Riot could have obtained access.

It further relied upon Word-document metadata, email records, digital evidence of submission and "digital forensics of submissions."

The SAC alleged working relationships between Riot and agencies which possessed the complete manuscript.

During the Rule 26(f) process reproduced within the SAC, Appellant explained the Riot route in greater detail. He stated that Riot Forge operated a publishing submission page and that *Bloodborg* had been submitted because Appellant was seeking adaptation into a game and animation.

When questioned concerning possible routes, Appellant identified direct Riot Forge submission, CBG and other agencies.

The access theory was therefore pleaded before dismissal.

What Appellant lacked was access to the internal systems necessary to establish what happened after his manuscript entered those channels.

## II. THE CASE ENDED BEFORE THE PLEADED ACCESS ROUTES AND UNFAIR BUSINESS PRACTICES WERE TESTED

The SAC expressly requested full discovery.

No merits discovery established what happened to the April 2020 Riot Forge submissions.

Riot did not produce the relevant submission-system audit trails, attachment histories, routing records, account histories, database entries, internal communications, retention information, access histories, searches or testimony concerning the handling of the submission.

Likewise, Appellant had no ability to inspect CBG's internal systems or determine whether information concerning *Bloodborg* moved through professional relationships identified in the SAC.

This information asymmetry also bears directly upon Appellant's already-pleaded claim under California Business and Professions Code § 17200. The SAC alleged unfair business practices arising from the alleged acquisition and commercial exploitation of Appellant's creative material and the resulting barriers to his own market entry. The records necessary to test those allegations remained almost entirely within the control of the corporations whose conduct was challenged.

This creates a substantial risk of an inherently unfair condition. Where a corporation controls the submission system through which creative material enters its organisation, controls the internal records showing who received or accessed the material, controls the technological systems capable of processing or transmitting it, and then resists discovery into those same systems, the information necessary to establish the alleged unfair practice becomes inaccessible to the person allegedly harmed by it.

The alleged stonewalling of the pleaded access routes therefore has significance beyond the copyright element of access. It bears upon whether the commercial conduct challenged under § 17200 could be investigated at all. If the entities possessing the decisive records can prevent examination of those records and simultaneously rely upon the claimant's inability to identify what occurred inside their systems, control of the evidence itself produces an informational advantage capable of insulating the challenged commercial practice from judicial scrutiny.

The subsequently identified MediaHound, UTA IQ and Entertainment Graph infrastructure makes this concern more concrete. Appellant has now identified systems capable of analysing books, story arcs, character identities and hundreds of content traits, integrating information from multiple sources and identifying patterns with commercial value. The SAC had already identified professional routes involving entities possessing *Bloodborg*. Discovery was required to determine whether those two factual paths intersected.

This bears directly upon *Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018).

There, this Court explained that where access is disputed, “disputed factual issues will often require discovery to flesh out.”

Here, access was disputed and became dispositive.

The same unresolved facts also bear upon the pleaded § 17200 claim. Whether Appellant's submitted creative material entered, moved through, was analysed by, or produced derived information within the identified professional and technological infrastructure is relevant both to access and to the allegation of unfair commercial exploitation.

The records capable of answering those questions were never discovered.

## III. SUBSEQUENT INVESTIGATION IDENTIFIED TECHNOLOGICAL INFRASTRUCTURE RELEVANT TO THE ALREADY-PLEADED ACCESS AND UNFAIR-COMPETITION CLAIMS

Appellant subsequently identified MediaHound and its Entertainment Graph.

Public technical material from 2016 described the system:

"The Entertainment Graph connects all the world's music, books, games, movies, and TV."

The architecture expressly included books.

MediaHound described content through "traits," features inherent to content through which creative material could be classified, analysed and related to other material.

This establishes the existence of a previously unidentified entertainment-industry system expressly incorporating books and analysing constituent content characteristics.

The technological capability is remarkably similar to the type of processing implicated by Appellant's existing allegations. The SAC alleged that *Bloodborg* entered professional submission channels and that Riot subsequently exploited constituent elements of the work, including narrative structures, character arcs, character identities and backstories, themes, scenes, symbolism and other creative characteristics. MediaHound subsequently emerged as technology expressly designed to analyse content through traits and relationships across books and other entertainment media.

The professional route is equally material. UTA had maintained an investment and working relationship with MediaHound for years before acquiring it in June 2022. MediaLink already operated a dedicated Data and Technology Solutions specialty by at least October 2020. Contemporary reporting identified a DTS team of strategists and architects responsible for assessing, recommending and implementing software, hardware and technology-partnership plans on both the buy and sell sides. In March 2021, MediaLink launched Hudson Bridge, a technology-driven transformation practice addressing agency enterprise systems, implementation, transition and integration, and technology infrastructure. UTA acquired MediaLink in December 2021 and expressly identified "data and technology solutions" among MediaLink's core services. UTA Marketing then became a MediaLink division. Approximately six months later UTA acquired MediaHound, and five days after that announced its agreement to acquire CBG, which had received Bloodborg in April 2020. UTA also publicly acknowledged that its companies and CBG companies had collaborated successfully for years. The MediaLink evidence does not establish that MediaLink processed Appellant's work or supplied data to MediaHound or UTA IQ. It establishes that a substantive data-and-technology operation existed within MediaLink before UTA acquired it and identifies an additional category of records relevant to UTA's information environment and the provenance of its data sources.

These facts materially strengthen the already-pleaded § 17200 theory. Appellant alleged an unfair commercial condition in which his creative work entered professional submission channels available to powerful entertainment entities, while he remained outside those

entities and without access to their internal systems. The subsequent identification of technology capable of decomposing creative works into searchable and commercially useful traits substantially increases the importance of determining what information entered those systems and how it was used.

The potential unfairness is particularly acute where an unpublished author's submitted material can enter an opaque professional and technological infrastructure capable of analysing constituent creative characteristics, while the author has no visibility into the processing, transmission, analysis or subsequent use of his work. If information derived from submitted creative material was incorporated into such systems and commercially exploited without authorization or compensation, the same conduct would bear directly upon the SAC's allegation of unfair business practices causing financial harm, reputational damage and barriers to Appellant's own market entry.

The informational imbalance continues into proof. The entities operating or participating in these systems possess the records capable of establishing what material entered them, how it was classified, who accessed it, what analyses were generated and where resulting information travelled. Appellant possesses none of those internal records. Blocking discovery into the very infrastructure capable of answering those questions risks preserving the commercial advantage created by the alleged unfair practice itself.

Whether *Bloodborg*, information describing it, manuscript metadata, literary coverage, characters, story structures, narrative descriptions, content traits or other derived information entered MediaHound, UTA IQ or connected professional systems is susceptible to documentary proof.

Those records bear simultaneously upon the pleaded access route and the already-pleaded claim for Unfair Competition under California Business and Professions Code § 17200.

## **IV. UTA'S RELATIONSHIP WITH MEDIAHOUND EXISTED BEFORE THE 2022 ACQUISITION**

UTA's relationship with MediaHound preceded its formal acquisition of the company.

UTA IQ Global Head Joe Kessler disclosed that UTA had been a shareholder in MediaHound "for years" through a seed investment.

Kessler further disclosed that UTA and MediaHound contemplated a joint project before the COVID-19 pandemic and remained in contact.

This relationship therefore extended into the period surrounding Appellant's April 2020 submissions.

The nature of information exchanged within the relationship, systems available to the participants and data involved are factual matters capable of determination from corporate records.

## IV-A. UTA ACQUIRED MEDIALINK IN DECEMBER 2021, ADDING DATA-AND-TECHNOLOGY CAPABILITIES TO ITS EXPANDING PLATFORM

On December 16, 2021, UTA announced its acquisition of MediaLink. The acquisition brought into UTA a pre-existing Data and Technology Solutions operation. By October 2020, MediaLink's DTS specialty was publicly described as using a team of strategists and architects to assess, recommend and implement plans involving software, hardware and partnerships on both the buy and sell sides. In March 2021, MediaLink launched Hudson Bridge, a technology-driven transformation practice addressing agency enterprise systems, implementation, transition and integration and the establishment of technology infrastructure. UTA's acquisition announcement subsequently identified "data and technology solutions" among MediaLink's core services and described the combination as operating at the intersection of strategy, technology, entertainment and marketing. UTA Marketing was reorganised as a MediaLink division called UTA Entertainment & Culture Marketing. This evidence establishes that MediaLink's data-and-technology capabilities pre-dated UTA's acquisition and were not created merely as a consequence of the June 2022 MediaHound transaction. The present public evidence does not establish that MediaLink processed Bloodborg or supplied data to UTA IQ or MediaHound. Discovery can determine whether MediaLink's DTS operations, software, systems, partnerships, analytical outputs or information sources intersected with UTA IQ's "multiple sources," MediaHound, or other connected professional systems.

Public source: Steve McClellan, "MediaLink Taps Dentsu Veteran For Data/Tech Solutions Role," MediaPost (Oct. 26, 2020).

Public source: "MediaLink Taps Lucas Cridland to Lead Hudson Bridge," Business Wire (Mar. 3, 2021).

Public source: United Talent Agency, "UTA Acquires MediaLink" (Dec. 16, 2021).

## V. UTA IQ HAD SYNTHESISED INFORMATION FROM MULTIPLE SOURCES SINCE 2018

UTA's June 8, 2022 announcement stated:

“Since the launch of UTA IQ in 2018, our team has been synthesizing information from multiple sources to create unique tools and insights for our clients and agents.”

UTA further described its data operation as involving “multiple layers of data.”

The operation therefore existed approximately two years before Appellant's April 2020 submissions.

The identity and provenance of those multiple sources are material to the pleaded access route.

