**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**MARC WOLSTENHOLME,**
Plaintiff-Appellant,
v.
**RIOT GAMES, INC.,**
Defendant-Appellee.

No. 25-3163
D.C. No. 2:25-cv-00053-FMO-BFM

# APPELLANT'S MOTION CONCERNING CUMULATIVE INJUSTICE, LITIGATION ABUSE, MATERIAL MISREPRESENTATIONS, EVIDENTIARY DISTORTION, POTENTIAL INSTITUTIONAL CONFLICTS, AND NEWLY DISCOVERED SUPPORTING INFORMATION AFFECTING THE INTEGRITY OF THE PROCEEDINGS

The litigation abuse and integrity concerns addressed by this Motion have already been placed before this Court through Appellant's existing filings and the underlying record. This Motion develops those existing concerns and is supported by additional material subsequently obtained by Appellant. The supporting material is submitted in connection with the present integrity-of-proceedings Motion and Appellant's request for an appropriate mechanism through which the allegations may be independently examined, verified or disproved. Appellant does not ask the Court to resolve disputed facts from the supporting material in the first instance; he asks that the alleged misconduct already placed before the Court, together with the additional evidence now supporting it, receive meaningful factual examination through whatever procedure this Court determines lawful and appropriate.

**INTRODUCTION AND RELIEF SOUGHT**

This Motion asks the Court to examine a cumulative course of alleged litigation abuse, material misrepresentation, evidentiary distortion, procedural pressure, and information control which Appellant contends affected the fair examination of access and ended with dismissal before merits discovery. The chronology begins in 2021, when Riot responded to Appellant's infringement allegations by relying upon a production chronology which treated Arcane's relevant creative material as already written and effectively locked before Riot could have received Bloodborg: The Harvest in April 2020.

The factual problem developed from the information imbalance between the parties. Riot possessed the internal submission records, communications, production histories, investigation material, preservation information, search information, document collections, and technological records capable of testing access. Appellant possessed his submission history, surviving external records, public production evidence, archived material, and evidence of professional routes, but could not inspect Riot's internal systems. He alleges that disputed representations progressively narrowed the external routes while the internal evidence remained inaccessible, and the case ended before discovery could test the disputed facts.

Appellant requests factual examination of the alleged misconduct and restoration of a meaningful route to discovery. If examination establishes that evidence material to access was concealed, destroyed, withheld, materially misrepresented, or rendered unavailable through misconduct, Appellant requests a corrective remedy sufficient to prevent the resulting evidentiary deficit from operating to the advantage of the party responsible for it.

## I. 2021: RIOT'S FIRST RESPONSE RELIED UPON A PRODUCTION CHRONOLOGY APPELLANT COULD NOT TEST

Following Arcane's release in November 2021, Appellant contacted Riot personnel through Twitter, LinkedIn, and email concerning similarities he believed existed between Arcane and Bloodborg. The existing material records a period in which Appellant's allegations were met with ridicule and descriptions of him as mad, insane, or a lunatic while he attempted to obtain substantive engagement. Appellant also identified a contemporaneous LinkedIn item from a Riot-connected individual referring to a person on Twitter claiming to have written Bloodborg. The item is relevant to the chronology of professional awareness of the allegation.

Riot's General Counsel then directed Appellant to stop contacting Riot's founders and employees and characterised his intellectual-property allegations as without merit. Appellant served a cease-and-desist notice. On December 1, 2021, Aaron J. Moss, copying Joshua Geller, responded on Riot's behalf. Moss characterised Appellant's allegations as "sheer speculation and conjecture," asserted a "fundamental lack of understanding" of the relevant production timeline, and represented in substance that by the time Riot could have received Appellant's manuscript in April 2020, Arcane had already been written and its relevant material was effectively locked in.

Moss relied upon the asserted chronology to reject Appellant's allegations. Riot rejected mediation, settlement, or attribution, raised the prospect of attorneys' fees and sanctions, and advised Appellant to obtain United States copyright counsel. On December 8, 2021, Moss again characterised the claims as "meritless" and "patently false" and informed Appellant that Riot considered the matter closed.

At this point Appellant had no access to Arcane's internal scripts, revision histories, development communications, casting chronology, voice-production records, submission records, or internal communications capable of testing the chronology supplied by Riot's lawyers. He was an outsider attempting to assess a production history held by the company whose lawyers were relying upon that history to reject his claim.

## II. 2022-2024: APPELLANT'S INVESTIGATION PRODUCED EVIDENCE DISPUTING THE 'LOCKED' CHRONOLOGY

Appellant spent the following years reconstructing the development history from surviving and public evidence. He examined writing and rewriting, story and dialogue development, casting and voice activity, production meetings, later creative decisions, public accounts of the development process, and evidence concerning activity during 2020 and 2021. He alleges that this evidence materially contradicts the certainty with which the relevant creative material had been presented as effectively locked before April 2020.

The dispute therefore moved from Riot's 2021 assertion of a completed or effectively fixed creative chronology to a factual conflict over what was written, revised, transmitted, approved, cast, recorded, or changed after April 2020. The records capable of resolving those

questions remained within Riot, Fortiche, and the associated production and communication systems.

Appellant also continued investigating routes through which Bloodborg could have reached Riot. Those routes included the direct Riot Forge submission history and professional intermediaries through whom Appellant alleges the work or related material could have moved. His position was that access required factual examination of the actual routes, records, communications, and systems, rather than acceptance of a chronology supplied by the party controlling those records.

## III. FEDERAL LITIGATION BEGAN WITH THE SAME EVIDENTIARY IMBALANCE

When the dispute entered federal litigation, Riot still controlled the internal submission records, communications, retention systems, development records, investigation material, search information, custodial information, and technological evidence capable of showing whether Appellant's work entered, moved through, was retained within, or was accessed through Riot's systems. Appellant sought access to evidence he could not obtain independently.

The access question was therefore concrete. The case concerned whether there was a reasonable possibility of an opportunity for the work to reach relevant persons, including through a chain of events or intermediaries. Appellant alleges that he identified specific external routes and categories of internal evidence capable of testing them. The action nevertheless ended before merits discovery into those internal categories occurred.