Relevant discovery could determine whether those sources included literary-rights information, books, manuscript descriptions, coverage, submissions, pitches, development material, agency information, character descriptions or other creative-content data. It could also determine whether MediaLink's pre-existing Data and Technology Solutions operation, including its software, systems, technology partnerships and later UTA-integrated operations, contributed information to or otherwise intersected with UTA IQ's described multi-source environment. Public material establishes the existence of MediaLink's DTS specialty by 2020, technology-driven transformation work by 2021, and its December 2021 integration into UTA. It does not establish a MediaLink-to-UTA-IQ or MediaLink-to-MediaHound data flow.

## VI. UTA PUBLICLY DESCRIBED GRANULAR ANALYSIS OF STORY ARCS AND CHARACTER IDENTITIES, RAISING A MATERIAL § 17200 ISSUE

UTA acquired MediaHound on June 8, 2022.

MediaHound's engineers and product developers were incorporated into UTA IQ.

Kessler publicly described the analytical capability:

“we can go beyond the typical traits of that content and zero in, for instance, on specific story arcs or character identities, among hundreds of other traits.”

He further stated:

“The more finely we can analyze that data, and the more we can integrate it with our other data sources, the more accurately we can assess the value of the content, and the more likely it is that we can identify patterns that help us drive value for our clients and see what's coming next.”

The description is directly relevant to the type of appropriation alleged in the SAC.

The SAC alleged appropriation extending across narrative structure, storylines, character arcs, character personalities, backstories, themes, scenes, aesthetics, trauma writing, symbolism and other constituent creative elements.

UTA subsequently described technology capable of analysing specific story arcs, character identities and hundreds of other traits, integrating those analyses with other data sources, assessing the commercial value of content, identifying patterns and helping its clients “see what's coming next.”

This technological capability also materially strengthens the already-pleaded claim under California Business and Professions Code § 17200.

The use of large-scale content-analysis systems within a gatekeeper-controlled entertainment market creates a serious risk of unfair competitive conditions for independent creators where the systems draw upon creative material which those creators submitted seeking representation, publication, adaptation or commercial opportunity. An individual author cannot realistically compete with an entertainment network capable of aggregating creative information across books, film, television, games and other media, decomposing those works into hundreds of searchable traits, identifying commercially valuable patterns, and deploying the resulting intelligence for established clients.

The competitive imbalance becomes substantially more serious if unpublished submissions, agency slush piles, rejected manuscripts, pitches, literary coverage or information derived from those materials were included among the “multiple sources” or “other data sources” described by UTA.

Appellant contends this occurred.

If discovery establishes that unpublished submitted works were ingested, analysed, indexed, cross-referenced or otherwise used without authorization for the commercial benefit of agencies, studios, producers or represented clients, such conduct would directly support Appellant's already-pleaded allegation of an unfair commercial practice. A creator could submit original material seeking access to the entertainment market, receive no representation or commercial opportunity, yet have the informational value of the submitted work extracted and used within systems benefiting the established participants controlling access to that same market.

Such a practice would create precisely the type of market-entry harm alleged in the SAC. The independent creator would contribute the underlying creative information while remaining excluded from the commercial opportunity generated from it. Established participants would possess both the submitted material and technological means to analyse it at scale, while controlling the professional gateways through which the creator seeks entry.

The issue therefore extends beyond copyright access. It concerns whether technological systems available to dominant entertainment intermediaries were used in a manner which converted submitted creative material into commercially valuable intelligence while denying the submitting creator participation in the resulting opportunity.

The unresolved factual question is what material entered MediaHound, UTA IQ and any comparable system operating within the identified access pipeline.

UTA's own description makes the source question unavoidable: it expressly referred to “multiple sources” and “other data sources.” Discovery can identify those sources.

If those sources included CBG or UTA submission repositories, slush piles, unpublished manuscripts, literary coverage, pitches or derived information, the evidence would materially support both Appellant's pleaded access theory and his existing § 17200 claim.

The records capable of resolving that question remain within the entities operating or participating in those systems.

## VII. FIVE DAYS LATER, UTA ANNOUNCED ITS AGREEMENT TO ACQUIRE CBG

UTA announced its definitive agreement to acquire CBG on June 13, 2022, five days after announcing the MediaHound acquisition.

CBG had received *Bloodborg* on April 15, 2020.

UTA stated that CBG would gain the benefit of UTA capabilities including "data analytics."

The announcement further stated:

"UTA and companies in the Curtis Brown Group have collaborated successfully together for many years."

This chronology particularizes a professional route already identified in the SAC.

The SAC identified CBG and UTA.

Appellant had already alleged working relationships involving agencies possessing his manuscript.

Subsequent investigation identified UTA's multi-source data operation, its pre-existing MediaHound relationship, MediaHound's book-inclusive Entertainment Graph, UTA's December 2021 acquisition of MediaLink and its stated data-and-technology capabilities, UTA's acknowledged years of collaboration with CBG companies, and content analysis extending to story arcs and character identities.

These facts identify records through which the pleaded access theory can be tested.

## VIII. THE ACCESS QUESTION CAN NOW BE DIRECTED AT IDENTIFIABLE RECORDS

Relevant records include:

UTA IQ source information from 2018 onward;

historical Entertainment Graph source information;

MediaHound ingestion and processing records;

records concerning books, scripts, literary rights, coverage, pitches and manuscript metadata;

records concerning MediaLink's Data and Technology Solutions specialty, including software, hardware, technology-partnership plans, agency enterprise systems, implementation and integration records, information sources, analytical outputs, and any documented information exchange or technical integration with UTA IQ or MediaHound;

records of information exchanged between UTA and MediaHound before acquisition;

records concerning UTA's acknowledged years of collaboration with CBG companies;

records concerning Marc Wolstenholme, M.W. Wolf and *Bloodborg: The Harvest*;

database entries, ingestion histories, user histories and searches;

analytical outputs, recommendations and derived information;

access logs and transmission histories;

internal communications concerning relevant material; and

Riot Forge submission, attachment, routing, retention and access records.

These records can establish whether the paths of Appellant's work and the relevant creators crossed.

## IX. NINTH CIRCUIT ACCESS DOCTRINE MUST BE APPLIED TO THE DIGITAL ENVIRONMENT ACTUALLY ALLEGED

This Court has recognised the factual character of access.

*Rentmeester* explains that disputed access issues will often require discovery.

*Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en banc), recognised copyright doctrine operating within a "digitally interconnected world."

*Woodland v. Hill*, 136 F.4th 1199 (9th Cir. 2025), recognised that this Circuit's access doctrine developed in an "offline" world involving physical media.

A modern professional chain of access can leave records very different from a physical manuscript moving from one person's desk to another.

The evidence can exist as submission metadata, database entries, ingestion histories, internal searches, access logs, analytical outputs, recommendation records, derived information, user activity, API records and internal communications.

Appellant cannot inspect those systems from outside the corporations controlling them.

Requiring an author to identify an internal digital transmission before discovery, while the records proving or disproving transmission remain exclusively within corporate control, allows the absence of externally available evidence to defeat access before the internal evidence can be obtained.

The chain-of-events doctrine must be capable of examining a digital chain of events.

The Appellant alleges that, given the technological advances during the years in question, including the rapid development of artificial intelligence, data analytics, and sophisticated systems capable of retaining, analysing, connecting and reconstructing information, individual creators face an increasingly profound imbalance of power. Systems such as MediaHound's Entertainment Graph demonstrate the technological capabilities now available to major entertainment conglomerates and gatekeepers. UTA itself described MediaHound's technology as capable of combining multiple layers of data to generate insights concerning content and talent. As increasingly powerful organisations control both access to creative markets and sophisticated information systems, meaningful legal protection for individual creators becomes increasingly important. The Appellant fears that, without precedent capable of addressing access in the modern digital environment, independent creators could become increasingly vulnerable to the very organisations through which they must submit and promote their work. Copyright law exists in part to protect individual authorship and preserve incentives for creative expression. The governing law should therefore be applied to the technological realities of modern creative industries, rather than an outdated conception of access dependent upon physical, person-to-person transmission.

## X. THE SAC ALSO EXPRESSLY PLEADED INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The emotional-distress claim was equally explicit.

The SAC's Fourth Cause of Action alleged:

"Defendant's legal representatives threatened and intimidated Plaintiff with excessive legal fees and dismissal of his claims, knowing Plaintiff was a vulnerable adult with complex PTSD."

It further alleged:

"Defendant's conduct was extreme, outrageous, and beyond the bounds of decency, causing Plaintiff severe emotional distress."

The SAC alleged that *Bloodborg* incorporated fictionalised therapeutic writing derived from Appellant's personal trauma and maintained that the alleged appropriation and commercial exploitation of this material caused continuing psychological injury at a very dark period of his life and suffering.

The SAC further pleaded:

"the endless threats to have the cases kicked out before any hearing, the complete disregard for the law and for the plaintiff's hardship and the unwillingness to take responsibility for their actions, along with the endless legal technicalities, delay tactics and diversions, all adds to the emotional and psychological toll and pain caused."

The SAC separately identified:

"Records of bad faith negotiations and legal threats and hate mail which exacerbated Plaintiff's emotional distress."

The harassment and litigation-pressure theory was therefore part of the pleaded case.

## XI. THE SAC ITSELF ALLEGED THREATS AND HARASSMENT BEFORE DISMISSAL

The SAC went substantially beyond a generalized allegation of emotional distress.

It stated that after Appellant publicly raised his allegations concerning Riot, he received extensive hate mail.

The SAC identified a bomb threat.

It alleged communications targeting Appellant's mental health.

It alleged that Appellant's daughter had been targeted with threats involving AI-generated sexual material being sent to her school and mother.

It described communications telling Appellant to harm himself and communications attacking him because of his mental-health conditions.

The SAC expressly linked this conduct to the emotional and psychological harm for which Appellant sought relief.