## IV. EARLY MEET-AND-CONFER: THE MAGISTRATE-JUDGE ISSUE AND COOPER'S PERSONAL OBSERVATIONS

During early meet-and-confer communications, Appellant alleges that Joshua Geller and Aaron J. Moss repeatedly attempted to attribute to him a preference for proceedings before a magistrate judge which he had not expressed. Appellant repeatedly corrected the characterisation. The position nevertheless reappeared during preparation of the joint report as though it represented Appellant's proposal, requiring him to correct the record concerning his own litigation position.

Hayley-Jo Cooper, a qualified United Kingdom solicitor, attended an early meet-and-confer personally as Appellant's friend and support person. She was not acting as his legal representative. Cooper personally observed the exchanges in which Riot's counsel attributed positions to Appellant which he maintained were not his own, including the recurring magistrate-judge issue. Her concern arose from what she heard during the meeting itself.

Cooper also expressed concern about Riot counsel repeatedly telling the unrepresented Appellant that they would “help” and “guide” him through the process. She regarded those representations as inappropriate because the people offering to guide him were opposing counsel acting for Riot Games and advancing interests directly adverse to his. Her observations gave Appellant an independent, professionally informed reason to be concerned about how his position was being represented during the litigation process.

The magistrate issue continued into the joint-report process. Before agreeing to the later settlement process, Appellant expressly sought to ensure that settlement would be used for genuine resolution and would not become another opportunity for litigation pressure, misrepresentation, or abuse. His concern therefore existed before the settlement conference and was grounded in events already experienced during the early litigation.

## V. STATEMENTS LEADING INTO THE SETTLEMENT PROCESS

Before the settlement conference, during the proceedings leading into that process, Appellant recalls the judicial officer making statements to the effect that "this is Los Angeles, not Coventry" and that a prospective jury would not consist of "twelve of your cousins," or words substantially to that effect. Appellant has identified the wording as his recollection and seeks examination of any contemporaneous record capable of establishing the precise language.

The remarks occurred after the magistrate dispute and after Appellant had already raised concerns about misrepresentation and litigation pressure. Appellant nevertheless proceeded reluctantly and after voicing much concern, because he sought a genuine opportunity to settle the case. The remarks became part of his concern about the process when considered with what occurred during the conference itself.

## VI. THE SETTLEMENT CONFERENCE BECAME AN EVIDENTIARY CONTEST OVER THE RIOT SUBMISSION ROUTE

During the settlement conference, on litigation ambush, Riot's counsel introduced historical Wayback Machine material concerning Riot's submission system and advanced representations concerning what the archived pages supposedly established. The historical operation of Riot's submission mechanism went directly to access because it bore upon whether Appellant's material could have been submitted to, received by, retained within, or accessed through Riot's systems.

Appellant alleges that counsel represented the historical submission mechanism as subject to a 250-word or character limitation. Appellant disputed the representation during the conference itself. A substantial portion of the conference was consumed by his attempt, in real time, to challenge Riot's account of the archived material and defend the plausibility of access. He alleges that he had received no fair advance notice that the historical operation and limitations of the submission route would become a contested evidentiary issue during a proceeding convened for settlement.

During the settlement conference, Riot's counsel represented the historical submission mechanism as subject to a 250-word limitation. Appellant was effectively required to litigate the accuracy of that representation on the spot. Using the URL contained within the material introduced during the conference, Appellant demonstrated in real time that the representation was evidently false. He showed that the submission window was capable of accepting the

entirety of Bloodborg and further demonstrated that the submission box contained an extension function permitting additional material.

Appellant therefore did more than dispute Riot's representation verbally. He used the material and URL before the participants during the conference to demonstrate how the submission mechanism actually operated and why the asserted 250-word restriction did not accurately describe it.

Nevertheless, following this unexpected evidentiary contest, the judicial officer concluded, based upon the evidence presented during the conference, that she could not ask Riot to settle. The practical result was that a proceeding Appellant had entered for settlement became an on-the-spot determination heavily affected by disputed access evidence introduced by Riot, despite Appellant demonstrating during the conference itself that the asserted limitation upon the submission route was false.

Appellant subsequently investigated the representation against archived Wayback Machine records and other contemporaneous material. He alleges that the archived evidence contradicts material representations concerning the availability, operation, and limitations of the submission route. The historical webpages, archived records, litigation filings, and associated communications provide an external documentary record against which the representation can be tested.

The dispute was material because the historical submission route concerned access itself. If the route was inaccurately described as incapable of receiving the relevant material, the representation could narrow the apparent means by which Bloodborg could have reached Riot before discovery into Riot's internal submission records, communications, retention systems, and access information occurred.

## VII. THE SAME SETTLEMENT PROCESS INCLUDED ALLEGED WARNINGS OF FINANCIAL DESTRUCTION

During the same settlement process, Appellant alleges that the judicial officer made statements to the effect that Riot Games could pursue him back to the United Kingdom and financially destroy him while the possibility of a settlement in the region of $10,000 was also discussed.

By then Appellant had entered the process after expressly raising concern about litigation pressure, had already experienced the magistrate dispute, had heard the Los Angeles, Coventry, and prospective-jury remarks, and was attempting to defend a central access route against historical material introduced on ambush during the settlement conference. He alleges that the combination of the financial warning, the disputed evidentiary representation, and the settlement pressure was profoundly disturbing and affected his experience of a process he had entered seeking genuine settlement.

## VIII. AFTER SETTLEMENT THE DISPUTES EXPANDED TO DEVELOPMENT HISTORY, PRESERVATION, SEARCHES, INVESTIGATION, AND SPOLIATION

After the conference, Appellant continued challenging what he alleges were false, backdated, or materially contradictory accounts concerning Arcane's development chronology. He also raised destruction, movement, withholding or manipulation of evidence, preservation, Riot's investigation of the alleged source of disputed material, internal searches, document collection, and spoliation.