Subsequent preservation of the communications now permits the allegations to be quantified.

## XII. THE PRESERVED ARCHIVE CONTAINS 593 EMAILS AND DEMONSTRATES THE SCALE OF THE HARASSMENT

Appellant has preserved a corpus of 593 emails received between November 1, 2024 and September 18, 2026.

Analysis of the preserved archive identified:

190 communications, approximately 32%, containing litigation or legal references;

162 communications, approximately 27%, referring to Riot Games, *Arcane*, Tencent or Fortiche;

40 communications referring to Appellant's daughter or a child;

36 communications containing death or killing-related threats or language;

25 communications containing sexual, AI-sexual or pornography-related material;

16 communications containing bomb or explosive-related threats or language; and

11 communications containing suicide or self-harm incitement.

The categories overlap because individual communications can contain multiple forms of abusive content.

The statistics transform the pleaded allegation of continuing hate mail into a quantifiable evidentiary record.

Almost one third of the preserved archive contains litigation or legal references.

More than one quarter expressly references Riot, *Arcane*, Tencent or Fortiche.

The archive contains repeated references to death, explosives, suicide and Appellant's daughter.

The alleged harassment must also be considered within the environment in which it occurred and the litigation pressure it allegedly generated. Riot Games created, operates and commercially benefits from the online communities surrounding its games. Riot itself has acknowledged persistent problems involving harassment, threats, hate speech and other disruptive behaviour within those environments. These concerns have reached the United States Congress. In March 2023, Senate Judiciary Committee Chairman Richard Durbin wrote directly to Riot Games concerning the exploitation of online gaming communities by extremists for propaganda, radicalisation and recruitment, citing research which reported that 34% of surveyed adults had encountered white-supremacist extremism in Valorant. Other members of Congress, including Senator Ron Wyden, separately sought answers from Riot concerning harassment and extremism within its games. Against this documented background, the Appellant alleges that the sustained harassment directed toward him, including the conduct identified in the evidentiary record, generated substantial litigation pressure and cannot simply be divorced from the wider community surrounding Riot's products.

## XIII. SOME COMMUNICATIONS EXPRESSLY ADOPTED RIOT OR LITIGATION IDENTITIES

The preserved communications include messages whose senders deliberately adopted names presenting themselves as connected to Riot or the litigation.

On November 10, 2024, an email using:

riotLegalTeamCA@intencent.com.ch

stated:

"lmao we are just going to bribe the jury."

Another communication using:

anon_riotlawyer@wewillfuckyouincourt.com

stated:

"tough luck idiot, we already got evidence, screenshots and recordings of you offering money for 'proof'."

Another communication threatened:

"I'm gonna send a bomb to 5 Shetland Close, Coventry."

These communications are evidence of the content and character of the harassment received.

The anonymous sender identities alone do not establish authorship by Riot, its counsel or any particular employee.

They establish that litigation-themed intimidation formed part of the harassment being directed at Appellant while this case was being prosecuted.

That distinction does not diminish the emotional effect of receiving the communications or the resources required to preserve, report and investigate them.

## XIV. RIOT AND ITS COUNSEL RECEIVED REPEATED NOTICE OF THE THREATS

The notice chronology is independently documented.

On March 4, 2025, Appellant transmitted a written complaint concerning harassment and alleged witness intimidation to Riot's counsel, including Joshua Geller and Aaron J. Moss.

The underlying chronology included allegations concerning bomb threats, doxxing, threats directed at Appellant's daughter, impersonation and other abusive communications.

On March 20, 2025, Appellant raised the threats during a recorded court conference at which Geller was present.

Appellant stated:

“Threats to my door, all kinds of horrible stuff that's ongoing still. Bomb threats, all kinds of stuff.”

The statement placed the existence of alleged bomb threats directly into a recorded court conference in counsel's presence.

On April 7, 2025, Appellant supplied counsel with a Civil Rights Department complaint concerning targeted harassment, online hate, death threats and threats against his daughter.

The threats were therefore repeatedly brought to counsel's attention while the litigation remained active.

## XV. COUNSEL'S SUBSEQUENT RECORDED STATEMENTS CREATE A MATERIAL FACTUAL INCONSISTENCY

During a later recorded meet-and-confer, Appellant again raised harassment and bomb threats.

Geller responded:

"I have not seen that."

He continued:

"No, I have not seen any threats to you from Riot's community. I've not seen any bomb threats. I have not seen anything like that."

Appellant stated that the evidence had been filed.

Geller responded:

"No. No, you're not correct."

When Appellant again referred to filed material, Geller stated:

"Well, whatever. I mean, the things you're writing, you filed them. But I haven't seen any threats from Riot's community, and I don't believe there have been any."

During the same recorded exchange, Geller stated:

"I'm familiar with the filings in this case."

He further stated:

"I see your filings. I don't know that anything in any of your filings is true. In fact, I believe the vast majority of what's in your filings is not true."

The recording also preserves the stable portion of another statement:

"Well, I've read… I've read the gibberish you file…"

These statements followed the March 4 written notice and the March 20 court conference in which Appellant expressly stated in Geller's presence that he was receiving "bomb threats."

The chronology therefore creates a direct factual inconsistency capable of documentary resolution.

The preserved emails, notices, filed exhibits, conference recording and meet-and-confer recording can establish precisely what information was supplied, when it was supplied, and what counsel subsequently represented concerning his awareness of it.

## XVI. COUNSEL ALSO DECLINED TO DISCUSS RIOT'S INVESTIGATION OF THE ACCESS ROUTE

The recorded conferences contain additional evidence directly relevant to access.

During the first meet-and-confer, Appellant explained his asserted access route involving CBG, Jonny Geller, Felicity Blunt and UTA.

Geller stated:

"I don't have a copy of your manuscript."

When Appellant asked whether Riot or its counsel had investigated where Riot obtained the material alleged to have originated in *Bloodborg*, Geller responded:

"Yeah, I'm not prepared to talk to you about that."

The source of the disputed material was therefore directly raised.

Counsel declined to discuss Riot's investigation of the question.

When preservation and spoliation were subsequently raised, Geller stated:

"There's been no spoliation… your accusations of spoliation are 100% baseless."

When Appellant asked whether Riot had examined its servers, Geller stated:

"I'm not going to get into details about Riot's search and document collection efforts."

The underlying search, preservation and collection records were never tested through merits discovery.

## XVII. THE PROCEDURAL HISTORY COMPOUNDED THE BURDEN AND PRESERVED THE ALLEGED INFORMATIONAL ADVANTAGE

Appellant initially filed a substantially shorter complaint.

Riot challenged its sufficiency.

Appellant then produced the 1,218-page SAC containing extensive comparisons, chronologies, declarations and supporting material.

Riot subsequently characterised the pleading as excessively long and obtained additional time to respond.

The case nevertheless terminated without merits discovery into the internal records controlling the disputed access issue.

Appellant therefore experienced both sides of the pleading problem: an initial pleading challenged as insufficiently developed, followed by an extraordinarily detailed SAC which still ended before discovery into evidence unavailable to him.

For a pro se litigant attempting to establish a digital access route controlled by major entertainment corporations, this created a severe practical burden. Given the profound imbalance in access to the relevant evidence, the result creates at minimum an appearance of structural unfairness and places Appellant in an almost impossible position: he is required to plead facts sufficient to establish access while the evidence necessary to establish the internal route remains within systems, records and communications controlled by the entities whose access is disputed.

The alleged conduct of Riot and its counsel intensified this imbalance. Appellant repeatedly sought factual engagement concerning access, preservation, Riot's production chronology and the internal evidence capable of resolving those disputes. Counsel declined to disclose the details of Riot's search and document-collection efforts, disputed Appellant's preservation allegations, and declined to discuss Riot's investigation into the source of the material Appellant alleged had originated in *Bloodborg*.

Appellant further alleged that Riot relied upon inaccurate or manipulated production chronologies and disputed archival material, including Wayback evidence which Appellant challenged as falsified and which he alleges was introduced without adequate opportunity for examination during settlement proceedings. Those allegations concern evidence bearing directly upon the temporal defence to access and remain factual matters requiring examination of the underlying records.

The resulting litigation advantage is directly relevant to the unfairness alleged throughout the SAC. Riot possessed the internal evidence concerning its own submission systems, production records, personnel, communications and document-collection efforts. Appellant possessed only the external evidence available to an author outside those systems. If the entity controlling the decisive evidence can resist examination of those records while relying

upon the resulting evidentiary absence to defeat access, the informational advantage created by exclusive control of the evidence is preserved through the litigation itself.

The same pattern extended to the harassment and emotional harm already pleaded in the SAC.

Appellant repeatedly notified Riot and its counsel of harassment, death threats, bomb threats and threats directed toward his young daughter. The preserved archive ultimately grew to 593 communications, including 190 containing litigation or legal references, 40 referring to Appellant's daughter or a child, 36 containing death or killing-related language, 16 containing bomb or explosive-related language, and 11 containing suicide or self-harm incitement.

Appellant raised the threats in writing and during recorded proceedings. On March 20, 2025, with Riot's counsel present, Appellant expressly stated:

“Threats to my door, all kinds of horrible stuff that's ongoing still. Bomb threats, all kinds of stuff.”

Counsel subsequently stated:

“I have not seen any threats to you from Riot's community. I've not seen any bomb threats. I have not seen anything like that.”

When Appellant referred to the evidence he had filed, counsel responded:

“Well, whatever. I mean, the things you're writing, you filed them. But I haven't seen any threats from Riot's community, and I don't believe there have been any.”

Counsel nevertheless also stated:

“I'm familiar with the filings in this case.”

And:

“I see your filings. I don't know that anything in any of your filings is true. In fact, I believe the vast majority of what's in your filings is not true.”