Appellant repeatedly sought information concerning what Riot had actually investigated, which systems had been searched, which custodians had been examined, which documents had been collected, what material had been preserved, and what Riot knew concerning the alleged source of disputed material. Those matters were controlled by Riot. Appellant had no independent access to Riot's servers, submission systems, communications, document collections, preservation procedures, or internal investigations.

During recorded communications, Appellant questioned Joshua Geller concerning Riot's investigation into the alleged source of disputed material. Geller responded in substance, "I'm not prepared to talk to you about that." When Appellant raised spoliation, Geller stated that there had been no spoliation and characterised the allegation as "100% baseless." When Appellant sought the factual basis necessary to test those assertions, including Riot's searches and collection of potentially relevant documents, Geller stated in substance, "I'm not going to get into details about Riot's search and document collection efforts."

These exchanges left Appellant with categorical conclusions about investigation, spoliation, searches, and document collection while the records needed to test those conclusions remained unavailable. The litigation terminated before merits discovery into those matters.

## IX. MARCH-APRIL 2025: COUNSEL RECEIVED EXPRESS NOTICE OF THREATS BEFORE THE LATER 'GIBBERISH' EXCHANGE

On March 4, 2025, Appellant sent Geller and Moss a complaint concerning harassment, online abuse, death and bomb threats, and threats directed toward Appellant's then five-year-old daughter, accompanied by chronology material. The underlying evidence schedule further records a formal harassment and witness-intimidation complaint sent that evening to Joshua Geller, Aaron Moss, Andrew Lux, Riot's Dan Chang and others, followed by a detailed chronology of harassment, threats, and intimidation.

The material also records oral notice during the pre-settlement period concerning ongoing threats, threats to Appellant's home, and bomb threats, with Geller present. On April 7, 2025, Appellant again supplied material concerning targeted harassment, online hate, death threats, and threats concerning his daughter. Appellant continued notifying Riot and its counsel as the alleged harassment and intimidation escalated.

During a subsequent recorded exchange, Geller stated in substance that he had not seen the threats or bomb threats. Appellant challenged the statement because those matters had already been raised directly with counsel and supplied in written material. Geller also indicated familiarity with Appellant's filed material while characterising material submitted by Appellant as "gibberish." The emails, attachments, filings, and recording permit

examination of what was supplied, when it was supplied, who received it, and what was later said concerning counsel's knowledge.

The same recorded communications also contain Geller's refusal to discuss Riot's investigation into the alleged source of disputed material, his statement that the spoliation allegation was “100% baseless,” and his refusal to provide details of Riot's search and document-collection efforts. Appellant relies upon the complete sequence because it concerns notice, knowledge, investigation, preservation, and evidence which remained within Riot's control.

## X. DISMISSAL BEFORE MERITS DISCOVERY PRESERVED THE INFORMATIONAL DEFICIT

By dismissal, the access dispute had accumulated several unresolved factual conflicts. Riot's 2021 production chronology was disputed by later development evidence. The historical submission route had become the subject of a disputed Wayback representation. Riot's internal investigation, searches, document collection, preservation activity, submission records, and access information remained undisclosed. The action terminated before merits discovery could test those matters.

The practical result was circular. Appellant could not establish the complete internal transmission without the records. The records required discovery. The case ended before discovery because the external evidence was treated as insufficient to cross the pleading threshold. The absence of the internal evidence therefore survived as an apparent weakness in the claim even though the process had never opened the records capable of resolving it.

## XI. ALLEGED PROCEDURAL MANIPULATION, CONFLICT OF INTEREST, AND THE CIRCULAR FORTIFICATION OF ACCOUNTABILITY

Appellant alleges a fundamental procedural and institutional conflict extending beyond the ordinary advantages of specialist legal representation. The concern is not merely that powerful professional interests possess specialist knowledge of copyright law. Appellant alleges that participants occupying influential positions within institutions concerned with copyright law, professional standards, transparency, integrity and accountability have been able to misuse those positions, institutional knowledge and procedural expertise to protect their own interests from scrutiny, prevent discovery into evidence capable of exposing the alleged conduct, and secure procedural outcomes which prevent the underlying allegations from ever being substantively examined.

At the litigation end of the alleged structure, Riot Games retained specialist copyright counsel occupying senior positions within the Los Angeles copyright establishment. Aaron J. Moss is a former President of the Los Angeles Copyright Society. Dan Nabel of Riot Games Is also an Immediate Past President. In October 2020, Moss moderated a programme examining the Ninth Circuit's treatment of early dismissal of literary copyright actions, including circumstances in which literary copyright claims may terminate before discovery.

Joshua Geller has likewise participated in professional analysis concerning Ninth Circuit copyright doctrine and has held a senior position within the Los Angeles Copyright Society. Appellant alleges that these positions provided more than general familiarity with copyright law. They placed Riot's counsel within professional structures examining and interpreting the very doctrines, procedural thresholds and mechanisms which determine whether a literary copyright claimant survives dismissal and reaches discovery.

At the opposite end of the alleged access route sits Curtis Brown Group, a member of the United Kingdom's Association of Authors' Agents (“AAA”). The AAA presents itself as an industry body concerned with authors' rights, transparency, professional integrity, fair business practices and copyright policy. Personnel associated with CBG have occupied positions concerned with professional standards, copyright and intellectual-property interests. Appellant alleges that CBG simultaneously occupied a central position within the alleged route through which his intellectual property entered the professional entertainment industry and possessed records concerning the receipt, handling and potential movement of his submitted material.

Appellant alleges that these circumstances create an integrity problem at the heart of the mechanisms through which accountability is supposed to operate. The same professional interests whose conduct may require scrutiny can occupy influential positions within institutions concerned with the rules, standards, transparency, integrity and accountability by which such scrutiny is undertaken. Appellant alleges a serious conflict where those institutional positions and the knowledge obtained through them are then used to exploit weaknesses in the applicable legal or professional framework, prevent factual examination, and protect the participants themselves or their corporate interests from accountability. This concern becomes particularly acute where those same interests control the evidence necessary to expose what occurred.