The recording further preserves counsel referring to material Appellant filed as:

“gibberish.”

These statements are material because the SAC already pleaded harassment, intimidation and emotional injury as part of Appellant's IIED claim. Appellant contends that Riot's failure to condemn the threats after repeated notice permitted the hostile environment surrounding the litigation to continue, while counsel's subsequent treatment of the filed evidence compounded the psychological burden of attempting to prosecute the case.

The litigation effect was therefore cumulative. Appellant was attempting simultaneously to establish access to evidence controlled internally by Riot and connected entities; respond to contested chronology and archival evidence; preserve hundreds of abusive communications;

report threats involving himself and his daughter; and prosecute a complex federal action without counsel.

Appellant contends that this conduct also bears upon the unfair commercial advantage alleged under California Business and Professions Code § 17200. The underlying § 17200 claim concerns an alleged commercial structure in which established entertainment entities obtained the benefit of Appellant's creative work while Appellant suffered financial harm, reputational injury and barriers to entry. Conduct which preserves exclusive control over the evidence necessary to investigate that alleged practice is relevant to whether the underlying competitive imbalance could ever realistically be challenged.

The alleged unfairness therefore extends across the factual sequence. Appellant submitted his work into professional systems he could not inspect. The relevant entities controlled the technological and professional infrastructure through which the work could have travelled. Riot controlled its own submission and production records. Appellant was denied merits discovery into those records. Meanwhile, he alleges that contested chronology and archival evidence were deployed against his access theory, while documented harassment and threats surrounding the litigation continued despite repeated notice.

If established through the underlying records, this sequence would materially support Appellant's contention that the commercial imbalance pleaded under § 17200 was reinforced by an evidentiary imbalance during litigation. The entities accused of benefiting from the alleged unfair practice possessed the information capable of proving or disproving it, while the independent creator alleging injury was required to establish the internal route without access to those records.

The result was an extreme practical disadvantage: Appellant was required to prove what occurred inside systems controlled by the opposing corporate interests before being permitted discovery into the very systems capable of establishing what occurred.

## XVIII. THE HARASSMENT CAUSED IDENTIFIABLE LITIGATION PREJUDICE

The preserved harassment occurred while Appellant was attempting to investigate and prosecute this action.

Appellant had to preserve threatening communications, document their contents, report threats, contact service providers, investigate identifying information, protect his family, conduct legal research, respond to Riot's counsel, prepare federal filings, preserve copyright evidence and pursue appellate proceedings.

The archive contains 593 emails.

190 contain litigation or legal references.

40 refer to Appellant's daughter or a child.

36 contain death or killing-related language.

16 contain bomb or explosive-related language.

11 contain suicide or self-harm incitement.

The burden was therefore concrete and measurable.

The threats involving Appellant's daughter intensified the emotional consequences.

The litigation-themed communications connected the harassment directly to the proceeding from Appellant's perspective, irrespective of the ultimate identity of the anonymous senders.

The harassment need not establish copyright infringement to establish litigation prejudice or emotional injury.

Its existence, frequency, content, timing, preservation, relationship to the litigation, repeated notification to Riot and counsel, and effect upon Appellant are independently capable of proof.

## XIX. THE EMOTIONAL-DISTRESS MATERIAL PARTICULARIZES AN EXISTING CLAIM

The emotional-distress evidence therefore occupies the same procedural position as the access material.

The SAC already pleaded the claim.

The SAC already pleaded intimidation through legal threats.

The SAC already pleaded harassment and hate mail.

The SAC already pleaded severe emotional and psychological injury.

The SAC already pleaded a bomb threat.

The SAC already pleaded threats involving Appellant's daughter.

The SAC already alleged that these circumstances exacerbated Appellant's emotional distress.

Subsequent preservation has supplied the scale: 593 communications.

Plus more received every day since the analysis was made, placing them over 600.

Subsequent analysis has supplied the statistics.

The preserved emails supply the words used.

The March 4 and April 7 notices supply evidence of notice.

The March 20 court conference supplies recorded notice concerning bomb threats.

The later meet-and-confer supplies counsel's subsequent statements concerning what he had seen and what he believed.

This material particularizes the pleaded claim with dates, quantities, communications and recorded statements.

**XX. RIOT'S OWN LATER MATERIAL ALSO BEARS UPON THE DISPUTED PRODUCTION CHRONOLOGY AND THE ALLEGED UNFAIR CONDUCT**

Appellant consistently disputed Riot's asserted chronology concerning the development of *Arcane*.

Throughout the litigation, Appellant conducted his own chronological investigation and produced what he contends is a more accurate reconstruction of the development timeline. Central to the dispute was Riot's position that the relevant creative development had occurred before *Bloodborg: The Harvest* could have been accessed following Appellant's April 2020 submissions. Appellant repeatedly challenged that position and alleged that Riot's chronology had been reconstructed to place the relevant creative decisions outside the period of possible access.

Appellant also received information from a purported whistleblower describing a substantial change in direction during 2020. According to the information provided to Appellant, *Arcane* underwent an approximately “180-degree” creative change in mid-2020, during which earlier Bilgewater-oriented material was abandoned and development remained focused upon the Piltover and Zaun conflict. Appellant presented this information as further reason why the actual dated production records were necessary to resolve the chronology.

Riot's own subsequently published material provides additional support for Appellant's contention that material production activity continued through 2020.

Riot's *The Art and Making of Arcane* states that producer Melinda Dilger was hired in 2020 to help *Arcane* “cross the finish line” and describes the creation of a Los Angeles production pipeline with Fortiche to complete the nine episodes.

Appellant's April 15 and April 19, 2020 submissions therefore occurred during a year in which Riot's own later publication describes continuing production activity.

This evidence is material because Riot's counsel had previously relied upon a chronology which Appellant understood to mean the relevant creative work was already completed before his manuscript could have been accessed. Riot's later publication describes a production which was still undergoing substantial work during 2020. The precise relationship between continuing production and continuing creative development cannot be resolved from public statements alone. It can be resolved through Riot's dated internal records.

Those records should establish the state of scripts, character arcs, scenes, dialogue, casting, revisions, storyboards, animation and other development material on April 15 and April 19, 2020, together with what subsequently changed and when.

They were never produced.

The chronology dispute also bears upon the unfair commercial conduct already pleaded under California Business and Professions Code § 17200. Appellant alleges that his work entered Riot and connected professional channels during an active period of *Arcane* production, that constituent elements of his work subsequently appeared within the finished production, and

that Riot then relied upon a chronology which placed the relevant development outside the period of possible access.

If Riot's internal records establish material creative development or revision after the April 2020 submissions, those records would directly undermine the chronological premise used to resist Appellant's access allegations. If they further establish movement of Appellant's submitted material or information derived from it through the professional and technological routes identified elsewhere in this motion, the same evidence would bear directly upon the SAC's existing allegation of unfair commercial exploitation under § 17200.

The alleged unfairness is compounded by the control of the evidence. Riot possessed the dated production records capable of establishing what existed before April 2020, what remained under development, what changed afterward, who participated in those changes and when those changes occurred. Appellant was required to challenge Riot's chronology from publicly available evidence while Riot retained the underlying records capable of conclusively testing both parties' accounts.

Appellant further contends that the presentation of an inaccurate production chronology during litigation preserved the same competitive and informational imbalance underlying his § 17200 claim. If an entertainment company commercially benefits from an independent creator's submitted work and then uses its exclusive control over production records to prevent the creator from establishing when and how the material was incorporated, the resulting informational advantage directly reinforces the alleged unfair commercial condition.

The subsequent publication of Riot's own production history therefore strengthens the need for discovery into the chronology Appellant disputed from the outset. It provides an independent basis for testing representations previously made concerning when *Arcane* was developed and whether Appellant's April 2020 submissions preceded material creative decisions reflected in the finished series.

The relevant evidence is finite and identifiable: dated scripts, revision histories, production databases, storyboards, character-development records, writers' materials, casting records, Fortiche communications, Riot communications and associated metadata.

Those records were within the defendants' and associated production entities' control.

The action terminated before Appellant was permitted to obtain them.

## XXI. THE WIDER INVESTIGATION INCREASES THE IMPORTANCE OF TESTING THE IDENTIFIED SYSTEMS

Appellant's continuing investigation concerns a wider catalogue of M.W. Wolf works submitted through professional literary and entertainment channels.

The developing civil RICO chronology presently organises separate alleged occurrences as Subcases A through Q.

The relevance here is evidentiary.

The investigation has produced a recurring factual question concerning whether submitted creative material, or constituent information derived from it, entered professional systems through which it could be analysed, recombined, recommended, transmitted or accessed.

MediaHound and UTA IQ provide identifiable infrastructure against which this question can be tested. MediaLink provides additional evidence of UTA's contemporaneous expansion into data and technology solutions after its December 2021 acquisition, while the existence or absence of any technical or informational connection between MediaLink and UTA IQ or MediaHound remains a matter capable of documentary determination.

MediaHound's Entertainment Graph expressly included books.

UTA described analysis of specific story arcs and character identities.

UTA described hundreds of content traits.

UTA described integration with other data sources.

UTA acknowledged a pre-existing investment relationship with MediaHound.

UTA acknowledged years of collaboration with CBG companies.

CBG possessed Appellant's submitted work.

These facts justify examination of the records.

## XXII. THE MATERIAL STRENGTHENS ALLEGATIONS ALREADY BEFORE THE COURT

The present motion can therefore be reduced to two factual propositions already contained in Document 58.

First, access.

The SAC alleged the entry points.

It identified Riot Forge, CBG and UTA.

It identified April 2020 submission dates.

It identified portal submission.

It identified metadata and digital-forensic evidence.

It identified agency relationships.

It requested discovery.

Subsequent investigation has identified the systems and records through which those allegations can be tested.