The allegation is therefore one of procedural manipulation, not merely procedural expertise. A sophisticated participant who knows, and has perhaps helped set, precisely where the evidentiary threshold lies also knows what an outsider must possess to cross it, what information remains inaccessible without discovery, and which procedural arguments can prevent discovery from occurring. Where the same interests also control the missing evidence, Appellant alleges that specialist institutional knowledge can be used to engineer the very evidentiary deficiency later relied upon to obtain dismissal. A procedural safeguard can thereby be converted into a mechanism for preventing examination of the conduct the safeguard is supposed to permit the legal system to adjudicate fairly.

Appellant alleges that this is what occurred in his case. He was required to establish a sufficiently developed route of access before discovery, while the evidence capable of establishing the complete internal route remained within submission systems, databases, communications, production records and technological infrastructure controlled by Riot and the interconnected professional entities identified in his allegations. The litigation terminated before those records were produced. Appellant therefore confronted a closed evidentiary circle: he could not establish the complete internal transmission without the

records; he could not obtain those records without discovery; and he could not obtain discovery without first producing sufficient evidence of the internal transmission which the records themselves were required to establish.

Appellant alleges that the resulting structure is capable of being deliberately exploited. Control the access route and the evidence recording it. Conceal, deny, or misrepresent the route. Require the creator to prove the concealed route as a condition of reaching discovery. Help set the law surrounding what must first happen to prove access. Use specialist knowledge of the governing evidentiary and procedural thresholds to prevent discovery. Then rely upon the resulting absence of internally controlled evidence as the basis for defeating the creator's claim. Appellant alleges that this produces a circular fortification capable of protecting the alleged participants from the very scrutiny necessary to determine whether the underlying allegations are true.

The alleged misuse of position is central. Appellant does not complain merely that opposing counsel understood copyright procedure. He alleges that institutional position, specialist knowledge, control of evidence and procedural mechanisms operated together to protect powerful interests from scrutiny. If a participant knows the precise evidentiary conditions required to reach discovery, possesses or represents the party possessing the evidence necessary to satisfy those conditions, and then uses the procedural threshold to prevent production of that evidence, the participant obtains the practical ability to influence whether his own conduct or the conduct of the interests he represents can ever be examined.

The conflict can be illustrated by a simple analogy. A person accused of wrongdoing may plead not guilty, but the integrity of the proceeding would plainly be compromised if the accused were then permitted to judge his own trial, determine which evidence concerning his conduct could be examined, apply the rules governing whether the accusation could proceed, and ultimately find himself not guilty because the accuser could not produce evidence which remained under the accused's own control. Appellant alleges an institutional equivalent: the interests requiring scrutiny possess the evidence, possess exceptional knowledge of the rules determining whether the evidence can be reached, occupy influential positions within professional structures concerned with those rules and standards, and can then invoke the resulting evidentiary deficiency to prevent scrutiny altogether. The existing allegations similarly describe a participant controlling both the evidence and, functionally, the conditions under which the evidence can ever be examined. The appellant alleges that this cannot be logical nor fair in law.

This alleged conflict is particularly significant because Appellant does not allege an abstract possibility of abuse. He alleges lies, manipulation, gaslighting, fabrication of evidence, spoliation concerns, litigation ambush, harassment, discrimination, and the appearance of bias in the settlement conference.

He alleges that procedural and evidentiary mechanisms were actually used to prevent substantive examination of his claims. His pleaded chronology includes alleged concealment or misrepresentation of access routes, contradictory development histories,

disputed archival evidence, withholding or suppression of evidence, and procedural strategies which terminated the underlying action before discovery into the internal records capable of resolving those disputes. The institutional evidence is therefore advanced as part of Appellant's explanation of how the alleged protection from scrutiny could operate in practice.

The AAA and LACS evidence forms part of the same integrity concern at opposite ends of the alleged structure. At the alleged entry point, professional gatekeepers connected to an institution promoting authors' rights, professional integrity, transparency and copyright policy possessed submission records and knowledge concerning the handling of creative material. At the enforcement point, specialist copyright litigators occupying influential positions within the Los Angeles copyright establishment possessed exceptional knowledge of the legal mechanisms determining whether the creator could ever obtain the internal evidence required to prove what happened to that material. Appellant remained outside both systems.

Appellant alleges that the result is a stronghold over evidence, procedure and accountability. The alleged participants control the creative gateways and internal records; possess specialist institutional knowledge concerning the standards and procedures governing accountability; invoke those procedures to prevent discovery; and then rely upon the resulting absence of evidence as a basis for defeating the outsider's claim. This is the circular fortification alleged by Appellant, and it is the alleged misuse of institutional position and procedural power to avoid scrutiny, accountability and discovery which makes the institutional evidence material to the present motion.

**Exhibit C**

The institutional concern is further supported by the records collected as Exhibit C. The Los Angeles Copyright Society identifies Aaron J. Moss as its President for 2019–2020, while its current records identify Joshua Geller of Mitchell Silberberg & Knupp as Treasurer and Dan Nabel of Riot Games as Immediate Past President. The Society's historical records further identify Nabel as its President for 2024–2025. LACS describes itself as a members-only organisation of attorneys practising in copyright and related fields, including lawyers employed by motion-picture studios, media companies and other corporations, which meets to exchange professional views concerning current copyright issues and cases pending before the Supreme Courts of the United States and California. Exhibit C therefore establishes documented institutional positions involving Riot's counsel and Riot's own senior copyright counsel within the same specialist copyright organisation.

The subject matter of Moss's involvement is particularly relevant to the procedural history alleged here. On October 14, 2020, while identified by LACS as its immediate past president, Moss moderated a programme entitled “Substantial Confusion: The Ninth Circuit's Approach to Early Dismissal of Literary Works Cases.” The programme expressly addressed when literary copyright actions could be “dismissed prior to discovery,” the role of expert witnesses, and the process district judges could use in deciding those cases. Moss

had also written in July 2020 about the Ninth Circuit's treatment of pleading-stage dismissal of literary copyright claims, including decisions holding certain cases should not have been dismissed before expert examination of the alleged similarities. He specifically discussed discovery and expert testimony in determining substantial similarity and the Ninth Circuit's treatment of literary-work claims at the pleading stage. These records are relevant because Moss subsequently represented Riot against Appellant in a literary copyright action which was ultimately terminated before Appellant obtained the discovery he maintains was necessary to establish the disputed route of access.