Second, emotional distress.

The SAC pleaded IIED.

It alleged legal intimidation.

It alleged hate mail and harassment.

It alleged bomb threats.

It alleged threats involving Appellant's daughter.

It alleged severe psychological harm.

The preserved record now quantifies those allegations and documents repeated notice to Riot's counsel.

Neither issue appeared for the first time after dismissal.

The later material gives specificity to allegations already presented.

## XXIII. CONCLUSION: THE CUMULATIVE RECORD CANNOT BE REDUCED TO "BARE CORPORATE RECEIPT"

This case cannot fairly be understood by isolating the word "access" from everything which occurred around it. Appellant alleges that, from the beginning of this litigation, the route to determining access has repeatedly been obscured by the very parties controlling the evidence necessary to resolve it. The result is a case terminated before merits discovery despite the existence of identifiable submission systems, corporate relationships, production records, digital records, witnesses and technological infrastructure capable of proving or disproving what occurred.

The history must be considered cumulatively. Appellant alleges that Riot and its counsel repeatedly advanced positions which confused, narrowed or obstructed the factual inquiry. This included the disputed Joint Report process, during which Appellant alleges he was accused of inserting material which Riot's side had itself introduced, followed by repeated alterations to a document Appellant believed no longer represented an agreed report, including language concerning assignment to a Magistrate Judge to which Appellant objected. It includes the 2021 chronology upon which Riot relied and which Appellant contends is contradicted by subsequently obtained evidence concerning the continuing development of *Arcane*. It includes communications which Appellant understood as representing that the matter was closed; assertions attacking his ability to litigate his own claim and even his ability to place allegations onto pleading paper; disputes concerning the length and word count of his filings; and the procedural contradiction whereby an initial complaint was attacked for insufficient detail, only for the resulting 1,218-page SAC to be attacked for containing too much, then Riot's council billing the plaintiff for the cost. The case nevertheless terminated before discovery into the evidence capable of resolving access. The present motion itself establishes that Riot did not produce the submission-system audit trails, routing records, account histories, database entries, retention information, access histories or testimony capable of determining what happened after Appellant's April 2020 submissions.

Appellant further alleges that disputed chronology evidence was introduced during a settlement conference in circumstances which required him to spend substantial time contesting material he had not been given a fair opportunity to investigate beforehand. He alleges reliance upon Wayback material which subsequent investigation has called into question. He further alleges preservation concerns involving Chronodisk and the wiping or removal of relevant computers, together with digital intrusions which remain unresolved. These are serious allegations. Appellant does not ask the Court to accept them as proved merely because he asserts them. He asks why none was permitted to be tested through discovery.

The same problem exists concerning Riot's internal investigation. When Appellant directly asked whether Riot or its counsel had investigated the source of the material he alleged originated in *Bloodborg*, counsel responded, "I'm not prepared to talk to you about that." When Appellant raised preservation and spoliation, counsel described those accusations as

"100% baseless." When Appellant asked about examination of Riot's servers, counsel stated, "I'm not going to get into details about Riot's search and document collection efforts." The records capable of resolving those competing positions were never subjected to merits discovery.

Meanwhile, Appellant was litigating against a backdrop of extraordinary harassment. The analysed archive alone contains 593 communications, with 190, approximately 32%, containing litigation or legal references, 162, approximately 27%, referring to Riot, *Arcane*, Tencent or Fortiche, 40 referring to Appellant's daughter or a child, 36 containing death or killing-related language, 16 containing bomb or explosive-related language, and 11 containing suicide or self-harm incitement. The archive has since exceeded 600 communications. This was therefore not an abstract allegation of emotional pressure. It consumed time and resources while Appellant was simultaneously required to investigate identifying information, preserve evidence, protect his family, conduct legal research and prosecute federal litigation.

Riot's counsel was repeatedly placed on notice. Appellant provided written notice on March 4, 2025, raised bomb threats during a recorded March 20 court conference, and supplied further material on April 7. Yet counsel subsequently stated that he had not seen threats from Riot's community, had not seen bomb threats and did not believe such threats existed, while also stating that he was familiar with Appellant's filings, that he believed the "vast majority" of them were untrue, and referring to material Appellant filed as "gibberish." Those statements are preserved and capable of comparison against the written notices, filed evidence and recordings.

Appellant also places these events within a much wider developing evidentiary picture. His investigation presently identifies RICO Subcases A through Q involving separate M.W. Wolf works which he alleges repeatedly intersect with the same CBG-UTA professional adaptation pipeline. The present motion does not ask this Court to adjudicate those wider allegations. Their significance is, what was treated below as an implausible corporate-access theory is increasingly capable of being examined against identifiable professional relationships, databases, analytical systems and records. The motion identifies MediaHound, UTA IQ, book-inclusive data architecture, multi-source synthesis, analysis of story arcs and character identities, and acknowledged longstanding collaboration between UTA and CBG.

Nor can the human and procedural imbalance be ignored. Appellant has prosecuted this action without counsel while managing severe dyslexia, an acquired brain injury, Complex PTSD and associated conditions at the most difficult time of his life, which he has survived. He has nevertheless produced extensive pleadings, preserved hundreds of threatening communications, investigated corporate relationships and digital systems, maintained evidentiary records and pursued appellate review. Those circumstances did not relieve Appellant of the pleading requirements. They do, however, provide essential context when considering a litigation environment in which the decisive evidence remained inside sophisticated corporate systems unavailable to him.

Appellant submits that the cumulative effect created a near-impossible litigation environment. He was required to identify an internal route of access without access to the internal records. When he supplied more detail, the volume of his pleading became another objection. When he raised harassment, counsel later said he had not seen it and did not believe it existed. When he asked about Riot's investigation, counsel declined to discuss it. When he asked about server searches and document collection, counsel declined to provide the details. When he raised preservation concerns, they were dismissed as baseless without the underlying preservation record ever becoming available for examination. The litigation ended before any of these disputes could be tested.

Under these circumstances, the central question extends beyond whether Appellant had already produced enough externally available evidence to establish the final link in access. The more fundamental question is whether an individual creator can realistically establish a digital chain of access when the evidence capable of completing that chain is controlled by the corporations accused of receiving the work, and the case is dismissed before those records can be discovered.

If existing access doctrine requires an individual author to establish that internal transmission before discovery, while simultaneously denying him access to the records capable of establishing it, then its application to the modern digitally interconnected entertainment industry becomes practically impossible. If that is not what the law requires, then this case should not have ended before the identified evidence was tested.

Appellant respectfully submits that the cumulative circumstances create, at minimum, a serious appearance of structural unfairness. What began as a copyright action has become entangled with disputed chronology, disputed preservation, disputed digital evidence, alleged litigation obstruction, extraordinary harassment, alleged wider patterns involving submitted creative works, and internal corporate systems which Appellant cannot inspect. Yet virtually every disputed question capable of objective resolution remains unresolved because the litigation never reached merits discovery and the defendant refused to engage meaningfully and have been shown to have mislead the court and the plaintiff on a number of important factual points.. and yet, the case is still framed as “ACCESS.”

The case should not ultimately turn upon which party was able to control the evidence before discovery began. It should turn upon what the evidence shows.

Appellant therefore asks for the opportunity he has sought from the beginning: discovery sufficient to test the pleaded routes of access, the disputed production chronology, the preservation and collection of relevant evidence, the handling of his submissions, and the internal records capable of establishing whether the paths of *Bloodborg: The Harvest* and *Arcane* crossed. Only then can access be determined upon evidence rather than upon the absence of evidence Appellant had no lawful means of obtaining.

Appellant submits that the cumulative result raises a much wider concern. Without litigation reaching discovery, powerful corporate defendants can avoid meaningful scrutiny of evidence held exclusively within their own systems. Where those defendants possess both the decisive

evidence and highly experienced copyright counsel capable of navigating the procedural doctrines governing pleading, access and early dismissal, an individual creator faces an extraordinary structural disadvantage. Here, Appellant alleges that this imbalance was repeatedly compounded by litigation conduct which obscured rather than exposed the factual record, ultimately allowing the action to terminate before the evidence capable of proving or disproving access was discovered.

The professional context further contributes to the appearance of structural imbalance and unfairness. Riot's counsel are not peripheral participants in the Los Angeles copyright bar. Aaron J. Moss is a former President of the Los Angeles Copyright Society, while Joshua Geller is presently its Vice President. Of particular relevance, Moss moderated the Society's October 2020 program specifically examining the Ninth Circuit's approach to early dismissal of literary copyright cases, including when such actions may be dismissed before discovery.

A corresponding concentration exists at the other end of Appellant's alleged access route. Curtis Brown Group is a member of the United Kingdom's Association of Authors' Agents (“AAA”). Current AAA records identify CBG's Alice Lutyens as an elected Committee Member and CBG's Becky Brown as co-chair responsible for Copyright and IP on the Association's Copyright and AI Committee.

Those positions are particularly relevant to the appearance of structural unfairness alleged here because the AAA publicly describes its functions as promoting authors' rights, transparency between authors and literary agents, professional integrity and fair business practices. Its Constitution expressly states that maintenance of “fair business practices” is an objective in the interests of industry participants. The AAA also represents literary agencies before government and other sectors and participates in lobbying concerning copyright and intellectual-property protection.

Appellant's allegations therefore arise within an unusual professional structure. At one end of the disputed access route sits CBG, whose personnel participate directly in an industry body concerned with copyright, intellectual property, transparency and professional standards. At the opposing end of the litigation sits Riot, represented by specialist copyright counsel who have themselves occupied senior positions within the Los Angeles Copyright Society and possess substantial expertise concerning the doctrines governing early dismissal of literary copyright actions.