The significance is heightened by the chronology of anonymous communications preserved by Appellant. Before the later IronArrow communications, an unidentified person contacted Appellant through his website and stated: "You want to know where is the actual thread that connects it all? … It's Joshua Geller." The sender then directed Appellant to seven specifically identified cases involving Geller and concluded, "The pattern is easy to spot if you know what you are looking for." In the subsequent IronArrow communication, the anonymous source asked whether Appellant had examined the cases previously supplied, described them as significant Geller cases, asserted Geller had prevailed in them, and thereafter advanced allegations concerning professional influence and the litigation process. Appellant does not offer those anonymous assertions as proof that any identified case was improperly determined. Their relevance is chronological and evidentiary: an anonymous source first directed Appellant toward a specific body of Geller litigation, later returned to the results of those cases, and then introduced allegations concerning Geller's professional relationships and institutional connections.

Exhibit C independently verifies several surrounding facts which are capable of verification without accepting the anonymous allegations. Moss was President of LACS in 2019–2020; he moderated a programme specifically examining Ninth Circuit early dismissal of literary copyright cases before discovery; Geller presently holds the office of Treasurer; and Riot Games attorney Dan Nabel served as LACS President in 2024–2025 and is identified as Immediate Past President in the 2025–2026 officer records. Appellant therefore does not ask the Court to infer corruption from professional association or institutional membership. He submits these records because they provide independently verifiable context for the broader integrity allegations and demonstrate why the alleged use of specialist procedural knowledge, professional positions, and information asymmetry to prevent factual scrutiny warrants examination through an appropriate evidentiary process.

**Institutional Reputation, Authors' Rights and Plausible Deniability**

Plaintiff further alleges that institutional reputation formed part of the architecture of plausible deniability surrounding the alleged conduct. Senior figures associated with Curtis Brown Group have publicly positioned themselves, and have been institutionally positioned, as defenders of authors, copyright and intellectual-property rights. The Association of Authors' Agents ("AAA") describes itself as representing the interests of literary agents and their authors. Its published materials state that authors' rights are "at the forefront of all members' practices," promote transparency between authors and agents, and state that

member agencies strive to uphold "the integrity of the industry." The AAA also identifies protection of intellectual property and lobbying on copyright as part of its institutional work.

Curtis Brown occupies positions within those structures. The AAA identifies Alice Lutyens of Curtis Brown Group as a committee member and Becky Brown of Curtis Brown Group as a chair of its Copyright and AI Committee, specifically responsible for "Copyright & IP." Those positions place Curtis Brown personnel within an organisation expressly concerned with authors' rights, professional integrity and protection of intellectual property.

The same reputational positioning appears in public statements by Curtis Brown CEO Jonny Geller. In March 2025, Geller publicly condemned the unauthorised use of authors' work by artificial-intelligence companies, describing companies which "stole our authors' work" and asking how the industry could respond to authors' material being taken "without our permission." Geller advocated principles under which creative rights remain with the creator and stated that no organisation has the right to take creative talent or copyright without permission.

Plaintiff alleges that these public and institutional positions are relevant because they create a substantial reputational shield when allegations of contrary conduct arise. A person or organisation publicly associated with defending authors against unauthorised exploitation may receive an assumption of credibility precisely because the alleged conduct appears inconsistent with the professional identity presented to the public. The resulting danger is an appeal to reputation or prestige bias: an allegation may be treated as inherently less credible because it concerns respected and institutionally prominent industry figures, while their denials may receive greater weight because of professional standing.

Plaintiff does not allege that advocacy for authors' rights itself establishes wrongdoing, yet when coupled with the abusive litigation behaviours alleged herein, these stances need to be examined and scrutinized as possible shields of blame and accountability. The evidentiary proposition runs in the opposite direction. Public advocacy for copyright, professional awards, institutional office, industry reputation and statements condemning unauthorised exploitation cannot establish that contrary conduct did not occur. Where allegations concern the movement, access, use or concealment of an author's intellectual property, the relevant questions remain factual: what material was received, who received it, where it travelled, who could access it, what communications occurred, what records were retained or withheld, and what subsequently happened to the intellectual property.

Plaintiff alleges that this reputational component operated alongside the broader architecture of plausible deniability pleaded in this action. Responsibility could remain fragmented between agents, agencies, rights departments, production entities and other intermediaries, while institutional reputation reinforced the apparent improbability of wrongdoing. Each participant could point elsewhere, while prominent gatekeepers could rely, expressly or implicitly, upon professional identities built around protecting authors and intellectual property. Plaintiff therefore alleges that institutional prestige cannot substitute for discovery and examination of the underlying documentary record.

## XII. JUNE 2026: THE IRONARROW COMMUNICATION PROVIDED SPECIFIC INVESTIGATIVE LEADS

On or about June 10, 2026, while the appeal remained active, an individual identifying themselves as "IronArrow" contacted Appellant through a temporary online chat service and claimed to operate within the professional orbit of Joshua Geller. The source specifically raised Geller's involvement within the Los Angeles Copyright Society and alleged that professional relationships available to Geller extended into Appellant's pending Ninth Circuit proceedings.

The source identified Molly Dwyer by name, stated that she worked within the Ninth Circuit and was involved with Appellant's case, and warned Appellant that, if information allegedly communicated by Geller was correct, Appellant would lose the appeal. When Appellant demanded a specific fact capable of independent verification, the source alleged that Joshua Geller had received a telephone call from Dwyer concerning the proceedings.

The source further alleged that the Ninth Circuit would uphold the lower court's ruling and described the relationships as providing "friend" privileges unavailable to Appellant. Appellant challenged the source to explain how the information could be known. The source said they worked within the same professional "orbit" and initially produced no documentary evidence.