Appellant does not contend that professional service within these organisations itself establishes misconduct, collusion or judicial bias. The relevance lies in the concentration of institutional knowledge and influence surrounding the very mechanisms through which an independent creator must seek protection and accountability against them. The entities implicated in Appellant's allegations possess sophisticated knowledge of copyright law, professional submission practices, industry standards, evidentiary requirements and the procedures through which copyright claims are tested.

Against Appellant's already-pleaded § 17200 claim, this concentration contributes to the alleged structural imbalance. Appellant contends that his work entered a professional pipeline

controlled by sophisticated entertainment intermediaries; that the internal route of the work remained inaccessible to him; that the entities within the pipeline possessed technological and documentary systems capable of determining what occurred; and that when he sought judicial scrutiny, Riot was represented by specialist counsel with extensive institutional expertise concerning the precise copyright doctrines governing whether such a claim reaches discovery.

The resulting imbalance bears upon the unfair competitive condition alleged in the SAC. An independent creator seeking entry into the entertainment market can be dependent upon established agencies to receive and evaluate his work, dependent upon those same corporate systems to preserve the evidence showing what happened to it, dependent upon industry organisations to establish and promote standards of transparency and fair dealing, and ultimately dependent upon litigation to obtain records which those entities will not voluntarily disclose.

Where the organisations and professionals occupying these positions also participate in shaping, administering or advising upon the industry's standards concerning copyright, transparency and professional accountability, the appearance of structural unfairness becomes especially acute. The creator remains outside every institution possessing the information, expertise and resources necessary to determine what happened to his work.

This concentration does not itself establish a violation of § 17200. It does, however, provide material context for the unfair competitive environment alleged in the SAC: a market in which Appellant contends established corporate participants possessed the submission channels, technological infrastructure, internal evidence, commercial opportunities, specialist legal resources and control or influence over organisations governing, refereeing and shaping what access, transparency, accountability and fairness should look like, while the individual creator alleging exploitation remained excluded from both the market opportunity and the evidence necessary to establish what occurred.

Viewed against the entire procedural history, this disparity creates an undeniable appearance of structural unfairness. Either existing copyright procedure is inadequate to provide meaningful access to justice where proof of digital access resides exclusively inside interconnected corporate systems, or its application here prevented the factual allegations from receiving the scrutiny they required. In either event, dismissal before discovery produced the same practical result: the entities possessing the evidence were never required to disclose it, while the individual creator was faulted for being unable to produce it.

That circularity goes to the heart of the unfairness of this case. Appellant could not prove the internal transmission without the records. He could not obtain the records without discovery. He could not obtain discovery without first pleading sufficient evidence of the internal transmission. Meanwhile, Riot's counsel declined to discuss Riot's investigation, declined to disclose details of its search and document-collection efforts, and the action terminated without those records ever being tested.

Under those circumstances, the question is no longer merely whether access is the “linchpin” of Appellant's copyright claim. The antecedent question is whether the litigation process itself

prevented the evidence necessary to determine access from ever being reached. If so, access was never meaningfully tested. It was procedurally foreclosed.

The same cumulative circumstances materially strengthen Appellant's already-pleaded claim for Unfair Competition under California Business and Professions Code § 17200. The SAC alleged that Riot engaged in unlawful and unfair business practices through the alleged misappropriation and commercial exploitation of Appellant's creative material, causing barriers to market entry, financial harm and reputational damage. The subsequent evidence gives that alleged unfairness an identifiable technological, commercial and procedural structure.

Appellant alleges that his unpublished work entered professional submission channels connected through CBG, UTA and Riot; that sophisticated technological infrastructure existed within that professional environment capable of analysing books through story arcs, character identities and hundreds of other constituent traits; that UTA described combining such analysis with "other data sources" to identify patterns, assess value and "see what's coming next"; that UTA had also acquired MediaLink in December 2021, adding a strategic-advisory operation whose stated services included data and technology solutions to its expanding platform; and that the entities participating in this professional and technological environment possessed internal records unavailable to the individual creator whose work had entered their professional channels.

If unpublished submissions, slush-pile material, literary coverage, manuscript metadata or information derived from submitted works entered those analytical systems, Appellant contends the resulting competitive condition would be inherently unfair. An independent creator could submit original intellectual property seeking representation, publication or adaptation, be denied entry into the commercial market, yet have the informational and creative value of his work extracted, analysed and deployed for the benefit of established market participants possessing vastly greater technological and commercial resources.

That alleged practice corresponds directly with the market-entry injury pleaded in the SAC. The creator remains outside the market while the entities controlling entry potentially retain the commercial intelligence derived from his submission. The same entities then control the databases, submission histories, analytical records, communications and production evidence necessary to determine whether the alleged exploitation occurred.

The procedural history compounded this alleged competitive imbalance. Appellant contends that Riot relied upon a production chronology which placed the relevant creative development outside the period of possible access, resisted examination of the internal routes capable of resolving access, declined to disclose details concerning its investigation and document-collection efforts, and retained exclusive control over the records capable of establishing what happened to Appellant's submissions and what remained under development after April 2020.

Riot's own subsequently published material concerning continuing *Arcane* production activity during 2020 further demonstrates why those records mattered. If the dated production

evidence establishes material creative changes after Appellant's submissions, while the internal submission and technological records establish a route through which his creative material or information derived from it travelled, the evidence would bear directly upon both copyright access and the unfair commercial exploitation alleged under § 17200.

The harassment evidence adds a further dimension to the cumulative unfairness. Appellant was attempting to investigate and litigate these matters while preserving hundreds of hostile communications, including death threats, bomb-related communications and threats involving his daughter. Riot's counsel had repeatedly been placed on notice of the harassment, yet counsel subsequently stated that he had not seen threats from Riot's community, had not seen bomb threats and did not believe such threats existed, while referring to material filed by Appellant as “gibberish.” The preserved communications, notices and recordings permit that chronology to be objectively tested. The existing conclusion already documents both the scale of the archive and counsel's notice.

Appellant contends that the combined effect was to preserve the very imbalance underlying his unfair-competition claim: the corporate participants retained control of the creative-development records, submission records and technological evidence; Appellant remained excluded from those records; the alleged commercial exploitation could therefore not be tested; and the psychological and procedural burden upon Appellant increased while he attempted to establish from outside the corporations what had occurred inside them.

The § 17200 claim therefore cannot be separated artificially from the access dispute. The alleged unfair commercial practice, the technological means through which creative information could be analysed and transmitted, the barriers to Appellant's market entry, the exclusive corporate control of the resulting evidence, and the subsequent resistance to discovery form parts of the same factual sequence.

The case terminated before that sequence was tested.

**Who is copyright law for?**

Creatives, lawyers who help to shape copyright law, or the conglomerates who can afford access?

Is it for the individual creator whose original work the law exists to protect, or only for those with sufficient institutional access, technological resources and specialist counsel to prove what occurred after their work entered systems they cannot inspect?

This case exposes the practical importance of that question. Appellant alleges that his manuscript entered professional submission channels controlled by sophisticated entertainment entities. Those entities possessed the internal submission records, production records, communications, technological infrastructure and professional relationships capable of establishing where the work travelled. Appellant possessed none of them.

Copyright protection becomes practically inaccessible if an individual creator must establish an internal corporate route of access before discovery, while the corporations controlling that route exclusively possess the evidence capable of establishing it. The resulting circularity does more than disadvantage a pro se litigant. It risks creating a system in which the strength of copyright protection depends upon the copyright holder's ability to obtain “access” to the institutions, evidence and legal resources necessary to enforce it.

The question therefore reaches beyond this particular dispute: Who is copyright law for, the creatives whose works give the law its purpose, the specialists who understand and help shape its application, or the conglomerates with the resources and institutional access necessary to navigate it?

Appellant respectfully submits that copyright protection cannot meaningfully depend upon corporate scale, professional proximity or the financial ability to penetrate an evidentiary system controlled by the alleged infringer. Where the decisive evidence exists and can be identified, the merits should turn upon what that evidence establishes.

**The locked Door of Access**

**Access cannot become a synonym for inaccessible evidence.**

In this case, and future cases, “access” risks becoming an unrecoverable concept, capable of being established only by those who already possess the keys necessary to unlock the evidence. Appellant is required to demonstrate an internal route of access, yet the records capable of establishing that route remain behind corporate databases, servers, communications, audit trails and professional relationships which he has no lawful ability to inspect without discovery. The motion identifies precisely this problem: the internal records capable of resolving disputed access were never discovered.

When access is defined in a manner which cannot realistically be tested by the person required to prove it, it ceases to operate merely as an evidentiary inquiry and risks becoming an impenetrable litigation gateway. The party without the key is required to identify what lies behind the locked door before the Court will permit the door to be opened.

That problem carries particular significance in an entertainment industry in which Appellant contends access itself functions as a form of currency. Professional networks, representation, databases, submission systems, internal recommendations and established relationships determine who and what enters the industry's protected channels. Appellant alleges that those same closed networks provided the routes through which his work could have travelled, while simultaneously placing the evidence necessary to trace that journey beyond his reach.

The law cannot meaningfully test modern digital access while demanding evidence available only to insiders. If the creator outside the network must possess the internal record before discovery, while the corporation inside the network exclusively controls that record, the resulting circularity creates a serious appearance of structural unfairness and threatens meaningful access to justice.

Justice cannot depend upon possessing the password to the evidence required to obtain justice. Access must remain a question capable of proof, testing and discovery, not a key held exclusively by the party standing behind the locked door and further guarded by litigation gatekeepers shaping the locking mechanism.

**The Man Who Speaks to His Dog: A Fable in Law.**

A man speaks to his dog, and his dog speaks back. They understand each other. They communicate perfectly well.

Yet very little of their communication is achieved through an exchange of words.