When pressed for something objectively verifiable, the source identified a purported communication at approximately 11:00 a.m. on Monday, June 8, 2026, stated that verification would require examination of telephone records associated with Geller's firm, identified "Knupp," referred to its Century Park office, and stated that records for the relevant date would establish whether the alleged communication occurred.

The source separately alleged that a significant "favour" had been provided to Riot around 2020, associated the allegation with Geller's developing position within the Los Angeles copyright community, and acknowledged uncertainty as to whether the alleged event related to Appellant's case. The source later characterised Geller as operating within the "highest circles of LA copyright law."

Appellant preserved the communication and recorded the source as anonymous and uncorroborated. The significance for this Motion is the existence of a preserved allegation containing names, an approximate date and time, an identified firm and office, and a specific category of records through which the central telephone allegation could potentially be verified or disproved.

## XIII. THE CUMULATIVE FACTUAL CHRONOLOGY REQUIRES EXAMINATION

The chronology begins with Riot's 2021 reliance upon a production history Appellant could not inspect. It continues through years of independent investigation which Appellant

alleges undermined that history; early litigation in which his position concerning a magistrate judge was repeatedly attributed to him despite correction; Cooper's personal observations during the early meet-and-confer; Appellant's express concern about further litigation pressure; the Los Angeles, Coventry, and prospective-jury remarks; the introduction of disputed Wayback evidence during settlement; the alleged 250-word or character representation; the financial-destruction warning; and the unresolved disputes over Riot's investigation, searches, document collection, preservation, and spoliation.

The chronology then includes repeated written and oral notice of death threats, bomb threats, and threats concerning Appellant's young daughter, followed by a recorded dispute over counsel's knowledge and the characterisation of Appellant's material as "gibberish." The case ended before merits discovery into the evidence Riot controlled. Appellant later identified the institutional positions described above and, during the active appeal, received the preserved IronArrow communication containing specific investigative leads.

These events are capable of documentary and testimonial examination. The 2021 correspondence can establish Riot's production representations. Production records and version histories can test the development chronology. Meet-and-confer communications, joint-report materials, recordings, and Cooper's evidence can establish what occurred during the magistrate dispute. Archived webpages can test the submission-route representation. Emails and attachments can establish notice of threats. Recordings can establish Geller's later statements. Riot's internal records can establish what was searched, collected, preserved, investigated, received, retained, or accessed. Identifiable telephone records may be capable of testing the specific IronArrow allegation.

## XIV. LEGAL BASIS FOR FACTUAL EXAMINATION AND CORRECTIVE RELIEF

Ninth Circuit authority recognises that copyright access may be established circumstantially through a reasonable possibility of an opportunity to view or copy and through a chain of events or intermediary relationship where the facts support the inference. Loomis v. Cornish, 836 F.3d 991, 995-96 (9th Cir. 2016); Kamar International, Inc. v. Russ Berrie & Co., 657 F.2d 1059, 1062 (9th Cir. 1981). Stevens v. CoreLogic, Inc., 899 F.3d 666, 678 (9th Cir. 2018), recognises the practical point central to Appellant's position: discovery exists to obtain information a party does not already know or cannot otherwise prove.

The Ninth Circuit also recognises judicial authority to address litigation misconduct which impairs reliable adjudication. Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348-55 (9th Cir. 1995), addresses deliberate deceptive practices affecting the integrity of judicial proceedings. Leon v. IDX Systems Corp., 464 F.3d 951, 958-61 (9th Cir. 2006), addresses inherent authority, abusive litigation practices, and prejudice to the rightful decision of a case. Glover v. BIC Corp., 6 F.3d 1318, 1329 (9th Cir. 1993), recognises appropriate evidentiary consequences for destruction or spoliation where the factual predicate exists. Akiona v. United States, 938 F.2d 158, 161 (9th Cir. 1991), addresses the foundation required for an adverse inference. For electronically stored information, Federal Rule of Civil

Procedure 37(e) and Jones v. Riot Hospitality Group LLC, 95 F.4th 730, 734-36 (9th Cir. 2024), provide the applicable framework where its requirements are satisfied.

If factual examination establishes that Riot or persons acting on its behalf materially concealed, destroyed, withheld, misrepresented, or rendered unavailable evidence necessary to establish access, the resulting absence should not operate as an evidentiary advantage produced by the same misconduct. The corrective remedy should correspond to the factual findings and may include reopening discovery, compelled production, preservation or forensic measures, an adverse inference, a rebuttable evidentiary presumption, burden-shifting where legally justified, or another proportionate measure capable of restoring the evidentiary position distorted by the established conduct.

## XV. THE RECORD SHOWS A CONTINUOUS COURSE TOWARD DISCOVERY AND JURY TRIAL BEFORE DISMISSAL

The procedural record is significant because Appellant did not wait until appeal to contend that access required factual development. From the outset, Appellant repeatedly maintained that discovery was necessary to establish the disputed production timeline, receipt and access to Bloodborg, internal circulation of the manuscript, and the persons and systems through which access could have occurred. Exhibit F consolidates this chronology.

By December 2024, Appellant was expressly requesting litigation discovery before his claims were determined and referring to the need for a fair trial. On January 10, 2025, Appellant opposed dismissal on the express basis that pretrial discovery was the primary means through which the disputed claims could be clarified. On January 26, he expressly contemplated attendance at eventual “Jury (Final) hearings.”

The District Court's own January 30, 2025 Scheduling Order then confirmed that discovery was to proceed. Judge Olguin stated that pro se litigants were entitled to discovery to the same extent as represented parties, permitted discovery to commence following the filing of an answer or motion to dismiss, and expressly directed that discovery would not be stayed merely because a motion to dismiss or protective order remained pending.

Access was subsequently identified during the Rule 26(f) process as one of the central disputed issues requiring factual development. Riot proposed limiting initial discovery to access and then seeking summary judgment on that issue. Appellant opposed restricting discovery in this manner and sought the broader evidence necessary to establish how Bloodborg could have moved through Riot, Riot Forge, associated entities, personnel, systems, and third parties.