A nod of the head, a wink, a look, a grunt, a gentle tap of the paw, a tone in a growl, a lowering of the hips, a wag of the tail, a facial expression. They read each other like a judge reads law. They know each other inside out. They communicate well. They know each other's habits, needs and personalities.

Yet the dog sometimes goes to stay with the man's family.

The family, perhaps his mother or sister, communicates with the dog in much the same way, yet achieves different results. The dog does not interpret them in the same way. The family has less influence. They imitate the expressions and commands, but their authority is different. The bond is less defined.

They do not “access” the correct words, actions, mannerisms or authority to command the dog. The dog is not able to read them in the same way. They might think the dog is being naughty or awkward. Likewise, the dog might think they are being nasty, bossy or strict.

They can imitate the bond, but they are not the bond.

The bond is changeable. It is fluid. It is learnable, but only where communication is stable, open and reliable.

The bond is very much like access in law. It can mean many different things. It involves a complex code of case law, structure, history and a dynamic environment, and it relies upon honest interactions, just as the dog's bond does.

If access, or the bond, refuses to adapt or communicate effectively with the person seeking to establish it, then the bond is broken.

The moral of the story is simple: if the gatekeepers do not honestly and reliably disclose the bond, their actions or the communications which establish it, access is broken. The necessary relationship cannot reliably be established or tested.

Access then ceases to be a means of reaching the truth and becomes an impenetrable barrier to justice.

If disabled litigants in person are held to an access standard shaped and argued by specialist defence counsel, while the evidence necessary to satisfy that standard remains concealed

behind the same corporate gateway, then the law becomes practically inapplicable to those it is supposed to protect.

**XXIII. RELIEF REQUESTED**

Appellant respectfully requests meaningful relief sufficient to permit the allegations already pleaded in the SAC to be tested upon evidence rather than terminated because Appellant could not produce internal corporate evidence unavailable to him without discovery.

Access was disputed and became dispositive. Yet the action terminated before merits discovery into the Riot Forge submission records, internal communications, databases, routing histories, access records, retention information and other evidence capable of establishing what occurred after Appellant submitted *Bloodborg: The Harvest*. Subsequent investigation has now identified additional technological infrastructure, professional relationships and specific categories of records through which the pleaded routes of access can be objectively tested.

*Rentmeester* recognises that disputed factual issues concerning access will often require discovery to flesh out. That principle has particular force here, where the evidence capable of proving or disproving the alleged transmission exists within digital systems controlled by the entities whose access is disputed. Requiring Appellant to establish the internal transmission before permitting discovery into the records capable of establishing it creates a circular evidentiary burden which, as applied here, risks making access impossible to prove from outside the corporate structure.

The same factual development bears upon Appellant's already-pleaded claim for Unfair Competition under California Business and Professions Code § 17200. The SAC alleged unfair commercial exploitation, barriers to market entry, financial harm and reputational injury. The subsequent identification of book-inclusive analytical technology, multi-source data systems, professional relationships connecting the entities within the alleged access pipeline, and records capable of determining what information entered those systems materially strengthens the factual basis for examining that claim.

The IIED claim likewise preceded dismissal. The subsequently preserved harassment archive, contemporaneous notices, statistical analysis and recorded conferences materially particularize the already-pleaded allegations of threats, intimidation, hate mail, litigation pressure and resulting emotional injury. The record now permits those allegations, including what Riot's counsel knew and when counsel was notified, to be examined against documentary and recorded evidence.

Appellant therefore respectfully requests review of the dismissal in light of the cumulative record and the factual allegations already pleaded. Appellant asks the Court to determine whether dismissal before merits discovery improperly prevented factual development of disputed access, unfair-competition and emotional-distress issues which depended substantially upon evidence exclusively controlled by Riot and the entities within the alleged access pipeline.

Appellant further requests appropriate relief vacating or reconsidering the dismissal and permitting the action to return to the district court for merits discovery sufficient to test the pleaded access routes, the handling of Appellant's April 2020 submissions, the disputed production chronology, the identified technological infrastructure, preservation and collection of relevant evidence, and the internal records capable of proving or disproving the allegations.

Appellant expressly renews and preserves his demand for trial by jury on all issues triable by jury. Appellant demanded a jury trial because the disputed factual questions in this action should ultimately be determined upon evidence by a jury, not extinguished at the pleading stage because the evidence necessary to resolve them remained within systems he had no lawful ability to inspect.

The Seventh Amendment right to civil jury trial, where applicable and properly demanded, is preserved through Federal Rule of Civil Procedure 38. Appellant therefore requests that any remand preserve his existing jury demand and permit the factual record to be developed so the issues triable by jury may reach the factfinder.

Appellant further respectfully requests that the Court review whether the application of existing access doctrine under these circumstances produced the structural unfairness demonstrated throughout this motion. If an individual creator must establish an internal digital transmission before obtaining discovery, while the evidence of that transmission is exclusively controlled by the corporate entities alleged to have received the work, the requirement becomes circular in operation.

The question reaches beyond the sufficiency of a pleading. It concerns whether copyright law remains meaningfully enforceable by an individual creator when the entities accused of receiving and commercially exploiting his work possess the submission records, technological records, production records and communications necessary to establish what occurred.

Appellant has repeatedly sought one fundamental thing throughout this litigation: examination of the evidence.

He renews that request here.

Appellant respectfully requests that this Court review the dismissal, grant appropriate relief permitting this action to proceed to merits discovery, preserve Appellant's demand for a jury trial on all issues triable by jury, and permit the disputed factual questions to be determined upon the evidence.

Access should be decided upon evidence, not upon Appellant's inability to obtain evidence which remained exclusively beyond his lawful reach.

**Exhibit List:**

**Exhibit A:** Declaration of Marc Wolstenholme
Exhibit B: MediaHound / UTA IQ / MediaLink evidence
**Exhibit C:** Transcript of recorded counsel statements
**Exhibit D:** Google Takeout Archive of Harassment, Threatening and Abusive Communications

# Exhibit A

**DECLARATION OF MARC WOLSTENHOLME**

I, Marc Wolstenholme, declare as follows:

1. I am the Plaintiff-Appellant in this action. I submit this declaration in support of my Motion Concerning Material Particularizing and Strengthening Access, Unfair-Competition, Discovery, and Emotional-Distress Allegations Already Presented in the Second Amended Complaint.

2. I have personal knowledge of the matters stated in this declaration, except where I expressly identify information obtained through subsequent investigation or documentary research. If called as a witness, I could and would testify competently concerning the matters within my personal knowledge.

3. I am the author of *Bloodborg: The Harvest*. I created the work during 2018 and 2019.

4. In April 2020, I submitted *Bloodborg: The Harvest* through professional channels in an effort to obtain representation and adaptation opportunities.

5. On April 15, 2020, I submitted material concerning *Bloodborg: The Harvest* through Riot Forge's online submission system.

6. On the same date, I submitted *Bloodborg: The Harvest* to Felicity Blunt at Curtis Brown Group ("CBG"). I retained documentary records concerning the submission, including the acknowledgement titled "Thank You for Your Submission: Bloodborg: The Harvest."

7. I made a further Riot submission on April 19, 2020.

8. I have preserved records relating to these submissions, including emails, electronic documents, metadata and other digital material.

9. Throughout this litigation, I have maintained that Riot Forge, CBG, UTA and associated professional relationships constituted routes through which my submitted material could potentially have reached persons involved with Riot Games.

10. I do not possess Riot's internal submission records, server records, routing histories, database entries, access logs, internal communications, retention records or document-collection records. I have never had the ability independently to inspect those systems.

11. I likewise have not had access to CBG's or UTA's internal systems sufficient to determine what happened to information concerning my work after it entered those professional channels.

12. I sought discovery because I believed those internal records were necessary to determine whether, when, how and by whom my submitted material was received, accessed, routed, searched, retained or transmitted.

13. The action terminated before I received merits discovery into those matters.

**Subsequent Investigation and Unfair Competition**

14. The SAC pleaded Unfair Competition under California Business and Professions Code § 17200. I alleged that the commercial exploitation and misappropriation of my creative material caused barriers to my entry into the entertainment market, financial harm and reputational damage.

15. I submitted *Bloodborg: The Harvest* through professional channels because I was attempting to obtain representation, publication and adaptation opportunities. I was an independent creator attempting to enter an industry controlled in substantial part through established agencies, studios, publishers and professional submission channels.

16. During my subsequent investigation, I identified additional information concerning MediaHound's Entertainment Graph, UTA IQ, the relationship between MediaHound and UTA, UTA's December 2021 acquisition of MediaLink, MediaLink's publicly described data-and-technology services, and professional relationships involving UTA and CBG. I identified these matters after the filing of the SAC.

17. I identified public technical material describing MediaHound's Entertainment Graph as connecting books with other entertainment media and analysing content through constituent traits.

18. I subsequently identified UTA's public description of analytical technology capable of examining "specific story arcs or character identities, among hundreds of other traits."

19. I also identified public statements describing the integration of such analysis with "other data sources" to assess the value of content, identify patterns, "drive value" for clients and "see what's coming next."

20. I learned through this investigation that UTA had maintained an investment relationship with MediaHound for years before acquiring the company in June 2022.

21. I further identified public material showing that MediaLink operated a Data and Technology Solutions specialty by at least October 2020. Contemporary material described its team of strategists and architects as assessing, recommending and implementing software, hardware and technology-partnership plans. I also identified material showing that MediaLink launched a technology-driven transformation practice in March 2021 involving agency enterprise systems, implementation, integration and technology infrastructure. UTA acquired MediaLink in December 2021 and expressly identified data and technology solutions among MediaLink's core services. I also identified public material describing longstanding collaboration

between UTA and CBG companies. UTA announced its agreement to acquire CBG five days after announcing its acquisition of MediaHound.