On March 4, 2025, the District Court entered its “SCHEDULING AND CASE MANAGEMENT ORDER RE: JURY TRIAL” and set a jury trial for March 10, 2026. Appellant thereafter served formal discovery on March 14 directed specifically to the evidence necessary to determine access. Those requests sought Riot Forge submission

records, internal emails and communications, personnel with access to submissions, development records, agreements with relevant third parties, server metadata, access logs, project folders, preservation information, depositions, admissions, and third-party evidence.

Appellant continued seeking this material throughout March and April. He notified the District Court of outstanding discovery, sought guidance concerning enforcement, and attempted to compel additional discovery. Riot, meanwhile, moved on April 4 to bifurcate discovery and obtain an initial summary-judgment determination specifically on access. The record therefore demonstrates that access was being treated by both parties as a disputed matter connected directly to discovery, although they sharply disagreed over the permissible scope and sequence of that discovery.

This chronology is material to the present Motion. The later dismissal did not occur against a record in which Appellant had simply failed to identify access and subsequently attempted to repair the omission on appeal. Before dismissal, Appellant had repeatedly identified access, demanded the evidence necessary to develop it, served formal discovery directed to it, and sought judicial assistance when that discovery was not produced. The District Court had itself directed discovery to proceed notwithstanding pending motions and had placed the action on a jury-trial schedule.

Appellant does not rely upon Exhibit F as proof that a separate formal Rule 38 jury-demand document has now been located. Its significance is narrower and documentary: before the action was dismissed, the record repeatedly contemplated discovery followed by trial, the Court expressly scheduled a jury trial, and Appellant was actively pursuing discovery directed to the very issue of access later used against him at the pleading stage.

The resulting procedural problem lies at the heart of this Motion. Evidence necessary to establish the precise route of access was principally within systems, communications, records, metadata, personnel files, development materials, and third-party relationships which Appellant could not lawfully inspect without discovery. Appellant repeatedly sought that discovery. The action nevertheless ended before he obtained the evidentiary process through which those disputed facts were expected to be developed.

Exhibit F therefore provides the chronological record supporting Appellant's request for meaningful factual examination and appropriate corrective relief.

## XVI. RELIEF REQUESTED

Appellant respectfully requests that the Court examine the foregoing chronology as an integrity-of-proceedings issue and determine the lawful procedure for developing the disputed facts. Where factual development is required, Appellant requests an appropriate limited remand, referral, supplemental proceeding, evidentiary hearing, preservation direction, or other mechanism permitting the relevant evidence to be obtained and examined while protecting the integrity of the appeal.

Appellant further requests restoration of meaningful merits discovery concerning access, including submission systems, communications, access records, development chronology, version histories, internal investigations, preservation activity, searches, custodians, document collections, and records material to the alleged access pathways and alleged litigation misconduct.

Where evidence relevant to access, development, preservation, or the integrity of the proceedings remains within the exclusive possession or control of Riot Games, its counsel, or relevant third parties, Appellant requests appropriate compulsory process and, where warranted, forensic or independent examination sufficient to establish what evidence existed, what was preserved, what was altered or destroyed, who possessed or accessed it, and whether representations made concerning such evidence were accurate.

If factual examination establishes that evidence material to access was intentionally destroyed, concealed, withheld, materially misrepresented, manipulated, or otherwise rendered unavailable through misconduct, Appellant requests an appropriate adverse inference, evidentiary presumption, burden-shifting remedy, or other proportionate evidentiary measure sufficient to prevent the responsible party from obtaining an advantage from the evidentiary deficit its own conduct created.

If factual examination establishes fraud, deliberate deception, spoliation, obstruction, professional misconduct, improper interference with the proceedings, or other wrongdoing affecting the integrity of the litigation, Appellant further requests that the Court exercise any disciplinary, supervisory, inherent, or referral authority lawfully available to it, including referral of established misconduct to the appropriate disciplinary, regulatory, investigative, or law-enforcement authority where the Court determines such referral is warranted.

Appellant further requests that any factual findings concerning misconduct be considered when determining the appropriate disposition of the appeal and whether the judgment obtained before merits discovery can fairly remain operative. Appellant respectfully requests vacatur, remand, reopening of appropriate discovery, or such other corrective relief as is necessary to prevent any party from retaining a litigation advantage obtained through misconduct affecting the evidence or integrity of the proceedings.

Finally, Appellant requests such further relief as the Court considers just and necessary to restore meaningful factual scrutiny, preserve relevant evidence, protect the integrity of these proceedings, and ensure that allegations of wrongdoing are determined through independent examination rather than by the parties whose conduct is itself subject to scrutiny.

## XVII. CONCLUSION: THE CIRCULAR ACCESS BARRIER CANNOT BE PERMITTED TO DETERMINE THIS CASE

This case ultimately presents a fundamental problem of fairness and judicial process. Appellant alleges throughout these proceedings that Riot and its counsel stonewalled discovery, repeatedly reframed the dispute around access, presented materially false or misleading factual positions, and then relied upon the resulting absence of evidence to defeat claims which discovery was intended to test. Appellant further alleges that materially inaccurate evidence concerning the Riot Forge submission mechanism was presented during the settlement process, while evidence capable of establishing the actual internal movement of his manuscript remained principally within Riot's possession, custody, or control, or within records held by associated third parties.

The problem is circular. Appellant was required to establish a plausible route of access, yet the evidence capable of establishing the precise internal route was contained within systems, communications, metadata, submission records, development materials, personnel records, and third-party relationships which he had no lawful ability to inspect himself. He repeatedly sought discovery into those matters. To require Appellant to identify the precise internal movement of Bloodborg without permitting meaningful discovery into the records capable of revealing that movement, and then to treat his inability to identify every internal step as a failure to plausibly allege access, converts informational control into an evidentiary advantage.

The record demonstrates why this matters. The factual chronology began years before dismissal. In 2021, Riot relied upon a production chronology to reject Appellant's allegations at a time when Appellant possessed no internal Riot evidence through which he could test those representations. Appellant thereafter spent years developing external evidence which he alleges materially disputed that chronology. By the time the dispute reached federal litigation, however, the decisive internal evidence remained principally beyond his reach.