22. I did not know about this technological infrastructure when I filed the SAC.

23. The subsequent identification of these systems caused me to investigate whether *Bloodborg*, information describing it, manuscript metadata, literary coverage, characters, story structures, narrative descriptions, content traits or other information derived from my work could have entered MediaHound, UTA IQ or related professional systems.

24. I do not possess the internal records necessary to determine what source material entered those systems.

25. In particular, I have never been permitted to inspect whether unpublished submissions, rejected manuscripts, agency slush piles, literary coverage, pitches or information derived from submitted works were included within the multiple or "other data sources" publicly described.

26. I contend that unpublished creative submissions were capable of providing commercially valuable information if they were analysed through systems capable of identifying story arcs, character identities and hundreds of other constituent content traits.

27. If my submitted material or information derived from it entered such systems without my knowledge or authorization and was used for the commercial benefit of established entertainment participants while I remained excluded from the resulting opportunity, I believe this would form part of the unfair commercial conduct I alleged in the SAC.

28. I experienced a profound informational imbalance in attempting to investigate this issue. The entities within the professional routes I identified possessed the submission systems, internal communications, databases, analytical systems, production records and other evidence capable of determining what occurred. I possessed my own submission records and information obtainable externally.

29. I had no lawful means independently to inspect the internal systems capable of determining whether my work or information derived from it was retained, analysed, transmitted, searched or otherwise used.

30. I sought discovery into the access routes because those records were necessary to prove or disprove my allegations.

31. The action terminated before I obtained that discovery.

**Production Chronology**

32. Throughout the litigation, I disputed Riot's asserted chronology concerning the development of *Arcane*.

33. I conducted my own investigation of the development chronology because I believed the chronology relied upon against my allegations was inconsistent with publicly available information.

34. My understanding of Riot's position was that the relevant creative development had occurred before my April 2020 submissions could have provided access to *Bloodborg*.

35. I disputed that position and maintained that material creative and production activity continued after my submissions.

36. During my investigation I received information from a person presented to me as a whistleblower concerning a substantial change in the direction of *Arcane* during 2020. I treated that information as an investigative lead requiring independent documentary verification.

37. I subsequently identified Riot's own published material stating that producer Melinda Dilger was hired during 2020 to help *Arcane* "cross the finish line" and describing the creation of a Los Angeles production pipeline with Fortiche to complete the nine episodes.

38. I believe Riot's dated scripts, revision histories, storyboards, character-development records, production databases, casting records, internal communications and associated metadata are capable of establishing precisely what existed on April 15 and April 19, 2020 and what subsequently changed.

39. I have never had access to those internal production records.

40. Those records were not produced to me through merits discovery.

41. I believe the chronology is also relevant to my unfair-competition allegations because it bears upon whether my submitted work entered the identified professional channels while material creative development of *Arcane* remained ongoing.

**Harassment and Emotional Distress**

42. During the underlying dispute and litigation, I received a sustained volume of hostile, abusive and threatening communications.

43. The communications included references to this litigation, Riot Games, *Arcane*, Tencent and Fortiche. Other communications referred to death, explosives, suicide or self-harm, sexual material, and my daughter.

44. Some communications contained threats directed toward my home and family. Others referred specifically to bomb threats or threatened conduct involving my daughter.

45. I preserved these communications rather than deleting them because I believed they were relevant to my safety, my family, my pleaded emotional-distress claim and this litigation.

46. I subsequently organised and analysed 593 preserved emails received between November 1, 2024 and September 18, 2026.

47. That analysis identified 190 communications containing litigation or legal references, 162 referring to Riot Games, *Arcane*, Tencent or Fortiche, 40 referring to my daughter or a child, 36 containing death or killing-related language, 25 containing sexual, AI-sexual or pornography-related material, 16 containing bomb or explosive-related language, and 11 containing suicide or self-harm incitement. Individual communications can fall within more than one category.

48. I continued receiving communications after completing that analysis. My preserved archive consequently now exceeds 600 communications.

49. I do not claim that an anonymous sender's use of a Riot-related name or litigation-related identity, standing alone, establishes that Riot Games, its counsel or any Riot employee authored the communication.

50. My evidence is that I received the communications, preserved them, experienced their effects, and repeatedly notified Riot and its counsel of the threats and harassment while this litigation was active.

**Notice to Riot's Counsel**

51. On March 4, 2025, I transmitted a written complaint concerning harassment and alleged witness intimidation to Riot's counsel, including Joshua Geller and Aaron J. Moss.

52. The material I supplied included allegations concerning bomb threats, doxxing, threats involving my daughter, impersonation and other abusive communications.

53. On March 20, 2025, during a recorded court conference at which Mr. Geller was present, I expressly raised the threats and stated:

"Threats to my door, all kinds of horrible stuff that's ongoing still. Bomb threats, all kinds of stuff."

54. On April 7, 2025, I supplied counsel with a Civil Rights Department complaint concerning targeted harassment, online hate, death threats and threats involving my daughter.

55. I therefore personally notified Riot's counsel about the alleged threats on multiple occasions while this litigation was ongoing.

56. During a later recorded meet-and-confer, I again raised the harassment and bomb threats with Mr. Geller.

57. Mr. Geller stated during the recorded exchange:

"I have not seen any threats to you from Riot's community. I've not seen any bomb threats. I have not seen anything like that."

58. During the same exchange, Mr. Geller stated that he was familiar with the filings in the case and subsequently referred to material I had filed as "gibberish."

59. I have preserved the relevant recordings and written communications.

60. The failure to condemn the harassment after my repeated notifications, combined with the subsequent statements concerning the threats and my filed material, materially increased the emotional and psychological burden upon me while I was attempting to prosecute the action.

**Access, Discovery and Informational Imbalance**

61. During a recorded meet-and-confer, I explained to Mr. Geller the access route I was alleging involving CBG, Jonny Geller, Felicity Blunt and UTA.

62. When I asked whether Riot or its counsel had investigated where Riot obtained material which I alleged originated in *Bloodborg*, Mr. Geller responded:

"Yeah, I'm not prepared to talk to you about that."

63. When preservation and spoliation were later discussed, Mr. Geller stated:

"There's been no spoliation… your accusations of spoliation are 100% baseless."

64. When I asked whether Riot had examined its servers, Mr. Geller stated:

"I'm not going to get into details about Riot's search and document collection efforts."

65. I was therefore unable to determine from those discussions what Riot had searched, what records existed, what had been preserved, what had been collected, or what happened internally to my April 2020 submissions.

66. I did not receive merits discovery permitting those matters to be independently tested.

67. I experienced this as an extreme informational imbalance. I was attempting to establish an internal route of access while Riot and other entities within the alleged route possessed the records capable of proving or disproving whether that route existed.

68. I repeatedly investigated the access route from outside those organisations because the internal evidence remained unavailable to me.

69. I believe the same informational imbalance is relevant to my unfair-competition allegations. I submitted my creative work seeking entry into the entertainment industry, while the established entities within the alleged route possessed both the commercial infrastructure capable of exploiting creative information and the internal evidence necessary to determine what happened to my submission.

70. I was therefore required to attempt to establish from publicly available evidence what occurred within private corporate systems I could not inspect.

71. The case terminated before those systems and records were examined through merits discovery.

**Effect Upon Me and the Litigation**

72. I prosecuted this action without counsel.

73. While doing so, I was simultaneously required to preserve and catalogue threatening communications, report threats, contact service providers, investigate identifying information, protect my family, conduct legal research, respond to Riot's counsel, prepare federal filings, preserve copyright evidence and pursue appellate proceedings.

74. This consumed substantial time and resources which I otherwise needed to prosecute the litigation.

75. The threats involving my daughter were particularly distressing to me.

76. The volume and content of the communications, combined with the demands of this litigation, caused substantial emotional and psychological distress and materially increased the burden of prosecuting the case.

77. I nevertheless continued preserving the evidence and pursuing the litigation because the factual questions concerning access had never, in my understanding, been tested through merits discovery.

78. I experienced the litigation as profoundly unequal. I was required to investigate access, production chronology, preservation, professional relationships and technological systems from publicly available information while the records capable of conclusively resolving many of those questions remained within corporate systems unavailable to me.

79. I believed throughout the litigation that the combination of exclusive corporate control over the relevant evidence, resistance to examination of the access routes, the disputed production chronology, the absence of discovery and the continuing harassment placed me at a severe and unfair disadvantage.

80. My concern concerning unfair competition arises directly from my experience as the creator who submitted the work and subsequently attempted to determine what happened to it. I sought entry into the entertainment industry through professional submission channels. I allege that my creative material was subsequently commercially exploited while I remained excluded from the resulting commercial opportunity and lacked access to the internal evidence necessary to establish how my work could have travelled.

81. The subsequent identification of MediaHound, UTA IQ, book-inclusive analytical infrastructure, UTA's acquisition of MediaLink and its stated data-and-technology capabilities, UTA and CBG's professional relationships, and identifiable categories of internal records has strengthened my belief that the access and unfair-competition allegations I previously pleaded are capable of objective investigation.

82. I seek examination of those records so the factual questions can be determined from evidence.

83. I continue to demand a jury trial on all issues triable by jury.

84. I respectfully request review of my case and the opportunity to obtain the evidence necessary to place the disputed factual issues before a jury.

85. The internal records necessary to determine what happened after my submissions entered Riot Forge and the professional channels identified in my pleadings have never been available to me.

86. I respectfully submit this declaration so the Court has a sworn factual record concerning what I submitted, what I preserved, what I personally received, what I communicated to Riot's counsel, what was stated to me during recorded conferences, what I subsequently identified through documentary investigation, the unfair competitive conditions I allege, and what evidence remained beyond my reach when the action terminated.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

s/ Marc Wolstenholme

Marc Wolstenholme
Plaintiff-Appellant, Pro Se

Dated: September 28, 2026