Appellant did not remain passive once litigation commenced. He repeatedly identified discovery as necessary to resolve access and the disputed development chronology. The District Court expressly stated that pro se litigants were entitled to discovery to the same extent as represented litigants, permitted discovery to commence following the filing of an answer or motion to dismiss, and directed that discovery would not be stayed merely because a motion to dismiss or protective order remained pending. The parties subsequently identified access as a disputed issue during the Rule 26(f) process. Riot itself proposed initial discovery limited to access followed by summary judgment on that issue. Appellant opposed that restriction and sought broader discovery into the factual circumstances capable of establishing access.

The District Court then entered its March 4, 2025 “SCHEDULING AND CASE MANAGEMENT ORDER RE: JURY TRIAL” and set the action for jury trial. Appellant thereafter served formal discovery directed specifically toward access, including requests concerning Riot Forge submissions, internal communications, development records,

relevant personnel, third-party relationships, server information, metadata, preservation, document collection, depositions, admissions, and other evidence capable of testing Riot's factual representations. Appellant continued seeking discovery and judicial assistance when the requested evidence was not produced. Exhibit F consolidates this chronology.

The litigation also produced additional factual disputes concerning the magistrate issue, the treatment of Appellant during early meet-and-confer communications, Hayley-Jo Cooper's independent observations, the settlement process, historical Wayback evidence, the alleged limitation upon the Riot Forge submission mechanism, financial pressure, the Arcane development chronology, preservation, internal investigation, searches, document collection, alleged spoliation, and counsel's knowledge of serious threats reported by Appellant. These matters are addressed throughout this Motion and its supporting exhibits. The action terminated before merits discovery into the internal records capable of resolving those disputes.

The concern is heightened by the institutional circumstances documented in this Motion. Appellant has produced evidence concerning the participation of Riot's counsel and Riot personnel in professional organizations engaged directly with copyright law and with professional discussion of doctrines governing literary copyright disputes, substantial similarity, pleading-stage dismissal, discovery, and related issues. Those institutional positions do not themselves establish misconduct. Their significance arises from the allegation that specialist procedural knowledge, informational asymmetry, control of relevant evidence, and procedural mechanisms were used together to prevent factual examination of access while the absence of the resulting evidence was simultaneously used against Appellant.

If factual examination substantiates those allegations, the resulting problem extends beyond an ordinary discovery dispute. A legal standard cannot operate fairly where the party alleged to possess the evidence necessary to satisfy it is permitted to withhold, conceal, destroy, materially misrepresent, or otherwise render inaccessible that evidence, prevent meaningful examination of the issue, and then obtain an evidentiary advantage because its opponent cannot produce what remained behind the opposing party's own informational barrier.

Nor can a party fairly create or materially enlarge an evidentiary deficit through misconduct and then invoke the resulting deficit as proof that the underlying event never occurred. If factual examination establishes that evidence relevant to access was concealed, destroyed, withheld, materially misrepresented, or rendered inaccessible through misconduct, Riot should not receive the benefit of the resulting absence. The Court should employ whatever corrective mechanism is lawful and proportionate to restore the evidentiary position distorted by the established conduct, including reopening discovery and, where legally warranted by the findings made, an adverse inference, evidentiary presumption, burden-shifting, compulsory process, independent examination, or other appropriate relief.

This is also why the alleged misconduct cannot be separated artificially from the access determination itself. If the evidentiary record upon which access was judged was materially shaped by obstruction, misrepresentation, withholding, destruction, or procedural

manipulation, the integrity of the access determination necessarily depends upon resolving those allegations. The absence of evidence cannot rationally be treated as dispositive until the Court determines whether the absence resulted from the underlying facts or from the alleged conduct which prevented those facts from being discovered.

Appellant therefore respectfully submits that meaningful factual examination is required. He requests restoration of a lawful and effective route to discovery into the evidence necessary to determine access and the related allegations presented in this Motion. If examination establishes misconduct which caused or materially enlarged the evidentiary deficit used against him, Appellant requests an appropriate corrective remedy and any findings, referrals, or other relief within the Court's authority which the established facts warrant.

If existing access doctrine permits a plaintiff to be denied meaningful access to evidence principally controlled by the alleged infringer, while simultaneously requiring the plaintiff to identify the internal route revealed only by that evidence, the resulting circularity also presents a broader question requiring authoritative appellate clarification. A doctrine governing access should provide a workable means of adjudicating cases in which proof of internal receipt, circulation, communication, or use necessarily resides within the opposing party's private systems. Otherwise, exclusive informational control can become the mechanism through which factual scrutiny is defeated.

Appellant does not ask this Court to presume wrongdoing. He asks for a process capable of determining whether wrongdoing occurred. What cannot constitute a fair resolution is to prevent examination of the evidence, rely upon the resulting evidentiary void, and then treat that void as proof that there was nothing to examine.

**DECLARATION**

I, Marc Wolstenholme, declare under penalty of perjury that the factual statements made by me in support of this Motion are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

Marc Wolstenholme

Plaintiff-Appellant, Pro Se

Dated: 02 of October 2026

**AUTHORITIES CITED**

Federal Rule of Appellate Procedure 27.

Federal Rule of Civil Procedure 37(e).

Stevens v. CoreLogic, Inc., 899 F.3d 666, 678 (9th Cir. 2018).

Loomis v. Cornish, 836 F.3d 991, 995-96 (9th Cir. 2016).

Kamar International, Inc. v. Russ Berrie & Co., 657 F.2d 1059, 1062 (9th Cir. 1981).

Glover v. BIC Corp., 6 F.3d 1318, 1329 (9th Cir. 1993).

Akiona v. United States, 938 F.2d 158, 161 (9th Cir. 1991).

Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348-55 (9th Cir. 1995).

Leon v. IDX Systems Corp., 464 F.3d 951, 958-61 (9th Cir. 2006).

Jones v. Riot Hospitality Group LLC, 95 F.4th 730, 734-36 (9th Cir. 2024).